**PAN AM CORPORATION,**
**et al., Plaintiffs,**

v.

**DELTA AIR LINES, INC., Defendant**
**and Counterclaim Plaintiff,**

v.

**PAN AM CORPORATION, et al. and The**
**Official Committee of Unsecured Creditors of Pan Am Corporation and Affiliated Debtors, Counterclaim Defendants.**

No. 93 Civ. 7125 (RPP).

United States District Court,
S.D. New York.

Dec. 23, 1994.

Cleary, Gottlieb, Steen & Hamilton by David E. Brodsky, Debra M. Buell, George Weisz, Jeffrey A. Rosenthal, James Bromley, Denise C. Morgan, Lee Dunst, New York City, for Pan Am Corp., et al.

Paul, Weiss, Rifkind, Wharton & Garrison by Stephen J. Shimshak, Elliot J. Schuchardt, New York City, for Pension Benefit Guaranty Corp.

Marcus Montgomery Wolfson P.C. by Neil T. Forrest, Arthur H. Ruegger, Richard Levy, A. Collin Biddle, New York City, for Official Committee of Unsecured Creditors.

Davis Polk & Wardwell by Dennis Glazer, John J. Clark, Jr., James Windels, M. Katherine Baird, Kirsten E. Rutnick, Julia Brickell, Walter A. Brill and Stroock & Stroock & Lavan by David Bolton, New York City, for Delta Air Lines, Inc.

## OPINION AND ORDER: FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT P. PATTERSON, Jr., District Judge.

This case was tried before the Court from May 4, 1994 to June 10, 1994. The findings

of fact and conclusions of law of this Court are as follows.

## I. CHRONOLOGY OF THE PAN AM–DELTA TRANSACTION

Pan Am Corporation and its subsidiaries (hereinafter "Pan Am") filed for bankruptcy protection on January 8, 1991. (Undisputed Facts ¶ 2). At the time of the bankruptcy filing, Pan Am Corporation had four main operating divisions: the Atlantic Division, the Latin American Division (the "LAD"), the Domestic Division and the Pan Am Shuttle. Tr. at 24 (Plaskett).[1]

### A. Exploration of a Potential Transaction

In March 1991, Delta Air Lines, Inc. ("Delta") expressed interest in examining an acquisition of Pan Am assets or another strategic transaction with Pan Am. Tr. at 25–26 (Plaskett). Pan Am Corporation's then Chief Executive Officer, Thomas Plaskett, informed Delta's Chief Executive Officer, Ronald Allen, that Pan Am Corporation was not interested in selling off individual assets piecemeal, but rather sought a "total solution" to its problems as part of its efforts to satisfy fiduciary responsibilities to its creditors. Tr. at 26 (Plaskett).

After a meeting on April 17, 1991 Delta commenced an information-gathering effort. Tr. at 29–32 (Plaskett). On June 28, 1991, Delta informed Plaskett that it was interested in acquiring two of Pan Am Corporation's operating divisions, the North Atlantic route authorities (the "Atlantic Assets") and the Pan Am Shuttle (the "Shuttle Assets"). Tr. at 37–38 (Plaskett). On July 11, 1991, Delta reached an agreement in principle with Pan Am Corporation and certain affiliates (collectively, "Pan Am") for the purchase by Delta of assets which related to Pan Am's Shuttle and Atlantic operations. Joint Ex. 1.

On July 25, counsel for the Official Committee of Unsecured Creditors (the "Committee") sent a letter to Delta, Trans World Airlines, Inc. ("TWA") and United Air Lines, Inc. ("United"), stating that "a sale of assets that is not combined with a plan of reorganization would be entirely unsatisfactory." Pl. Ex. 206 at MT72174.

On the morning of July 27, 1991, Delta and Pan Am signed an Asset Purchase Agreement and, pending the closing of that agreement, a Credit Agreement providing Pan Am with $60 million of debtor in possession financing (as amended, "the Senior DIP"). Tr. at 47 (Plaskett); Joint Ex. 2; Pl.Ex. 4086. Both agreements were subject to Bankruptcy Court approval. At the suggestion of Pan Am's CEO acting on the insistence of the Committee, Delta provided Pan Am with a letter expressing Delta's interest, once the Bankruptcy Court approved the asset sale, in exploring the development of a plan of reorganization of Pan Am into a smaller Miami-based airline serving Latin and South America. Tr. at 48–50 (Plaskett); Joint Ex. 3.[2]

On July 30, the Committee issued a press release clarifying the Committee's opposition to the proposed asset purchase by Delta and expressing its intention to solicit bids from TWA, Delta and United Airlines for Pan Am's assets that would include proposals for a plan of reorganization. Tr. at 53 (Plaskett); Pl.Ex. 210. On August 7, counsel for the Committee issued a letter inviting bids to fund a plan of reorganization. Pl.Ex. 215.

.From July 29 through August 9, Pan Am and Delta executives reviewed a business plan for a Miami-based airline prepared by Pan Am and an outside consultant. Tr. at

---

1. Citations in the form "Tr. __" are to the transcript of the trial. Citations in the form "Rule 43 Tr. __" are to those portions of the transcript of the hearing conducted by this Court pursuant to Federal Rule of Civil Procedure 43 which have been stipulated by the parties to be part of the trial record.

2. Delta had earlier decided not to pursue an acquisition of substantially all of Pan Am's assets for several reasons, including concerns that by doing so Delta might subject itself to successor-

ship liability for Pan Am's pension obligations and other liabilities. Tr. at 2950 (Harkey). Thereafter, Delta's Chairman and Chief Executive Officer Ronald Allen and Delta's Senior Vice President and General Counsel Robert Harkey discussed the idea of minority equity investment, and Mr. Harkey expressed his view that such an arrangement might address Delta's concerns about possible successorship liability. Tr. at 2952 (Harkey); see Tr. at 38–39 (Plaskett).

893–94, 899–900, 908 (Punwani); Pl.Ex. 3025. Delta confirmed to Pan Am that the results of Delta's own assessment of the business plan were very close to the results of Pan Am's study. Tr. at 905 (Punwani).

During the weekend of August 9–11, the Creditors Committee solicited offers from Delta and other parties, including Trans World Airways, as alternatives to the proposed Asset Purchase Agreement. United Airlines, Delta and TWA presented Pan Am and the Creditors Committee with alternative proposals for transactions with Pan Am. Tr. at 152–57 (Lockhart).

Pan Am and the Creditors Committee discussed the obstacles that would face any transaction between Pan Am and TWA. Mr. Plaskett expressed concerns about TWA's weak financial condition, possible labor integration problems and doubts about TWA's management. Tr. at 119, 121 (Plaskett); Def.Ex. GG. In addition, TWA was a major competitor of Pan Am in the U.S.–European market, and a transaction between TWA and Pan Am would have raised antitrust and other regulatory concerns with the Department of Transportation and the Department of Justice. For these reasons, among others, Pan Am's executives, including Mr. Plaskett, believed that TWA's proposal was not credible and that consummation of such a transaction was unlikely. Tr. at 119, 121 (Plaskett); Def.Ex. GG. The Creditors Committee had similar doubts about the financial means of TWA to complete their proposal. Tr. at 209 (Lockhart).

B. *The August 11, 1991 Letter Agreement*

On the evening of August 11, 1991, Mr. Allen, Delta's Chief Financial Officer Thomas Roeck and other Delta representatives presented to the Creditors Committee a Delta proposal for transactions with Pan Am, which was set forth in (1) a proposal letter to Pan Am, attention Mr. Plaskett, and to the Creditors Committee, attention counsel Leon C. Marcus (the "August 11 Letter"), Joint Ex. 5; (2) a Revised term sheet for the Asset Purchase Agreement, Joint Ex. 4; and (3) a proposed "operating plan" describing elements of a proposed marketing relationship between Delta and a proposed reorganized Pan Am (the "August 9 Operating Plan"), Joint Ex. 11.

The August 11 Letter proposed that Delta enhance the terms of the Asset Purchase Agreement and sponsor a plan of reorganization of Pan Am. It provided for two steps. First, the Asset Purchase Agreement was to be amended: (1) to include purchase of certain additional spare parts and increase the cash paid by Delta for Pan Am's Shuttle and Atlantic assets from $310 million to $416 million; (2) to provide that Delta would assume up to $100 million of Pan Am ticket liabilities in certain circumstances; (3) to eliminate the indemnifications by Pan Am that had been contained in the Asset Purchase Agreement; and (4) to increase the number of Pan Am employees to 6600 that Delta would hire in connection with the Asset Purchase Agreement. Delta also proposed an amendment to the Credit Agreement to increase from $60 million to $80 million the Senior DIP financing that Delta would provide until the asset purchase closing on Nov. 1, 1991, when it would be repaid. Joint Ex. 5.

In the second transaction outlined in the August 11 Letter, Delta proposed, "conditioned on a Plan or Reorganization satisfactory to Delta being confirmed by the Bankruptcy Court," to make an investment of $305 million in a reorganized Pan Am ("Pan Am II"), which primarily would serve Latin America and the Caribbean from Pan Am's Miami hub. Joint Ex. at 5. The investment would be comprised of $50 million in cash for 45% of Common Equity, $155 million for 10% Senior Notes and $100 million in a Working Capital Facility; and Delta would assume responsibility for all existing contingent and non-contingent U.S. Air Force claims against Pan Am arising under the Civil Reserve Air Fleet ("CRAF") program. *Id.* at 4–5. Pan Am II was to assume approximately $39 million of Pan Am's current liabilities, certain liens on assets retained by Pan Am II, and $50 million in ticket liabilities on the routes to be operated by it (all other liabilities of Pan Am were to be discharged in bankruptcy). *Id.* at 5. Pan Am II would employ 6900 of Pan Am's existing employees and its corporate governance was described. *Id.*

In addition, Delta also proposed to fund up to $100 million of any Pan Am operating losses in excess of the first $140 million of such losses (the "Stop Loss Proposal") incurred by Pan Am between the date of Bankruptcy Court approval of the Asset Purchase Agreement and December 1, 1991, the target date for the reorganization. *Id.* at 2. Any operating losses in excess of Delta's commitment were to be borne by Pan Am. *Id.* Delta also proposed to implement code sharing, frequent flyer and marketing arrangements to reduce or minimize Pan Am's operating losses as soon as possible after Bankruptcy Court approval of the enhanced Asset Purchase Agreement, as amended. *Id.*

The August 11 Letter provided that any Delta commitment to invest in Pan Am II was subject to (1) completion of the asset sale contemplated by the enhanced Asset Purchase Agreement; (2) completion of definitive documentation and completion of legal, financial and environmental due diligence by September 15, 1991 with the results of such due diligence being satisfactory to Delta; and (3) confirmation of a Pan Am plan of reorganization that was satisfactory to Delta prior to December 1, 1991. Joint Ex. 5 at 6.

After a series of meetings conducted by the Creditors Committee on August 11, the Creditors Committee and Pan Am chose Delta's proposal and signed the August 11, 1991 letter signifying acceptance thereof. Tr. at 173 (Lockhart); Tr. at 365 (Gagnon); Joint Ex. 5.

### C. *Approval of the Asset Purchase Agreement and Senior DIP Financing*

The next day, on August 12, 1991, Delta and Pan Am completed and entered into definitive agreements relating only to Part A of the August 11 Letter—the sale of the Shuttle and Atlantic assets to Delta and the provision of up to $80 million in DIP financing to Pan Am. Joint Ex. 7; Def.Ex. AL.

Later that day, the Bankruptcy Court held a hearing to consider the Asset Purchase Agreement, as amended, and the Credit Agreement, as amended (Senior DIP Financing). At the hearing the Bankruptcy Court was apprised of the terms of the August 11 agreement. Thereafter all objections to the Asset sale were withdrawn or overruled and the Bankruptcy Court signed orders authorizing Pan Am to enter into the transactions contemplated by the Asset Purchase Agreement and the Senior DIP financing. Joint Ex. 6; Def.Ex. AT. (Proposed agreements of a debtor in possession not in the ordinary course of business require court authorization after notice and a hearing by the Bankruptcy Court. 11 U.S.C. § 363.)

In connection with the proposed DIP financing, Joan Fabio, Pan Am's Assistant Treasurer, testified on August 12 that Pan Am had attempted and had been unable to obtain funding from any source other than Delta. Pl.Ex. 10 at 114–23. In addition, Mr. Roeck testified that Delta would not lend to Pan Am on anything other than the fully secured and super-priority basis contemplated by the Senior DIP Financing. Pl.Ex. 10 at 127–33.

In reaching its determination, the Bankruptcy Court made a finding of fact that completion of the transaction contemplated by the Asset Purchase Agreement was a condition to Delta's commitment to fund a plan of reorganization, "subject to certain conditions," (Joint Ex. 6 at 10–11). Amendment No. 1 to the Asset Purchase Agreement, executed on August 12, acknowledged that Delta had agreed with the Letter Agreement of August 11, 1991. Joint Ex. 7 at DT3373. On or about September 1, 1991, Pan Am transferred its Shuttle assets to Delta as contemplated under the amended Asset Purchase Agreement and, consistent with that agreement, Delta paid Pan Am $113 million at that time. Undisputed Facts ¶ 9. On September 24, 1991 Pan Am and the Creditors Committee filed a Disclosure Statement with respect to the Joint Consolidated Plan of Reorganization which included a proposed business plan for Pan Am II. Pl.Ex. 3145.

### D. *The October 22, 1991 Letter Agreement*

By October, Pan Am's operating losses caused a need for substantial additional operating funds and led to negotiations among the parties for additional DIP financing by

Delta to Pan Am. Tr. at 176–77 (Lockhart). On October 3, 1991, Mr. Marcus sent a letter to Delta bankruptcy counsel Lawrence Handelsman demanding that Delta immediately provide additional financing to Pan Am and threatening to force a liquidation of Pan Am if Delta did not provide such additional financing. Def.Ex. AU. In the letter, Mr. Marcus also threatened Delta with litigation if Pan Am was liquidated. *Id.*

On October 8, 1991, Mr. Marcus told Delta that the Creditors Committee had prepared two responses to a motion brought on October 3, 1991 by the U.S. Air Force, to whom Pan Am had granted secured interests in the air transportation receivables of 12 Boeing 747 aircraft, to deny Pan Am continued use of cash collateral from those receivables on the grounds that the Air Force non-contingent liabilities exceeded the Debtor's most recent statement of receivables. Joint Ex. 12 at D378180–81 and D378192–93. If granted, the foreclosure motion would have resulted in Pan Am's immediate shutdown. Mr. Marcus told Delta that if Delta would not provide additional financing, the Creditors Committee would file a response supporting the foreclosure motion, and if Delta agreed to provide financing, the Creditors Committee would file a response in opposition to the foreclosure motion. Tr. at 2957–58 (Harkey); *see* Def.Ex. IC at 2 ("two responses prepared—one light, one heavy"). On October 11, 1991 Delta agreed to provide Pan Am with $20 million in additional DIP financing to be repaid at the closing on November 1, 1991 of the Asset Purchase Agreement. *See* Def.Ex. AM; Joint Ex. 9.[3]

The Creditors Committee next raised questions about Delta's Stop Loss Proposal in the August 11 Letter concerning the nature of the expenditures that would be considered operating expenses and the time at which Delta was required to supply funding under that proposal. Tr. at 483–84 (Gagnon).

Delta's position was that its obligation under the Stop Loss Proposal to provide up to $100 million of any operating losses of Pan Am in excess of $140 million since the date of the approval of the asset Purchase Agreement (August 11, 1991) could not be determined until December 1, 1991, the end of the period in which operating losses were to be measured. Tr. at 2970, 3155 (Harkey). The Creditors Committee position was that Delta was obligated to provide funds under the Stop Loss Proposal immediately. Tr. at 2970, 3155 (Harkey).[4]

On October 17, 1991, Creditors Committee counsel Leon Marcus outlined a compromise on the dispute over the Stop Loss Proposal which Delta accepted. Under Mr. Marcus's proposal, Delta would provide up to $140 million in new DIP financing prior to the reorganization. In the event that no plan of reorganization was confirmed, Delta would be repaid the entire amount "as DIP financing." Tr. at 2971–72 (Harkey). If a plan was confirmed and became effective, however, the first $50 million of DIP financing would be forgiven, the next $50 million would be refinanced through the issuance of additional senior notes to Delta, and the balance, if any, of the DIP financing would be repaid to Delta. Tr. at 2971–72 (Harkey). As part of the stop loss compromise, the maximum principal amount of the senior note financing by Delta was increased from $155 million to $205 million. *Compare* Joint Ex. 5 at D070536–37 *with* Joint Ex. 9 at DP016893. At Delta's request it was agreed that the interest rate for the senior notes be increased from 10% to 15%. Pl.Ex. 3008 at PW156772.[5]

Mr. Marcus's proposal was the subject of negotiations in which Pan Am and the Credi-

---

3. It also developed that after payments required to certain preferred creditors, there would be virtually no net cash proceeds from the $313 million received from Delta on November 1, 1991 to fund Pan Am's operations until the reorganization date. Joint Ex. 12 at 378188.

4. No evidence was presented at trial that by mid-October 1991 Pan Am had in fact incurred $140 million in operating losses since August 12, 1991.

5. After reviewing the interest rates then being paid by other airlines, Pan Am's Chief Executive Officer Russell Ray concluded that the proposed 15% interest rate was "reasonable and fair." Tr. at 2007–8 (Ray); *see also* Tr. at 3793 (Roeck).

tors Committee participated that led up to an October 22 Letter Agreement. Between October 17 and October 21, Pan Am's outside counsel Robert Davis reviewed and commented upon drafts of the proposal and had lengthy telephone conversations about the proposal with Delta's outside counsel Joseph Rinaldi and with representatives of the Creditors Committee. Tr. at 320–24 (Davis); Tr. at 3566–67 (Rinaldi); Def.Ex. DDL at 219–21; Pl.Ex. 405 (Davis comments on draft).

On October 19, 1991, financial representatives of Pan Am, Delta and the Creditors Committee met and discussed the impact on the proposed business plan for Pan Am II of the proposed repayment terms of the Working Capital Facility Agreement that provided for a $100 million line of credit and the new $205 million five year Senior Note Purchase Agreement contained in the term sheets attached to the new DIP financing proposal. Tr. at 3184–87 (Sanregret).

At the meeting on October 19, Mr. Punwani informed the group that the terms proposed to be included in the Working Capital Facility Agreement and the Senior Note Purchase Agreement would result in less than $30 million liquidity at the end of each year in the proposed five year business plan. On three occasions during the meeting, Mr. Sanregret was asked by Pan Am whether Delta would agree to modify the proposed repayment terms under those proposed agreements. Mr. Sanregret left the meeting on each of those three occasions and obtained the consent of Mr. Roeck to reduce the repayment terms as proposed by Mr. Punwani in order to increase the liquidity of Pan Am II. Tr. at 3184–87 (Sanregret); Tr. at 926–28 (Punwani); Tr. at 765–69 (Andresen); Tr. at 3670 (Roeck).

As the result of the discussions at that meeting, Delta agreed to extend the period for repayments under the proposed Working Capital Facility from 24 months to 27 months and to defer the beginning of repayment until the third quarter of 1992; to change the repayment terms of the senior notes from two years interest only and three years principal and interest to three years interest only and two years principal and interest; and finally to extend the amortization of the proposed senior notes from five to five-and-one-half years. Tr. at 3184–89 (Sanregret); Tr. at 765–69 (Andresen); Tr. at 503 (Gagnon).

With those changes to the repayment terms, Pan Am determined that Pan Am II's closing cash balance at the end of each year of the business plan would be at least $30 million. Tr. at 926–28 (Punwani); Tr. at 3184–87 (Sanregret). The approximately $30 million liquidity ultimately included in the First Amended Disclosure Statement with respect to the Revised Joint Consolidated Plan of Reorganization (the "Disclosure Statement"), dated October 24, 1991, next to the line for "CASH AND CASH EQUIVALENTS AT END OF PERIOD," Joint Ex. 12 at D378247, included only the cash on hand at Pan Am II, and was to be in addition to any undrawn amounts to be available to Pan Am II under the $100 million line of credit Working Capital Facility to be provided by Delta. Tr. at 1483 (Punwani).

On October 22, 1991, Delta, Pan Am and the Creditors Committee entered into a letter agreement (the "October 22 Letter Agreement") under which, *inter alia*, the parties settled their dispute over the stop loss agreement. Delta agreed, subject to certain terms and conditions, to provide Pan Am with up to $140 million in new DIP financing, and to modify its proposed financing of Pan Am II to take into account the $50 million increase to $205 million in Senior Note Financing, as well as the increased interest rate and extended repayment terms of the Senior Notes and Term Loan Agreement. Joint Ex. 9.[6]

The October 22 Letter Agreement was not an unconditional agreement by Delta to make an investment in Pan Am II. As the letter itself states, its purpose was to "address the problems raised by Pan Am's current cash situation and to improve the chances of confirming a Plan of Reorganization...." Joint

---

**6.** The $100 million stop loss provision was amended to provide that Delta receive credit for its $50 million increase by Senior Notes financing and to acknowledge that Delta's right to repayment of $50 million of its DIP financing, an amount equal to its proposed equity investment, would be forgiven upon confirmation.

Ex. 9 at DP016891. It also recognized the possibility that confirmation of a Pan Am plan of reorganization would not occur, in which case Delta would be entitled to immediate repayment on December 5, 1991 of any amounts advanced to Pan Am. *Id.* at DP016894.

Appendix B to the October 22 Agreement set forth the following conditions, among others, to Delta's investment: (1) Conclusion of agreements between Pan Am and the Pension Benefit Guaranty Corporation ("PBGC"), the Department of Labor ("DOL") and the Internal Revenue Service ("IRS"), on terms and conditions satisfactory to Delta; (2) Renegotiation of collective bargaining agreements in form and substance satisfactory to Delta, and such agreements shall be in full force and effect; (3) Modification of Pan Am's CRAF agreements with the Air Force in form and substance satisfactory to Delta; (4) Confirmation of a Plan of Reorganization satisfactory to Delta on or before December 5, 1991; (5) The liabilities of Pan Am II as of the Effective Date consisting only of certain defined obligations; and (6) No material adverse changes in Pan Am's performance subsequent to August 12, 1991. Appendix B to Joint Ex. 9 at DP016942–46.[7]

In the October 22 Letter Agreement, Delta agreed to provide Pan Am up to $140 million in additional DIP financing (referred to in the Revised Joint Plan and hereafter as Junior DIP Financing) in two steps, on certain terms and conditions that were to be set forth in definitive contracts. Joint Ex. 9 at DP016892–93. Delta agreed to provide Pan Am up to $50 million in immediate DIP financing (the "First Tranche") under a Loan Agreement dated as of October 21, 1991 between Pan Am and Delta. *See* Joint Ex. 8. Delta also agreed to provide Pan Am, on or after November 1, 1991, with up to an additional $90 million in DIP financing on a schedule of dates and in scheduled amounts (the "Second Tranche"). Borrowings under the Second Tranche were to be governed by the Loan Agreement, as amended by Amendment No. 1 to the Loan Agreement dated as of October 25, 1991. *See* Joint Ex. 10.[8]

On October 22, 1991, Creditors Committee counsel Marc Richards signed the October 22 Letter Agreement on behalf of the Creditors Committee. Joint Ex. 9 at DP016898. Prior to entering into the October 22 Letter Agreement, the Creditors Committee voted in favor of taking that action. Tr. at 1397–98 (H. Miller).

At a Bankruptcy Court hearing on October 22, 1991, Mr. Richards informed the court that the October 22 Letter Agreement reflected compromises of "good faith differences as to the interpretation of certain provisions" of the August 11 Letter, and that "nobody stuck a gun to our head, but the committee considered it, deliberated it, and we are prepared to go along...." Pl.Ex. 501 at 36, 42.

On Pan Am's application the Bankruptcy Court then authorized Pan Am to incur $50 million of Junior DIP financing agreed to in the October 22 Letter Agreement to enable Pan Am to operate until November 6, 1991. *See* Pl.Ex. 501. On October 25, 1991 and November 12, 1991, on Pan Am's application, the Court approved the additional Junior DIP financing of up to $90 million and the

---

**7.** (10) *No Material Adverse Change.* Since August 12, 1991 there shall have been no material adverse change in the business, financial position, results of operations or prospects of the Retained Assets, except for any change resulting from conditions or circumstances disclosed to Delta on or prior to such date, and except that any change in results of operations (whether before or after September 24, 1991) resulting from conditions or circumstances in effect on September 24, 1991 shall not constitute such a material adverse change.
Joint Ex. 9 at DP016944.

**8.** Amendment No. 1 to the Loan Agreement dated as of October 25, 1991, provided that, "[u]n-less otherwise agreed by Delta," the funds that could be borrowed under the Second Tranche would be provided only on the dates and in the amounts set forth in an attached schedule. Joint Ex. 10 at D369806. Before Pan Am could receive any scheduled advance, Pan Am was required to provide a certification demonstrating its need for the cash scheduled to be borrowed on the date of the advance by showing expenditures since its last advance and proposed expenditures until its next advance. *Id.* at D369808. Amendment No. 1 also provided that the amended Loan Agreement could "not be altered or amended without the written consent of all parties...." *Id.* at D369810.

Creditors Committee countersigned the orders. Def.Ex. BB and BC; Pl.Ex. 508.

### E. *The Joint Plan and Disclosure Statement*

On October 24, 1991, Pan Am and the Creditors Committee filed the First Amended Disclosure Statement with Respect to the Revised Joint Consolidated Plan of Reorganization for Pan Am Corporation and its Affiliated Debtors (the "Disclosure Statement" and "Joint Plan"). *See* Joint Ex. 12. This Disclosure Statement, as its predecessor in September, was drafted by Pan Am's outside counsel, Cleary, Gottlieb Steen & Hamilton. Rule 43 Tr. at 584 (Weisz).

Pan Am's Chief Executive Officer Russell Ray, on behalf of Pan Am, and Mr. Marcus, on behalf of the Creditors Committee, each signed both the Joint Plan and the Disclosure Statement. Joint Ex. 12 at D378283, D378329. Unlike Pan Am and the Creditors Committee, Delta was not a proponent of the Joint Plan and did not sign either the Joint Plan or the Disclosure Statement. *See id.*

The Disclosure Statement reflects the contemporaneous understanding by Pan Am and the Creditors Committee of the August 11, 1991 letter, and the October 22 Letter Agreement for the Junior DIP financing by Delta and Delta's obligation to make an investment in Pan Am II. As signatories to the Disclosure Statement and the Joint Plan, and having presented the Disclosure Statement to the Bankruptcy Court, its creditors and Delta as a fair description of the proposed transactions, Pan Am and the Creditors Committee are bound by the statements therein.

On November 4, 1991, Michael Gagnon, a financial advisor to the Creditors Committee, travelled to Atlanta to meet with Delta's Chief Financial Officer Thomas Roeck to discuss the terms that the Creditors Committee had agreed to in the October 22 Letter Agreement. Tr. at 422–36 (Gagnon). During the meeting, Mr. Gagnon asked Delta to change the terms agreed to in the October 22 Letter Agreement. Mr. Roeck expressed surprise that the Creditors Committee was raising changes two weeks after the October 22 Letter Agreement had been entered into, and told Mr. Gagnon that Delta believed the

present terms were reasonable. Tr. at 434–35 (Gagnon); Tr. at 3673 (Roeck).

During the meeting, Mr. Gagnon warned Mr. Roeck that Mr. Marcus was preparing a strongly worded letter to Delta that would be sent unless Delta agreed to additional concessions that the Creditors Committee was seeking. Tr. at 3673 (Roeck). Mr. Gagnon also warned that he was concerned that the letter might find its way into the press. Tr. at 3673 (Roeck).

Mr. Roeck told Mr. Gagnon that, based on his experience in the airline industry, the impact of a negative press report such as Mr. Gagnon was suggesting could cause a loss of confidence in Pan Am among consumers and travel agencies, and that a loss of public confidence in an airline created a situation that is equivalent to a run on a bank. Tr. at 3674 (Roeck).

Creditors Committee counsel Leon Marcus sent a letter dated November 4, 1991 to Delta and Delta's counsel in which Mr. Marcus stated his view, and "the views of the Creditors Committee," Def.Ex. BG at 1, that "Delta [had] squeezed the deal so dry [that] it appears [Pan Am's Joint Plan] cannot or will not be confirmed." *Id.* at 2. Leon Marcus related an "industry rumor was that Pan Am II would not survive six weeks," *Id.* at 3, and he urged that the parties should pay close attention to statements by Pan Am's unions "that they are ready to shut down Pan Am...." *Id.* In the letter, Leon Marcus asked Delta to consider modifications of the interest rate in the Senior Notes and other terms of the proposed Delta investment in Pan Am II. *Id.* at 8–9. Mr. Marcus mentioned the possibility of litigation against Delta several times, and wrote that "if the Plan is not confirmed for almost any reason, there is no doubt in my mind that the Committee will vote to sue Delta and to petition the Bankruptcy Court for appropriate relief." *Id.* Counsel for the Creditors Committee sent the letter to the members of the Committee on November 5, 1991.

The testimony of Delta's expert document examiner makes clear that the *Miami Herald* published statements from the Marcus letter on November 6, 1991, which were also

reported by the *Wall Street Journal*, due to intentional transmission of the letter to the *Miami Herald* by Creditors Committee member George Miranda of the International Brotherhood of Teamsters. Tr. at 3835–45, 3868–83 (Tytell); Def.Ex. DIC; Def.Ex. DIF.

The article in the *Miami Herald* noted Mr. Marcus's prediction that Pan Am's reorganization was in peril and that Pan Am may be in default under its proposed agreements with Delta even before a scheduled confirmation hearing. Def.Ex. BH. On November 7, 1991, the *Wall Street Journal* published an article discussing the contents of the November 4 Marcus Letter. Def.Ex. BI. The second headline of the *Wall Street Journal* article referred to the threatened prospects of Pan Am II: "Group says Carrier's Tactics Are a Threat to Pan Am's Success After Revamp." The lead paragraph of the article related Mr. Marcus's charge that the future of Pan Am II was in jeopardy: "[Delta's conduct is] jeopardizing the future success of the reorganized carrier, Pan Am's creditors charged." Def.Ex. BI. The article quoted Mr. Marcus's statement that "Delta has squeezed the deal so dry it appears the plan cannot or will not be confirmed." *Id.*

### F. Drawdowns of Junior DIP Financing

In separate borrowings in late October and early November 1991, Delta loaned Pan Am the full $50 million available under the First Tranche and on November 1, November 8, November 15, November 22 and November 29, Delta advanced a total of $65 million to Pan Am under the Second Tranche. Undisputed Facts at ¶ 14; Tr. at 700–10 (Fabio); Rule 43 Tr. at 680–81 (Fabio). Prior to each of those advances, Pan Am provided Delta with a certification as required under the amended Loan Agreement. Tr. at 699–710 (Fabio); *See also* Def.Ex. JR; Def.Ex. LQ; Def.Ex. MA; Def.Ex. ZY; Pl.Ex. 708. On two occasions in November, Pan Am was unable to provide a certification demonstrating a need for amounts otherwise available under the Second Tranche. Tr. at 1706, 1709 (Andresen); *See* Def.Ex. BD; Def.Ex. MA.

On each occasion that Pan Am was unable to certify a need for amounts scheduled un-

der the amended Loan Agreement, Mr. Andresen requested in writing that Delta agree to permit such funds to be borrowed in the future. Def.Ex. BD; Def.Ex. MA. Delta did not agree to those requests. Tr. at 1708, 1710 (Andresen).

The Loan Agreement, as amended, provided that Delta had no obligation to provide any Second Tranche DIP financing other than in the amounts and on the dates set forth in Schedule 1.2A to that agreement. Joint Ex. 10 at D369806. Any amounts not borrowed on a scheduled date would not be available at a later date unless agreed to by Delta. *Id.* at D369810. Pan Am's Chief Financial Officer Rolf Andresen understood that the unborrowed DIP funds under the amended Loan Agreement would not be available in the future unless Delta agreed. Tr. at 1703, 1708, 1710 (Andresen). However, on every occasion that Pan Am provided a certification as required under the amended Loan Agreement, Delta advanced the funds requested by Pan Am. Tr. at 1705 (Andresen).

On or about November 1, 1991, Pan Am transferred certain of its Atlantic assets to Delta pursuant to the Asset Purchase Agreement. At that time Delta paid Pan Am $303 million in cash, from which approximately $100 million was deducted to repay Delta for amounts that had been advanced in the Senior DIP financing by Delta to Pan Am pursuant to the Credit Agreement as amended and approved by the Bankruptcy Court on August 12 and October 11, 1991. Stip Facts. ¶ 19; Def.Ex. AZ; Def.Ex. AY.

### G. Revenue Projections for Pan Am Deteriorate

During November 1991, Pan Am's Senior Vice President & Controller Ramesh Punwani received reports from the heads of each Pan Am operating department of changes in projected expenses for Pan Am II, Tr. 985 (Punwani), and was updated almost daily by Pan Am's airline planning department concerning changes in Pan Am's advance bookings and revenue outlooks, Tr. 985, 1491–92 (Punwani). Based upon those reports, Mr. Punwani regularly prepared updates to the

Business Plan of Pan Am II during November 1991. Tr. at 985–86 (Punwani).

As of November 12, 1991, an update prepared by Mr. Punwani's staff showed that Pan Am was forecasting no change in the projected revenues or the projected expenses for Pan Am II for 1992 from the revenues and expenses set forth in the Business Plan.[9] Tr. 1501–02 (Punwani); Def.Ex. DEQ.

Shortly thereafter, Pan Am's outlook for revenues and expenses for Pan Am II when measured against the Business Plan changed significantly for the worse.

In a November 12 memorandum, Pan Am's Vice President for Airline Planning, John Lewis, predicted to Mr. Andresen that Pan Am's revenues for November 1991 would be 17.1%, or a total of $19.5 million, less than previously expected, and that Pan Am's projected revenues for December 1991 would be $9 million below its revenue plan. Pl.Ex. 802; see Tr. at 2266–67 (Lewis). The Pan Am revenue plan for November 1991 against which Mr. Lewis was projecting the 17.1% shortfall had been created by Mr. Lewis and his staff in late September, just six weeks before. Tr. at 2240, 2247–48; Pl.Ex. 802 at DT459.

On November 14, 1991 Mr. Andresen learned of a shortfall of Pan Am II 1992 projected revenues and informed Delta's James Sanregret of a $25–30 million deterioration in Pan Am's revenue outlook for the first few months of the Business Plan. Mr. Sanregret was "stunned" by Mr. Andresen's report, and immediately reported the information to Mr. Roeck. Tr. at 3202–05 (Sanregret); Tr. at 3675 (Roeck).[10]

On November 18, 1991, Mr. Lewis prepared a revised revenue outlook for the first quarter of 1992 for Pan Am II that showed a significant shortfall compared to the forecast prepared in connection with the Business Plan. Pl.Ex. 803. Mr. Lewis's November 18th outlook included two cases: a "straight line" case based on Pan Am's advance bookings, and a "better" case which adjusted the revenue outlook for certain intangible factors such as improved consumer confidence and awareness, see Pl.Ex. 803.

In his "straight line" case, Mr. Lewis projected that Pan Am II would experience a revenue shortfall of $26.4 million for the first quarter of 1992, compared to the 1992 Revenue and Yield Plan that Mr. Lewis and his staff had created on October 21, 1991, less than a month before. Pl.Ex. 803 at DT457; see Pl.Ex. 314. Despite this outlook based which was based on advance bookings, Mr. Lewis's straight line case did not assume any reduction in yield (i.e., revenue per passenger mile) from the levels assumed in the 1992 Revenue and Yield Plan. Pl.Ex. 803 at DT457.

In his "better" case, Mr. Lewis forecast that Pan Am II would have a revenue shortfall of $17.6 million for the first quarter of 1992 compared to the 1992 Revenue and Yield Plan after taking certain assumptions into account.[11] Pl.Ex. 803 at DT456.

Mr. Ray drafted an undated memo to Mr. Allen of Delta and Leon Marcus, counsel of for the Creditors Committee to report some of these figures, but the memo was never sent. Def.Ex. BM. In the draft memorandum, Mr. Ray wrote:

> I want to report to you on the traffic and revenue condition of Pan Am.
>
> Based on performance for the first third of November, Pan Am expects to underachieve the Plan by 17% in traffic. This translates to a potential $20 million revenue miss.
>
> Traffic for December appears to be 6½% below Plan, or a $9 million loss in revenue.
>
> The outlook for the first quarter based on current bookings [would] indicate that we

---

9. "Business Plan" refers to that section of the Disclosure Statement and Joint Plan of Reorganization. Joint Ex. 12 at D378231–52.

10. Even Mr. Lewis's revised November 12 outlook for the period November 10–30 overstated Pan Am's actual performance for that period by 8.2%, or $3.2 million. Tr. at 4366–69 (Kasper); Def.Ex. DGI at Chart K–10; Pl.Ex. 2005.

11. Some of the assumptions built into Mr. Lewis's "better" case, including the assumption that Pan Am's image would improve after bankruptcy, had already been taken into account in the 1992 Revenue and Yield Plan. See Pl.Ex. 314 at DT232190.

will miss the Plan by somewhere between $17 and $26 million.

It should be clear that the public is concerned about Pan Am's condition and the uncertainty of coming out of bankruptcy. Def.Ex. BM.

On November 19, 1991, Delta's Chief Financial Officer Thomas Roeck met with Mr. Lewis and Mr. Andresen of Pan Am to discuss Pan Am's updated revenue outlook. Tr. at 3675–79 (Roeck). In a letter to Mr. Andresen on November 21, 1991, Mr. Roeck stated that Delta was "very concerned" with the projected revenue shortfalls for the first quarter of 1992, and asked for Pan Am's views as to how the revenue shortfall might be remedied. Def.Ex. BO. Mr. Roeck discussed Mr. Lewis's November 18 revised revenue outlook for Pan Am II with Robert W. Coggin, Delta's Vice President, Marketing and Planning, and Mr. Coggin asked Mr. Roeck for a copy to evaluate those revised projections. Tr. at 4149–50 (Coggin); Pl.Ex. 4164.

On November 20, Mr. Coggin and Mr. Lewis discussed Mr. Lewis's November 18 revised revenue outlook for Pan Am II. Mr. Coggin stated that he thought Mr. Lewis's yield assumptions were too optimistic in light of the significant deterioration in traffic that Mr. Lewis was projecting. Tr. at 4154, 4215 (Coggin); Def.Ex. BL. Mr. Coggin's opinion was based upon his experience that a decrease in traffic results in excess capacity which, in turn, creates increased price competition that forces ticket yields to decline. Tr. at 4215 (Coggin). Mr. Lewis responded that his optimistic case adjusted his yield outlook to a limited extent to take into account a proposed reduced price sale for travel in Florida and Caribbean markets, but that he did not believe any other yield adjustments were necessary. Def.Ex. BL. In a subsequent conversation on November 25, 1991, Mr. Lewis advised Mr. Coggin of Pan Am's current outlook for the second quarter for Pan Am II. Tr. at 4158 (Coggin).

Mr. Coggin developed his own projections for Delta of the outlook for Pan Am II in the first half of 1992 based on Pan Am's recent operating results as well as advance booking and other information that had been supplied by Pan Am. Tr. at 4168–69 (Coggin).

Mr. Lewis continued to revise his revenue forecast for Pan Am II for the first half of 1992, adjusting his view of revenues upward. In a forecast prepared on November 26, Mr. Lewis assumed that revenues for the first quarter of 1992 would be $2.6 million higher than his "better" outlook had been on November 18 (and over $11 million higher than his original "straight line" case). *Compare* Def.Ex. NY *with* Pl.Ex. 803.

Later that same day, Mr. Lewis revised his revenue forecast for the first quarter upward by an additional $2 million. *Compare* Pl.Ex. 807 at DT232245 *with* Def.Ex. NY.[12] Mr. Lewis also developed a revenue forecast for Pan Am II for the second quarter of 1992 which was based on a very small number of advance bookings, and used an adjustment for various factors, particularly an assumed improvement in the economy. Pl.Ex. 807 at DT232245. In his second quarter outlook, Mr. Lewis assumed that Pan Am II would receive approximately $3 million per month in incremental revenues from implementation of its proposed code sharing arrangement with Delta. Pl.Ex. 807 at DT232245; Tr. at 2281–82 (Lewis).[13]

Mr. Lewis's final revenue outlook for Pan Am II for the first half of 1992[14] projected a revenue shortfall of over $27.8 million compared to the 1992 Revenue and Yield Plan before any estimated code sharing benefits, and over $16.4 million after adding estimated code sharing benefits. Pl.Ex. 807 at DT232245; Tr. at 2284 (Lewis).

---

**12.** At trial Mr. Lewis was unable to explain the reason that he made the favorable adjustments. Tr. at 2302–03, 2305 (Lewis).

**13.** At trial Mr. Lewis conceded that no definitive projection had been developed for the revenue impact of code sharing. Tr. at 2281 (Lewis). Mr. Lewis had estimated that a previous code sharing relationship between Pan Am and United Airlines would provide Pan Am with only about $18 million per year, or $1.5 million per month, Tr. at 2341 (Lewis).

**14.** Mr. Lewis did not update the revenue outlook for Pan Am II for the second half of 1992. Tr. at 2330–32 (Lewis).

Mr. Coggin's revenue outlook for Pan Am II for the first half of 1992 was less optimistic than Mr. Lewis's. For the first quarter, Mr. Coggin forecast a $30.9 million revenue shortfall from the 1992 Revenue and Yield Plan, $3 million worse than Mr. Lewis's "straight line" case for that period. Def.Ex. BT. For the second quarter of 1992, Mr. Coggin forecast a revenue shortfall of $22.4 million compared to the 1992 Revenue and Yield Plan. *Id.*

Mr. Coggin's traffic outlook for Pan Am II was slightly higher than Mr. Lewis's, but Mr. Coggin's projected yield for Pan Am II was lower, reflecting his estimate that planned fare reductions would be required to stimulate traffic and would result in a lower yield. Tr. at 4202–3, 4212 (Coggin).

The final print-out of the spreadsheet developed by Mr. Coggin on November 29th and 30th contained errors in alternative cases that he had developed for purposes of comparison, and included corrected figures written in on the document by hand. Tr. at 4212 (Coggin); Def.Ex. BT.

### H. *Expense Projections for Pan Am Increase*

Shortly after learning of the revenue shortfall, Delta also learned of increased expense projections for Pan Am II. Tr. at 3210 (Sanregret). During the last week in November 1991, Pan Am generated three successive updates to the Business Plan detailing unexpected increases in expenses for Pan Am II. Pl.Ex. 805; Pl.Ex. 816; .Pl.Ex. 809; Tr. at 1737–38 (Andresen).

On Sunday November 24 and Monday November 25, Mr. Andresen created a document entitled "Business Plan Sensitivities." Pl.Ex. 805. That document showed total expense increases to the Business Plan of $30.7 million in 1992, including "transition costs reclassified to Pan Am II" of $23.5 million,[15] but not including certain other increased expenses. *Id.* at D320489. Together with revenue shortfalls, the November 25th update showed a $62.7 million deterioration in the

Business Plan for 1992. *Id.;* Tr. at 785–87 (Andresen).

Mr. Andresen reviewed Pan Am's November 25th update with Mr. Sanregret of Delta "because there was some urgency to review what the condition was." Tr. at 798–99 (Andresen); Tr. at 3210–11 (Sanregret). Mr. Andresen explained to Mr. Sanregret that certain transition costs had been shifted from the bankruptcy estate to Pan Am II. These included $13.1 million in information services costs; $6.4 million in additional expenses associated with return conditions of airplanes leased by Pan Am from General Electric Credit Corporation (GECC); and an additional $4 million in expenses associated with a delay in consummating a proposed transaction with DynAir Corporation to take over Pan Am's maintenance facility at JFK airport. Tr. at 3211–13 (Sanregret). Mr. Andresen stated that the additional information services costs were more properly an expense of Pan Am II and that Pan Am and the Creditors Committee had decided that the additional GECC lease expenses should be borne by Pan Am II. Tr. at 3211–12 (Sanregret).

Regarding the "Other Updates," listed in the November 25th update, Mr. Andresen explained that Pan Am had updated its fuel forecasts and was anticipating $4.2 million in expenses above the Business Plan. Tr. at 3214 (Sanregret). Andresen also explained that there were increased costs resulting from an agreement recently reached between Pan Am and Airbus permitting the leases for Airbus aircraft to be extended. Those extra costs were $1.4 million more than had been assumed in the Business Plan for 1992, not including increased lease rates for later years. Tr. at 3215 (Sanregret); Tr. at 790–91 (Andresen). Mr. Andresen also explained that Pan Am II would have to pay $1.6 million in additional interest expenses due to the need to delay repayment of principal under the terms of the proposed Working Capital Facility. Tr. at 3216 (Sanregret).

Mr. Andresen suggested a proposal to pay for some of the expense increases: first, by

---

**15.** Transition costs were to be borne by the Creditors Estate under the Joint Disclosure State-ment. Joint Ex. 12 at D378242.

deferring $16.9 million of Pan Am II's projected capital expenditures of $36 million for 1992; second, by assuming a $19.5 million "material credit" that could result from a proposed arrangement under which Pan Am would in effect sell DynAir its inventory of certain spare parts.[16] Tr. at 795–96 (Andresen). Mr. Andresen believed that with these changes he could obtain a total of $35.8 million in improvements to partially offset his anticipated $62.7 million in overall deterioration of the Business Plan (revenue shortfall plus expense increases). Pl.Ex. 805 at D320490; Tr. at 3221 (Sanregret).

In support of his proposal, Mr. Andresen also provided an update on Pan Am II's expected liquidity during 1992 reflecting his proposed changes which showed that, even with utilization of its full revolving credit line under the proposed Working Capital Facility, Pan Am II would have a cash balance of only $23 million in December 1992 instead of $50.2 million under the Business Plan, as well as ownership of the $19.5 million in parts which Mr. Andresen proposed in effect to sell to DynAir. Pl.Ex. 805 at page D320491; Tr. at 3223 (Sanregret); Tr. at 793–97 (Andresen).

Mr. Andresen also projected in the November 25 Business Plan Sensitivities that Pan Am II would be not be able to repay Delta as provided under the Senior Notes when those payments were due in 1994, 1995 and 1996. Pl.Ex. 805 at D320492; Tr. at 798 (Andresen). The Business Plan Sensitivities showed that Pan Am II would be $12.8 million in arrears in payments under the Senior Notes as of December 31, 1994; $38.9 million in arrears as of the end of 1995; and $45.8 million in arrears as of the end of 1996.[17] Id.

Mr. Sanregret told Mr. Andresen that he was very troubled by Mr. Andresen's forecast that Pan Am II would be unable to repay Delta as provided under the Senior Notes. Mr. Sanregret also expressed concern that Mr. Andresen's liquidity forecast

showed that "Pan Am would have been bankrupt" by the end of 1993. Tr. 3224–25 (Sanregret); See Pl.Ex. 805 at D320492. After his meeting with Mr. Andresen, Mr. Sanregret immediately faxed the Business Plan Sensitivities to Delta's Chief Financial Officer, Thomas Roeck. Tr. at 3224–25 (Sanregret).

Shortly after November 25, Mr. Andresen informed Mr. Sanregret that Pan Am had reached an agreement with Airbus that would require Pan Am II to bear additional unanticipated expenses of approximately $22 million, plus interest for a total of $25 million, in equal payments over the five years of the Business Plan, for the purchase of certain Airbus spare parts that previously had been consigned to Pan Am. Tr. at 3226–27 (Sanregret); Tr. at 303–4 (Davis); see Pl.Ex. 3006.

On November 26, 1991, Mr. Andresen and Mr. Punwani of Pan Am prepared another reassessment to the Business Plan. Pl.Ex. 816; Tr. 800 (Andresen). The November 26th Business Plan reassessment showed the same figure for increased expenses of $30.7 million through 1992 and did not account for the $5 million in increased annual expenses associated with the Airbus consignment parts or for any increased Airbus aircraft lease rates during the years after 1992. Tr. at 988–89 (Punwani); Tr. at 1508–09, 1512 (Punwani); Tr. at 3277 (Sanregret); Pl.Ex. 816 at DT452.

I. *Administrative Solvency*

The parties also had meetings about the required administrative solvency of the Pan Am estate, *i.e.*, the ability of the Pan Am estate to satisfy administrative claims at the confirmation hearing. Tr. at 3228–29, 3246–48 (Sanregret).

At a meeting on the weekend of October 19th, James Sanregret and other Delta rep-

---

**16.** The Disclosure Statement provided that other than the proceeds of certain sales of assets for the benefit of the creditors, "[p]roceeds from other sales of assets that are not required for the operation of the reorganized Pan Am will be made available to the reorganized Pan Am as additional working capital." Joint Exh. 12 at D378204.

**17.** Although Mr. Andresen subsequently attempted to offset some of the unanticipated deterioration with "cash improvements," Mr. Andresen never suggested changes that would enable Pan Am II to repay its debts to Delta when due, which would total at least $45 million by 1996. *See* Pl.Ex. 805 at D320492.

resentatives, Michael Gagnon, an accountant at Price Waterhouse who had been retained by the Creditors Committee, and Pan Am representatives discussed Mr. Gagnon's then-current solvency analysis, which showed an administrative insolvency of $10–11 million. Tr. at 3191–92 (Sanregret).

Thereafter on November 4, 1991 Mr. Gagnon travelled to Atlanta and told Delta's Chief Financial Officer Thomas Roeck that the terms of the October 22, 1991 Letter Agreement which the Creditors Committee had agreed to should be changed to provide concessions for the Creditors Committee. Tr. 412–36 (Gagnon).

At a meeting on November 26th, Messrs. Sanregret, Gagnon, Andresen, and others discussed a November 25 draft of Mr. Gagnon's solvency analysis, which showed an administrative insolvency of $13 million. Tr. at 3246–48 (Sanregret); see Def.Ex. NF at 110038. Prior to the meeting on November 26th, Mr. Sanregret reviewed the draft solvency analysis of November 25 and sent Mr. Gagnon a memorandum detailing his disagreement with its assumptions. In the memorandum, Mr. Sanregret pointed out that Mr. Gagnon was assuming the benefit of at least $89 million in assets to which the creditors were not entitled. Def.Ex. TX; Def.Ex. QA. The assets of Pan Am to which the Creditors were entitled are set forth in the Disclosure Statement. Joint Exh. 12 at D378204.

Mr. Gagnon's analysis provided that the projected $7 million cash balance in the operating account in Pan Am's Subsidiary Airways as well as $8 million in Pan Am's corporate operating account would be transferred to the Creditor Trust on the effective date. Joint Exh. 12 at D378248; Def.Ex. NF at 110041. Mr. Gagnon's analysis provided that the estate would receive $42 million in deposits and $15 million in prepayments on Pan Am's books [18] as well as the proceeds of $25 million from the projected sale of Pan Am's L.A.–San Salvador and JFK–Mexico City routes. Def.Ex. NF at 110038. In his

memorandum, Mr. Sanregret pointed out that the Joint Plan and the Disclosure Statement provided that certain of those assets were to be made available to Pan Am II as additional working capital unless Delta and Pan Am agreed otherwise. Def.Ex. TX at PW0110066; see Joint Ex. 12 at D378204 (provision of Disclosure Statement delineating assets available for the Creditor Trust). Mr. Sanregret also suggested to Mr. Gagnon that his figure for accounts receivable should not include any non-traffic receivables, since Mr. Sanregret understood that non-traffic receivables would remain with Pan Am II and not be available for the Creditor Trust. Tr. at 3239–3240 (Sanregret); Def.Ex. TX at PW0110066.

After the meeting on November 26th, Mr. Sanregret sent Mr. Gagnon a second memorandum detailing Delta's disagreements with the assumptions in Mr. Gagnon's solvency analysis. Def.Ex. QA. Mr. Sanregret's second memorandum noted that the $13 million insolvency in Mr. Gagnon's November 25 solvency estimate could actually be as high as $131 million. Id. at PW205495. The difference between Mr. Gagnon's figures and Delta's resulted from Mr. Gagnon's assumed use of the proceeds of the projected route sales ($25 million), deposits and prepayments (at least $52 million), and certain accounts receivable not provided to be transferred to the creditors in the Joint Plan and Disclosure Statement. Id. at PW205493–94. Mr. Sanregret also questioned Mr. Gagnon's estimate for Creditor Trust and transition costs, and pointed out that Mr. Gagnon had not made provision for any operating losses that could be sustained by Pan Am until the effective date of the Joint Plan.[19] Id. at PW205494–95. Mr. Sanregret noted that: "In view of Pan Am management's continued downward revisions of reorganized Pan Am's projected revenues and cash flow in recent days, it would be imprudent and irresponsible to divert the proceeds of [those assets] from reorganized Pan Am." Id. at PW205494. Mr. Sanregret also stated that the solvency analysis did not address "Pan Am's funding re-

---

18. Presumably prepayments and deposits would be used by certain creditors for tickets on flights flown by Pan Am II.

19. November losses were projected to be $19.5 million more than those projected on and before October 24, 1991. Pl.Ex. 802 at DT459.

quirements for the 10 day period between the date of confirmation of the Plan of Reorganization and the effective date of the Plan of Reorganization." *Id.*

### J. *The Final Week*

Late in the week of November 25, 1991, Delta arranged to have over $300 million made available under its bank credit facility so that Delta would be prepared to provide funds contemplated to be invested in Pan Am II. Tr. at 4321–22 (Allen).

On November 27, 1991, Mr. Andresen, who understood that Delta had no obligation to provide Pan Am with additional funds under the Junior DIP financing agreement, requested that Delta provide $20 million. Tr. at 1712–14 (Andresen); Pl.Ex. 708; Joint Ex. 10 at D369810. November 28, 1991 was Thanksgiving.

At Mr. Roeck's instruction, on Friday, November 29, Mr. Sanregret told Mr. Andresen that Delta would respond to his request after Delta had an opportunity to meet with Pan Am the following day. Tr. at 3262–64 (Sanregret).

#### (1) *The November 30, 1991 Meeting at Stroock, Stroock & Lavan*

On Saturday November 30, 1991, officers of Delta and Pan Am and their legal and financial advisors held a meeting at the midtown offices of Stroock & Stroock & Lavan. *See* Def.Ex. QT (Agenda). Attendees from Delta and its advisors included Ron Allen, Whitley Hawkins, Robert Harkey, Thomas Roeck, Robert Coggin, Harold Achtziger, James Sanregret, Joseph Rinaldi, Lawrence Handelsman and Joel Beckman. Attendees from Pan Am and its advisors included Russell Ray, Rolf Andresen, John Lewis, Roger Cooke, Robert Davis and Robert Finlayson. Tr. at 3980–81 (Handelsman); Def.Ex. XXY.

The meeting had been requested by Mr. Allen at Mr. Roeck's suggestion in order for Delta to better understand the revenue and expense information Delta had recently received from Pan Am. Tr. at 3681–82 (Roeck).

#### (a) *Revenues*

The meeting started with a discussion of the differing revenue outlooks for Pan Am II during the first six months of 1992. Mr. Lewis reported that Pan Am's traffic in November had been 20–25% below forecast. Tr. at 3982 (Handelsman); Tr. at 1967 (Ray); Tr. at 4293 (Allen); Def.Ex. XXY. Mr. Roeck of Delta stated that a 20% traffic miss was a cause for alarm. Def.Ex. DHE at 1; Def.Ex. XXY; *see* Tr. at 3798 (Roeck).

Mr. Lewis reported that his latest revenue forecast for Pan Am II for the first half of 1992 was $33 million below the level projected in the 1992 Revenue and Yield Plan prepared in October. Tr. at 3982 (Handelsman); Tr. at 2984–86 (Harkey); Tr. at 4293 (Allen); Def.Ex. XXY.

Mr. Lewis listed several factors that he believed had contributed to the revenue problems: the shutdown of Midway Airlines; the publication of the Marcus letter; uncertainty about whether Pan Am would emerge from bankruptcy; confusion over whether Pan Am even still existed; disruption of management and sales efforts; and the delay in beginning code sharing. Def.Ex. XXY; Def.Ex. DHE at 2; Tr. at 2984–86 (Harkey); Tr. at 3983 (Handelsman); Tr. at 3685 (Roeck); Tr. at 4172–73 (Coggin); Tr. at 3272–73 (Sanregret).

Mr. Coggin, Vice President of Delta, stated Delta's view that Pan Am II's revenue shortfalls for the period from December 1991 through June 1992 would total over $60 million, including the $9 million shortfall for December that had been reported by Mr. Lewis earlier in the month. Tr. at 4174–75 (Coggin); Tr. at 4293 (Allen); Tr. at 3983 (Handelsman); Tr. at 3684 (Roeck); Def.Ex. XXY. Mr. Lewis acknowledged that Mr. Coggin could be right about the revenue outlook. Tr. at 2985 (Harkey); Tr. at 3272 (Sanregret).

Mr. Ray stated that general economic conditions and vigorous competition from American Airlines were contributing to the revenue problem. Tr. at 3983–84 (Handelsman); Tr. at 1760–61 (Andresen); Tr. at 4294 (Allen); Def.Ex. XXY. Part of Mr. Ray's concern was that American Airlines was then hiring Pan Am marketing and reservations employees in South America. Tr. at 1970 (Ray).

Mr. Ray reported that Pan Am was planning a significant fare reduction in an effort to regain market share. Tr. at 3983–84 (Handelsman); Tr. at 4176 (Coggin); Def.Ex. XXY. Mr. Ray noted that the commencement of operations for Pan Am II would be a "cold start," and noted that Pan Am's name was not even in the Yellow Pages in Queens and Miami. Tr. at 3983–84 (Handelsman); Def.Ex. DHE at page 2; Def.Ex. XXY. Later in the meeting, Mr. Ray stated that he did not "have a clue" how to solve the revenue problems in the down market that Pan Am was facing. Tr. at 4296 (Allen); Tr. at 3992 (Handelsman); Def.Ex. XXY (last page).

### (b) *Expenses*

Pan Am's Chief Financial Officer Rolf Andresen then discussed increased expenses for Pan Am II from the levels projected in the Business Plan, which increases he said now totalled approximately $64 million. Tr. at 3274–78 (Sanregret); Tr. at 2988 (Harkey); Tr. at 3984 (Handelsman); Tr. at 4295 (Allen); Tr. at 3571 (Rinaldi); Def.Ex. XXY.

At the meeting, Mr. Andresen presented a business plan update dated November 30 and entitled "Financial Review." Pl.Ex. 809. In this review he pointed out that the adjustments required due to the October 22, 1991 negotiations would result in losses of $11.3 million in December 1991 and $87.6 million during 1992, but that 1993–96 was forecast as producing $18.6 million in profits.[20] *Id.* at DT474. Mr. Andresen's "Financial Review" then made a new forecast as of November 30, 1991 showing an additional loss for December 1991 of $16.8 million, and for 1992 of $41.6 million, for a total loss of $76.2 million over the Business Plan. Pl.Ex. 809 at DT474; Tr. at 1628, 1667 (Andresen).

The increased Airbus lease rates for 1994–96 ($3 million in 1994; $4 million in each of 1995 and 1996) and the $25 million in increased expenses associated with the Airbus consignment parts were not included in Mr. Andresen's "Financial Review," but those items were disclosed at the meeting, Tr. at

1673–75 (Andresen); Tr. at 3274–78 (Sanregret).

Mr. Andresen also explained at the November 30 meeting that his "Financial Review" assumed that the Creditors Committee would agree to allow Pan Am II to collect pre-closing operating receivables estimated at $38 million, and to defer payment of those receivables to the Pan Am estate until later in 1992. Tr. at 3690 (Roeck); Tr. at 3279–80 (Sanregret); Tr. at 3987 (Handelsman); Def. Ex. DHE at 6. Mr. Andresen testified that Pan Am II would run out of cash during the first quarter of 1992 if the Creditors Committee did not agree to that receivables deferral. Tr. at 1677 (Andresen). At the meeting on November 30, Mr. Andresen stated that he did not have agreement from the Creditors Committee to the $38 million receivables deferral he had assumed in his "Financial Review." Tr. at 3279–80 (Sanregret); Tr. at 3690 (Roeck). Mr. Gagnon and Mr. Andresen never discussed a dollar amount in connection with such an arrangement and Mr. Gagnon's testimony was that he did not recall ever discussing such an arrangement with the Creditors Committee. Tr. at 4909–20 (Gagnon).

At the November 30 meeting, one interim solution suggested by Mr. Andresen in response to the deterioration in the Business Plan was to defer $14.7 million in capital expenditures. Mr. Ray responded that such spending cuts were not a good idea because Pan Am was already a run-down airline and its facilities already looked like a "M\*A\*S\*H unit." Tr. at 3985 (Handelsman); Tr. at 2990 (Harkey); *see also* Tr. at 3688–89 (Roeck); Def.Ex. XXY; Def.Ex. DHE at 5. Mr. Roeck added that such cuts would adversely affect Pan Am II's ability to create a seamless product, presumably facilities roughly comparable to those of Delta. Tr. at 3688–89 (Roeck); Tr. at 2988–91 (Harkey); Def.Ex. DHE at 5.

Another partial offset that Mr. Andresen suggested was a proposal that DynAir purchase for about $25 million Pan Am's parts inventory at JFK airport instead of supply-

---

**20.** Mr. Andresen also pointed out that a change in the accounting methods required by the Accounting Standards Board resulted in a downward income projection of $226.2 million in the four-year period. Pl.Ex. 809 at DT474; Tr. at 1626 (Andresen).

ing its own parts. Tr. at 3985 (Handelsman). Mr. Andresen assumed that such an arrangement with Dynair could result in a cash flow improvement of $25 million through 1992, Pl.Ex. 809 at DT475.[21] Earlier in the week Mr. Andresen had assumed only $19.5 million in benefits from that proposed arrangement. *See* Pl.Ex. 805. Pan Am's General Counsel Roger Cooke reported at the meeting that there was no agreement with DynAir, and that there were still a number of open issues concerning a possible DynAir transaction. Tr. at 1764–65 (Andresen); Tr. at 3990 (Handelsman); Def.Ex. XXY at 3.

### (c) *Liquidity*

The discussion at the November 30 meeting also considered Pan Am II's liquidity in 1992. Mr. Andresen noted that liquidity would be tight and that after taking into account all of his proposed cash improvements, his current projection for June 1992 was that Pan Am II would then have total liquidity of $36 million (even after borrowing the full $100 million available under the Working Capital Facility Agreement). Tr. at 3986 (Handelsman); Def.Ex. XXY at 2; *see* Pl.Ex. 809 at DT477. Mr. Andresen stated that if Mr. Coggin's revenue projections were correct, Pan Am II's liquidity would be wiped out. Def.Ex. XXY at 2.

Mr. Allen asked Mr. Andresen what level of liquidity cushion would make him comfortable given the unanticipated deterioration to the Business Plan, and Andresen replied $75 million. Tr. at 1766 (Andresen); Tr. at 4295 (Allen); Tr. at 3571 (Rinaldi); Tr. at 3280–81 (Sanregret); Def.Ex. DHE at 7; Def.Ex. XXY at 3; *see also* Def.Ex. PK at 3. Mr. Allen then asked Mr. Roeck his opinion regarding the appropriate liquidity level for Pan Am II. Mr. Roeck stated that in light of the uncertainties in the revenue forecast, a liquidity cushion of more than $100 million would be needed. Tr. at 3691–92 (Roeck); Tr. 3280 (Sanregret); Tr. at 4295 (Allen). When Mr. Roeck stated that more than $100 million in liquidity was necessary, Joel Beckman of Goldman Sachs & Co., Delta's invest-

ment banking advisor, agreed. Tr. at 3691–92 (Roeck); Tr. at 3280 (Sanregret); Def.Ex. XXY at 3.

### (d) *Status of Labor Negotiations*

Mr. Ray reported at the November 30 meeting that the Marcus letter of November 4, 1991 had delayed the labor negotiation process by three weeks, and that Pan Am had not yet reached agreement with any of its five unions. Tr. at 3572 (Rinaldi); Def. Ex. XXY at 2; Tr. at 4295–96 (Allen); Tr. at 3988–89 (Handelsman); Tr. at 3571–72 (Rinaldi); Tr. at 3690–91 (Roeck).

Walter Brill, a Delta attorney who had been receiving reports on the status of Pan Am's labor negotiations, stated that even if agreements were reached that day, there was a question whether ratification could be obtained by the confirmation hearing. Tr. at 3690–91 (Roeck); Tr. at 2994 (Harkey).

Mr. Ray reported that he thought ratification of the five new labor agreements might be obtained by the confirmation hearing, and that the Independent Union of Flight Attendants posed the toughest problem with respect to ratification. Tr. at 3989 (Handelsman); Def.Ex. XXY at 3.

Mr. Ray also reported on the difficulties that Pan Am was having in negotiations with its pilots' union, ALPA, including: (1) the union's insistence on receiving a bonus arrangement as part of their new agreement, and (2) the union's unwillingness to permit termination of the Pilots "A" Plan, a defined benefit pension plan that was required to be terminated before Delta's funding of Pan Am II. Tr. at 3989 (Handelsman); Tr. at 3571 (Rinaldi). Mr. Ray stated that Pan Am and ALPA were discussing an arrangement under which Pan Am II would make up benefits that might be lost as the result of termination of the Pilots "A" Plan, but that such an arrangement might be considered an illegal follow-on plan by the PBGC. Tr. at 3989 (Handelsman); *see* Def.Ex. DHY at 1 (Davis notes); Def.Ex. XXY at 4.

---

**21.** Under the Disclosure Statement such assets were to be available to Pan Am II for additional working capital. For 1993 the Financial Review by Mr. Andresen projected a reduction of an additional $19.9 million in unidentified expenses for cash flow needs. Tr. at 1634 (Andresen); Pl.Ex. 809 at DT475.

### (e) Pan Am's Funding Requirements

The final topic discussed at the meeting was Pan Am's funding requirements until the Effective Date of the Joint Plan. Mr. Andresen stated that he had assumed that a closing would occur immediately upon confirmation. Tr. at 3573 (Rinaldi); Tr. at 3991 (Handelsman); Def.Ex. XXY at 5; Def.Ex. DHE at 11. Pan Am's outside counsel Robert Davis stated that he had been assuming that by the hearing date that there would be settlements with all creditors who were in a position to obtain a stay of a confirmation order without posting a bond, and he stated that his belief was that the risk to Delta of an early closing would be minimized if such settlements were obtained, and that if Delta would not close early Pan Am would have to make other arrangements to fund during that gap period. Tr. at 3573–74 (Rinaldi); Tr. at 3991–92 (Handelsman); Def.Ex. XXY at 5; Def.Ex. DHE at 11.

Mr. Davis acknowledged that Delta had never committed to invest in Pan Am II immediately after confirmation, but that he hoped Delta would feel comfortable moving ahead with an effective date earlier than the end of the statutory ten-day appeal period. Tr. at 2998–99 (Harkey); Tr. at 3575 (Rinaldi); Tr. at 3281 (Sanregret); Def.Ex. DHE at 11. There was no evidence that Delta stated that it would not fund if such agreements were reached.

At the end of the meeting, both Pan Am and Delta agreed that there were certain issues that needed to be further considered. Tr. at 1644–45 (Andresen).

Despite what it had heard, Delta articulated no decisions on November 30 regarding its investment in Pan Am II or Pan Am's request for more DIP funding to the Effective Date. Tr. at 3123 (Harkey).

### (2) Meetings on December 1, 1991

In three meetings during the morning and afternoon of Sunday, December 1, 1991, Delta received further information which raised more questions about Pan Am's ability to successfully reorganize.

On the afternoon of Sunday, December 1, 1991, Messrs. Sanregret and Coggin of Delta met with Mr. Gagnon again to discuss his current solvency analysis. Tr. at 3283 (Sanregret). During the meeting, Messrs. Sanregret and Coggin updated Mr. Gagnon on Pan Am II's revenue and expense problems that Pan Am's management had discussed the previous day (November 30) with Delta management. Tr. at 3283–84 (Sanregret); Tr. at 4181–82 (Coggin).

The parties also discussed Delta's disagreements with Mr. Gagnon's solvency analysis. Tr. at 453 (Gagnon). Mr. Sanregret explained his position that Pan Am was administratively insolvent by a large number. Id.

Mr. Sanregret raised with Mr. Gagnon Mr. Andresen's two prior requests for an agreement from the creditors to defer collection of receivables in order to improve the cash flows of Pan Am II. Mr. Gagnon stated that he did not recall' discussing the issue with Mr. Andresen, but that he would raise it at a meeting of the Creditors Committee that night. Tr. at 3284 (Sanregret). At trial Mr. Gagnon could not recall the deferment of collection of the receivables coming before the Creditors Committee that night, however. Tr. at 4919 (Gagnon).

### (a) Morning Meeting on Open Issues Under the Proposed Funding Agreements

Beginning in the morning of December 1, a meeting was held among representatives of Delta, Pan Am and the Creditors Committee to discuss the numerous open issues under the drafts of the Working Capital Facility Agreement and Senior Note Purchase Agreement. Tr. at 654–55 (Fabio); Tr. at 1645–46 (Andresen); Rule 43 Tr. at 214–15 (H. Miller).

Delta was represented at the meeting by, among others, its Vice President–Treasurer, Frank Chew, and by outside counsel Karin Day. Pan Am was represented by Rolf Andresen and Joan Fabio and by outside counsel Paul Shim. Investment banker Henry Miller attended on behalf of the Creditors Committee. The meeting lasted most of the day. Tr. at 3502–03 (Day).

Among the items discussed at the meeting were various issues relating to funding; a Pan Am request for assurance that Delta

would keep its own bank credit facility in place because the interest rate was to be determined in reference to that rate; a request by Pan Am that it not be required to make representations and warranties about foreign environmental liabilities; and Delta's request of Pan Am's counsel for an opinion letter at closing that the Working Capital Facility Agreement and Senior Note Purchase Agreement were valid and binding agreements of Pan Am II and that Delta's security interest was valid and perfected. Tr. at 3507–10 (Day); *see also* Tr. at 655 (Fabio).

Mr. Shim of Pan Am's outside counsel Cleary Gottlieb stated that Cleary Gottlieb would not agree to provide the requested opinion of counsel. Tr. at 3502, 3510 (Day).[22]

The parties also discussed the schedules that Pan Am was required to provide in connection with the proposed loan agreements. Those schedules were to list Pan Am II's outstanding liabilities and litigation, and to describe various Pan Am II assets. Tr. at 3511–12 (Day); *see* Pl.Ex. 704. Pan Am's representatives reported that Pan Am was having difficulty assembling the information, and stated that the schedules would be delivered later. The schedules were never provided. Tr. at 3511–12 (Day).

A major issue discussed at the December 1 morning meeting involved the new ratios to be included in the financial covenants for the proposed Working Capital Facility Agreement and the proposed Senior Note Purchase Agreement. Tr. at 3509 (Day); Rule 43 Tr. at 214–15 (H. Miller); *see also* Tr. at 655 (Fabio). Earlier in November Delta had proposed ratios for the financial covenants. *See* Tr. at 3509–10 (Day); Tr. at 1647 (Andresen); Rule 43 Tr. at 207 (H. Miller). The October term sheets for the Working Capital Facility Agreement and Senior Note Purchase Agreement provided that the ratios in the financial covenants would be "based upon the projections set forth in the current Business Plan...." Joint Ex. 9 at DPO16926. At the December 1 morning meeting, the

Pan Am representatives requested that Delta relax the proposed ratios in response to Pan Am's deteriorating projections. Tr. at 1646–47 (Andresen); Tr. at 658–62 (Fabio); Tr. at 3509 (Day).

Mr. Chew from Delta responded that he believed, based on the projections in the Business Plan, that the cushions were appropriate and did not require Pan Am II to meet its projections with exactitude. Mr. Andresen responded that the Business Plan projections were no longer correct and that the proposed cushions wouldn't work as a result. The parties agreed to consult with their respective executives and discuss the issue further, and the matter was left unresolved. Tr. at 1648 (Andresen); *see also* Tr. at 658–662, 664 (Fabio); Tr. at 3512–13 (Day).

After the December 1 meeting, Delta and its representatives remained available to continue negotiating the open terms under the proposed agreements. Rule 43 Tr. at 248–50 (H. Miller); Tr. at 3517–18 (Day). Ms. Day continued to work on the necessary documents until the Bankruptcy Court hearing on December 3, 1991, however none of the participants communicated with her. Tr. at 3517–18 (Day).

(b) *Afternoon Meeting with PBGC*

On the afternoon of Sunday December 1, 1991, representatives of Delta and the PBGC met to discuss the status of negotiations of the PBGC's claims against Pan Am. Tr. at 3600–01 (Rinaldi); Tr. at 3993 (Handelsman). Delta was represented at the meeting by Thomas Roeck, its Chief Financial Officer, and Joseph Rinaldi and Lawrence Handelsman, outside counsel. Tr. at 3993 (Handelsman). The PBGC was represented by Diane Burkley, who was Deputy Executive Director and Chief Negotiator, Tr. at 4601 (Burkley), Jeffrey Cohen, Deputy General Counsel, Tr. at 2182–83 (Cohen), John Menke, a PBGC attorney, Tr. at 4665 (Menke), and outside financial and legal advisors to the PBGC

22. It was a condition to any Delta obligation under the October 22 Letter Agreement that prior to entering the proposed Working Capital Facility Agreement and Senior Note Purchase Agreement that

Delta shall have received all documents it may reasonably request relating to ... the authority of [Pan Am] for the Delta Agreements, all in form and substance satisfactory to Delta. Joint Ex. 9 at DP016944.

from Smith Barney and Milbank Tweed, Tr. at 4666 (Menke).

Ms. Burkley stated that the PBGC had not reached agreement with the Creditors Committee on its administrative and priority claims and that she did not think a settlement was likely. Tr. at 3601 (Rinaldi); Tr. at 3995 (Handelsman); Tr. at 3698 (Roeck). She reported that the PBGC was taking the position stated that it would not accept less than $60 million in cash in settlement of its administrative and priority claims, while Pan Am and the Creditors Committee were not prepared to pay more than $36 million in cash. Tr. at 4668 (Menke).

Ms. Burkley asked Delta to contribute an additional $25 million to the "pot" to help satisfy administrative claims. Tr. at 4669–70 (Menke); Tr. at 2183–84 (Cohen); Tr. at 4609 (Burkley); Tr. at 3603 (Rinaldi). Ms. Burkley asserted that the administrative creditors should also receive the proceeds of certain projected asset sales that had been allocated under the Disclosure Statement for the benefit of Pan Am II, and asked for Delta's agreement to that effect. Joint Ex. 12 at D378204; Tr. at 3994 (Handelsman). Ms. Burkley also stated that it was the PBGC's position that the transition costs to be borne by the bankruptcy estate should be capped at $20 million, and that these costs were now estimated at approximately $44 to $50 million. Tr. at 3994 (Handelsman). She stated that Pan Am II should assume an additional $24 million in transition expenses not anticipated in the Joint Plan and Disclosure Statements based on her estimate of transition costs. Joint Exh. 12 at D378231–52 (Business Plan); Tr. at 3994 (Handelsman); Tr. at 4703 (Menke). Ms. Burkley stated that the PBGC would oppose confirmation and would object to the Joint Plan unless Delta provided more cash for the creditors. Tr. at 4608–09 (Burkley); Tr. at 2183–84 (Cohen); Tr. at 4708 (Menke). Ms. Burkley stated that Pan Am and the Creditors Committee were incorrectly assuming that the PBGC would not oppose confirmation, and that the PBGC was concerned

about accepting a low settlement that would create a precedent in other bankruptcies where the PBGC also had sizeable claims. Tr. at 3602 (Rinaldi).

Mr. Roeck responded that Delta could not agree to provide more cash for the administrative creditors. Tr. at 4671 (Menke). He also stated that given its deteriorating outlook, Pan Am II could not bear any additional costs and needed the proceeds from the sales of excess assets which under the "Business Plan" would provide working capital for Pan Am II. Tr. at 4708–09 (Menke); Tr. at 3994–95 (Handelsman).[23]

(c) *Delta Executives' Meeting to Consider Pan Am's Request for Additional DIP Financing*

Following the meetings on the afternoon of December 1, 1991, Messrs. Allen, Roeck, Harkey and Coggin met to consider Pan Am's pending request for additional DIP financing to the effective date. Tr. at 4300–01 (Allen); Tr. at 3000–01 (Harkey).

The consensus of the group was that, based on the information Delta had received at the meeting on November 30 and at the various meetings on December 1, 1991, it would not be a prudent business decision for Delta to provide additional DIP financing to Pan Am. Tr. at 4300 (Allen). Mr. Allen decided that Delta could not agree to Pan Am's request for additional DIP financing. Tr. at 4300 (Allen).

At the same meeting, Delta determined that it would not make any other decisions regarding any investment in Pan Am II until additional information became available. Tr. at 4301 (Allen); Tr. at 3014–16 (Harkey); Tr. at 3805–07 (Roeck).

(d) *The Denial of Additional DIP Financing*

On the evening of Sunday December 1, 1991, Messrs. Allen and Roeck of Delta met with Messrs. Ray and Andresen of Pan Am. Tr. at 4298–4302 (Allen); Tr. at 1648–49 (Andresen); Tr. at 1951–52 (Ray).

---

**23.** On the morning of December 2, 1991, the PBGC served Pan Am with a Hearing Statement and Proposed Order to be filed in Court stating that it was objecting to confirmation of the Joint Plan and that it would present testimony that the Joint Plan could not be confirmed. Tr. at 2200 (Cohen); Def.Ex. AQO.

At that meeting, Mr. Allen stated that Delta could not agree to Pan Am's pending request for additional DIP financing based on the information Delta had learned that weekend. Mr. Allen also stated that Delta had provided all the DIP funds for which Pan Am had qualified under the amended Loan Agreement. Tr. at 4302 (Allen). This statement was not disputed.

During the meeting, Mr. Ray stated that neither he nor Mr. Andresen could testify to the viability of the Business Plan. Tr. at 4302–03 (Allen); Tr. at 1991, 2107, 2110–13 (Ray).[24]

At the meeting, Messrs. Allen and Roeck expressed Delta's concerns about the Joint Plan of Reorganization, including the viability of the Business Plan, administrative solvency, the status of negotiations with the PBGC, and the status of Pan Am's negotiations with its five unions. Tr. at 1650 (Andresen); Tr. at 1952 (Ray). There is no evidence that anyone took issue with these concerns. Mr. Andresen acknowledged that there had been substantial adverse developments to the Business Plan and that he could not testify as to the viability of the Business Plan. Tr. at 4303 (Allen); Tr. at 3699 (Roeck). Mr. Andresen believed that Delta's concerns were expressed in good faith, "[b]ased on the information they had gathered and what they communicated to us . . . ." Tr. at 1770 (Andresen).

Delta did not state during the meeting that it would not provide funding for Pan Am II. Tr. at 1954 (Ray); Tr. at 4305 (Allen).[25] Mr. Andresen testified that at the meeting Messrs. Allen and Roeck

> said that they were not ready to make any decisions on that day. . . . However, they did point out that they had made one decision, which was that Delta would not advance any of the amounts unused under the DIP facility.

Tr. at 1649 (Andresen).

There is no evidence that any representative of Delta ever stated that Delta would not

fund Pan Am II as contemplated in the Joint Plan and Disclosure Statement. Tr. at 1951–52, 1954 (Ray); Tr. at 1649 (Andresen); Tr. at 4873–74 (Marcus); Rule 43 Tr. at 581 (Weisz); *see* Def.Ex. BZ at 20 (remarks of Mr. Weisz in bankruptcy court on December 3, 1991). Nor is there evidence that Mr. Ray told Pan Am executives or counsel that he had concluded Delta would not fund Pan Am II as stated in the Amended Consolidated Complaint. Nevertheless, on December 2, 1991 representatives of the Creditors Committee spread the word that Delta had decided not to fund Pan Am II. Tr. 4717 (Menke); Pl.Ex. 4239.

Delta did not repudiate any obligation to provide additional DIP funding to Pan Am, nor did Delta ever decide not to provide funds to Pan Am II. Tr. at 3805–07 (Roeck); Tr. at 3140–41 (Harkey); *cf.* Pl.Ex. 4239.

### (3) *Events of December 2, 1991*

Mr. Ray and Mr. Andresen met with Mr. Allen and others from Delta on the morning of December 2, and again on December 3, to discuss the remaining hurdles with respect to a plan of reorganization. Tr. at 1955, 1962 (Ray). During those meetings, Mr. Allen did not state that Delta would wait ten days before providing funds to Pan Am, but instead stated that Delta would not provide funds during the period before the Joint Plan became effective. Tr. at 2115 (Ray).

Also on the morning of December 2, 1991, counsel scheduled a Bankruptcy Court chambers conference for later in the day to advise the Bankruptcy Court of events that had occurred during the Thanksgiving weekend. Tr. at 4002 (Handelsman); Rule 43 Tr. at 565–66 (Weisz).

During a telephone conversation on the morning of December 2, 1991, Creditors Committee counsel Leon Marcus asked Delta's counsel Lawrence Handelsman for an

---

**24.** At trial Mr. Ray first testified that he did not believe the Business Plan was viable, but he changed his testimony the next day. *Compare* Tr. at 1987, 1989, 1991, 2107 *with* Tr. at 2102, 2056 (Ray). Since Mr. Ray demonstrated a poor memory of events generally, his change of testimony seems questionable.

**25.** At trial Mr. Ray did not testify that he concluded that Delta would not proceed with the Joint Plan as stated in the Amended Consolidated Complaint nor did he state that he advised Pan Am executives or counsel to that effect.

unconditional commitment that Delta would fund the Joint Plan on the Effective Date. Tr. at 4005–07 (Handelsman); Tr. at 4791–93 (Marcus). During the telephone call, Mr. Handelsman responded that he did not have the authority to make such a commitment. Mr. Handelsman told Mr. Marcus his understanding of Delta's position, which was that Delta would not provide Pan Am with additional DIP financing but that Delta had not made a final decision regarding funding of Pan Am II and would wait and see what developed. Mr. Handelsman then stated his understanding that Delta would decide whether or not to fund based on circumstances that existed on the Effective Date of the Joint Plan. Tr. at 4005–07 (Handelsman); Tr. at 4877 (Marcus). Mr. Marcus also told Mr. Handelsman that counsel for Pan Am wanted to withdraw the Joint Plan but that Pan Am could not do so without the consent of the Creditors Committee, and that Mr. Marcus wanted to go forward with a confirmation hearing in order to set up a lawsuit against Delta. Tr. at 4004 (Handelsman).

During that telephone call with Mr. Handelsman, Mr. Marcus also stated that "what he really wanted was not a lawsuit [but to go forward with confirmation, and] fix whatever is wrong later, we will worry about it later." Tr. at 4005 (Handelsman). Mr. Handelsman replied that it was Delta who bore the risk of such an approach since Delta would be making a substantial investment in connection with the Joint Plan. Tr. at 4005 (Handelsman).

In another telephone call on the morning of December 2, 1991, Pan Am counsel George Weisz told Delta counsel Lawrence Handelsman that, if Pan Am obtained $75 million in additional concessions for 1992 from Pan Am's unions and trade creditors, Mr. Andresen and Pan Am's accountant, Robert Finlayson, would be prepared to testify that the business plan was viable for 1992 without making a reexamination of projections for 1993. Tr. at 4000–01 (Handelsman); Rule 43 Tr. at 559 (Weisz).[26]

On the morning of December 2, 1991, Creditors Committee counsel Leon Marcus informed PBGC representatives Diane Burkley, Jeffrey Cohen, Carol Flowe, John Menke and Mark Cantor that George Weisz had advised Mr. Marcus that Delta was not going to fund Pan Am II. Mr. Marcus stated that the Creditors Committee and Pan Am planned to continue to work toward satisfying the conditions to the Joint Plan and to the proposed agreements relating to the Delta investment in Pan Am II so that there was no charge by Delta of Pan Am's anticipatory repudiation in a subsequent lawsuit which would be brought against Delta, and that Pan Am's counsel Mr. Weisz planned to represent to the Bankruptcy Court that "Delta has taken so much out [in interest rates and fees] [that] no one will testify as to feasibility." Pl.Ex. 4239 at 2; Pl.Ex. 4240 at 2; *see also* Tr. at 4715–17, 4721–24, 4736 (Menke).

At the chambers conference in the Bankruptcy Court on the afternoon of December 2, 1991, Mr. Marcus again asked Mr. Handelsman for an unconditional commitment from Delta to fund the Joint Plan on the Effective Date. Mr. Handelsman stated that Delta could not make such a commitment in advance, but that Delta would wait to see what the circumstances were on the Effective Date before providing funds. Tr. at 4011–12 (Handelsman); Tr. at 3605–06, 4252 (Rinaldi).

The chambers conference before Bankruptcy Court Judge Cornelius Blackshear was held in the afternoon of December 2, 1991. Attendees included Pan Am's counsel George Weisz, Mr. Marcus, and Delta's counsel Joseph Rinaldi and Mr. Handelsman, among others. Tr. at 4008 (Handelsman). At the chambers conference, Mr. Weisz informed the Bankruptcy Court that, unless Pan Am was able to obtain an additional $75 million in concessions for 1992 from its unions and trade creditors, Pan Am might be forced to shut down, and that in that event Pan Am did not see any alternative but to withdraw the Joint Plan. Tr. at 4009–10 (Handelsman). Mr. Marcus responded that

---

**26.** There was no evidence that Pan Am ever obtained such additional concessions or told Del- ta such concessions had been obtained.

he did not want to withdraw the Joint Plan, that he thought he could show that the conditions to the Joint Plan had been satisfied, and that he wanted to proceed with confirmation. Tr. at 4010 (Handelsman).

Mr. Weisz initially testified (at the Rule 43 hearing) that because Judge Blackshear told him during the chambers conference on December 2, 1991:

No, it's silly, we don't need to have a full-blown confirmation hearing. Show up, you'll make your statement on the record so that the people in the audience will understand just what has happened, and we'll just do that. You don't have to come with your witnesses and that kind of thing.

Rule 43 Tr. at 570–71. At his deposition Mr. Weisz did not recollect Judge Blackshear saying that he did not have to come in with his witnesses or that Judge Blackshear said "let's have the hearing tomorrow anyhow." Rule 43 Tr. at 572–76 (Weisz). During trial, Mr. Weisz testified that his testimony recorded at the Rule 43 hearing was "not entirely accurate" because the Bankruptcy Court had not instructed him to forego the confirmation hearing. Tr. at 2829 (Weisz).

Creditors Committee counsel Leon Marcus testified at trial that "Judge Blackshear told George Weisz at that point that it would not be necessary to waste the Court's time and go forward with confirmation [on December 3.]" Tr. at 4789 (Marcus). Mr. Marcus also testified that Mr. Weisz mentioned at the chambers conference that "Delta was not going to fund on the day following the confirmation hearing" and that "Pan Am had no funds to get [to] the end of that ten day period [when Delta would consider funding.]" Tr. at 4788 (Marcus). Mr. Marcus testified that it was in that context that Judge Blackshear stated that if Pan Am "couldn't go on,

[then] the witnesses should not be prepared" for a confirmation hearing. Tr. at 4875 (Marcus).

Neither Mr. Handelsman nor Mr. Rinaldi, who also attended the chambers conference, recall Judge Blackshear instructing Pan Am not to proceed with confirmation. Tr. at 3605–08 (Rinaldi); Tr. at 4008–12 (Handelsman).

(4) *Events of December 3, 1991*

On December 2 and 3, 1991 Pan Am management turned their attention to the possibility of Pan Am II not coming into existence, and determined that an orderly shutdown would be a complex undertaking. Accordingly, their time was devoted to those activities. Union negotiations meanwhile were continued by Mr. Kimmins and a board meeting was held.

According to Pan Am's Chief Executive Officer Russell Ray, it was he who made the decision on the morning of December 3, 1991 not to proceed with a confirmation hearing on the advice of counsel. Tr. at 2114–16 (Ray). Mr. Ray remembered no details of the advice he received but did indicate that he was taking steps from December 1 onwards to prevent the potential ill effects of an uncontrolled shutdown. Tr. at 1963, 2115–16 (Ray).[27]

Mr. Weisz later testified that he advised Mr. Ray on December 3, 1991 to adjourn the confirmation hearing to avoid the possibility of an uncontrolled shutdown that might arise if Pan Am obtained confirmation of the Joint Plan. Tr. at 2813–15 (Weisz). Mr. Weisz testified that there was a risk of an uncontrolled shutdown if Pan Am's cash balances ran below $5–6 million. Tr. at 2800 (Weisz).[28]

---

**27.** Mr. Weisz explained that funds were needed to avoid an uncontrolled shutdown by purchasing fuel to bring the planes back to the United States, hire security to protect them, and protect the foreign employees of Pan Am from personal liability. Tr. at 2801 (Weisz).

**28.** According to Pan Am's Assistant Treasurer Joan Fabio, on December 3, 1991, Pan Am had $9.5 million in cash in domestic accounts, and $15 million in cash in foreign accounts, Tr. at 2756–57 (Fabio); *see also* Def.Ex. NZ. Ms. Fabio testified the cash in foreign accounts was not

available to be used to sustain Pan Am's operations after December 3 because it was needed in case of a shutdown. Tr. at 2789 (Fabio).

On December 3, 1991, Pan Am also held $54 million in escrow from the sale of the Shuttle assets to Delta. *See* Def.Ex. BZ at 74. During the hearing on December 3, 1991, the Bankruptcy Court granted Pan Am authority to use up to $4 million of the escrowed funds to sustain Pan Am's operations while primed interim financing was sought. *Id.* at 54–77. Pan Am never asked the Bankruptcy Court for permission to use the

On the morning of December 3, 1991, Mr. Marcus asked Mr. Handelsman if Delta would agree to permit Delta's security interest in Pan Am's assets to be "primed" by a TWA lien in order to provide Pan Am with $15 million in secured interim financing (*i.e.*, to allow TWA a priority over Delta's security interest). Tr. at 4791 (Marcus); Tr. at 4013–14 (Handelsman). Following the conversation with Mr. Marcus, Mr. Handelsman consulted with Messrs. Allen, Harkey and Roeck of Delta, who determined that Delta would agree to be primed. Tr. at 3004–05 (Harkey); Tr. at 4308 (Allen). In a subsequent telephone call at 12:30 p.m., Mr. Handelsman told Mr. Marcus that Delta would agree to be primed, as requested. Tr. at 4792 (Marcus); Tr. at 4015 (Handelsman). Mr. Marcus reported Delta's agreement to be primed to the Bankruptcy Court at the hearing that was held that afternoon. Def.Ex. BZ at 23. On the morning of December 2, 1991, Jonathan O'Herron of Lazard Freres & Co., Pan Am's investment banking advisors, told Mr. Marcus that Lazard Freres would not agree to provide any primed interim funding to Pan Am. Tr. at 4883 (Marcus).

In a telephone conversation with Mr. Marcus on December 2, 1991, Hank Handelsman, a representative of the Pritzker family interests, stated that the Pritzkers would not provide primed interim financing to Pan Am. Tr. at 4884–85 (Marcus).

The PBGC was approached about providing primed interim financing to Pan Am out of the $54 million in funds held in a Pan Am escrow account for the PBGC. Tr. at 2869 (Weisz); Tr. at 2194 (Cohen). The PBGC did not agree to provide primed interim financing to Pan Am from the available funds. Tr. at 2198 (Cohen).[29]

### (5) *Events at the Bankruptcy Court hearing*

During the Bankruptcy Court hearing held on December 3, 1991, the Bankruptcy Court gave Pan Am permission to use funds in the escrow account if needed, but the PBGC resisted the Bankruptcy Court's efforts to

make use of such funds even to provide Pan Am with one day's operating funds. Def.Ex. BZ at 74–79.

At the confirmation hearing scheduled by the Bankruptcy Court on December 3, 1991, Pan Am and the Creditors Committee failed to present testimony that the Joint Plan was feasible on the terms and conditions set forth in the Joint Disclosure Statement. Thus, a condition to any obligation by Delta to invest in Pan Am II was never met by Plaintiffs.

On December 3, 1991, Pan Am's Chief Executive Officer Russell Ray decided not to proceed with a confirmation hearing relating to the Joint Plan. Tr. at 2115 (Ray). In a memorandum dated December 4, 1991 to all Pan Am employees, Mr. Ray explained his decision as follows: "With the cash problem, the dismal economic climate, and the projections of reduced revenues as well as that of Delta's, our future is too risky to find the sources to fund the new company. Optimism and prayer could not overcome the reality of these poor industry market conditions and recession in our country." Def.Ex. OZ.

### II. *NO EVIDENCE DELTA REPUDIATED ITS OBLIGATIONS TO INVEST IN PAN AM II*

■ Plaintiffs' argument that by refusing to make a decision to invest in Pan Am II prior to the effective date Delta repudiated its obligations under the August 11, 1991 Letter Agreement and the October 22, 1991 Letter Agreement is not supported by evidence.

### A. *Delta had no Obligation under the Agreements to Fund prior to the Effective Date (a Defined Term under the Joint Plan)*

The October 22 Letter Agreement refers to the Effective Date, defined as "the date the Plan of Reorganization becomes effective," which the Disclosure Statement states "is expected to occur no earlier than approximately 10 days after the date the Bankruptcy

---

escrowed funds to fund operations beyond December 4 or to prevent an uncontrolled shutdown. Tr. at 2876 (Weisz).

**29.** Pan Am apparently had funds to operate beyond Saturday, December 8, 1991 since Mr. Ray and Mr. Wiesz had decided to ask for an adjournment until that date. Tr. at 2830 (Weisz).

Court confirms the Plan" unless all the parties agreed otherwise. Joint Ex. 9 at DP016901; Joint Ex. 12 at D378174. Throughout the relevant period, Pan Am's Senior Management and its legal advisors knew that funding of Delta's investment in Pan Am II might not occur until up to ten days after entry of a confirmation order. *See* Tr. at 2005–06 (Ray); Tr. at 1696–99 (Andresen); Def.Ex. EA (Ray); Def.Ex. DY at D313130 (Cooke); Def.Ex. BZ at 56 (Weisz). The Disclosure Statement and Joint Plan also provided that the loans furnished under the Delta Junior DIP would mature on December 3, 1991. Joint Exhibit 12 at D378189.

There is no evidence that Delta repudiated its obligation to invest in Pan Am II and its actions are inconsistent with repudiation. Delta caused $400 million in funds to be made available in the week of November 25 in anticipation of the transaction.

Minutes prior to the Bankruptcy Court hearing on December 3, 1991, Delta's general counsel Robert Harkey signed a CRAF settlement agreement that would have resolved the claims of the United States Air Force against Pan Am arising out of the CRAF program. Under the settlement agreement, Delta would have assumed certain of Pan Am obligations to the United States Air Force. Tr. at 2966 (Harkey); Def.Ex. PN. When the hearing did not proceed on December 3, 1991, Pan Am refused to sign that settlement agreement. Tr. at 2538–39; 2575–78 (Rendich).

Karin Day of Delta's outside counsel continued to revise and draft the documents relating to the proposed Working Capital Facility Agreement and the proposed Senior Note Purchase Agreement up until the Bankruptcy Court hearing on December 3, 1991. Tr. at 3517–18 (Day). Delta also continued to work on the technical aspects of code sharing between Delta and Pan Am II until after December 3, 1991. Tr. at 3435 (Sohl).

(1) *The September Discussions and the Joint Plan of Reorganization*

The timing of Delta's investment in Pan Am II was first discussed among Delta, Pan Am and the Creditors Committee at a meeting on September 6, 1991. Tr. at 3562–63

(Rinaldi); 3975–80 (Handelsman); 4781–83 (Marcus). Attendees at the meeting included Lawrence Handelsman, Joe Rinaldi, Robert Davis, Nancy Schwartzkopf, Leon Marcus, Ray Mantle, Henry Miller, Michael Gagnon and Marc Richards. Tr. at 3975–76 (Handelsman); Tr. at 1410–14 (H. Miller); Rule 43 Tr. at 544–47 (Gagnon).

Prior to the September 6th meeting, counsel to the Creditors Committee had circulated a draft of a plan of reorganization for Pan Am which provided, *inter alia,* for an "Effective Date" that was ninety days after the date on which an order confirming the plan became a "Final Order." Tr. at 3977 (Handelsman); *see* Def.Ex. GU at D375404.

At the September 6th meeting, Mr. Handelsman, counsel to Delta, stated that the ninety day period was too long. Tr. at 3978–79 (Handelsman); Tr. at 3562–63 (Rinaldi). Mr. Handelsman suggested that the period be shortened to have the Effective Date occur ten days after entry of a confirmation order because this would be more appropriate. Tr. at 3979 (Handelsman); Tr. at 3563 (Rinaldi); Tr. 4783 (Marcus). In response, Leon Marcus, counsel to the Creditors Committee, agreed that the Effective Date should be on December 10 or December 11, ten days after the confirmation hearing then expected to occur on or about December 1. Tr. at 3979 (Handelsman); 3564 (Rinaldi); *see also* Tr. at 1415–17 (H. Miller); Def.Ex. EC at PR26113 (notes of Henry Miller); Def.Ex. ED at PW156392 (notes of Michael Gagnon); *cf.* Tr. at 4783 (Marcus).

The first Joint Plan of Reorganization filed by Pan Am and the Creditors Committee with the Bankruptcy Court on September 24, 1991 reflected the definition of Effective Date that had been discussed at the meeting on September 6, 1991. *See* Pl.Ex. 3145 at DT0060963–66. The first Joint Plan defined the "Effective Date" to be the first business day following the "Confirmation Date." *Id.* at DT0060965. The "Confirmation Date," however, was defined not as the date of the confirmation order, but as the date on which an order confirming the Joint Plan became a "Final Order." *Id.* at DT060963. "Final Order" was defined as

an order or judgment of the Bankruptcy Court (or, as appropriate, the United States District Court for the Southern District of New York or any court having the right to determine any appeal thereof), including any revision, modification, or amendment: (a) as to which the time to appeal or seek reargument, rehearing, reconsideration or certiorari has expired without any such action having been taken, waived or rendered moot; (b) as to which no timely-filed appeal, reargument, rehearing, reconsideration or certiorari is pending, or if it is pending, as to which no stay is in effect; or (c) that has been affirmed on any timely-filed appeal or reargument, rehearing reconsideration or certiorari and as to which the time to take any further appeal, reargument, rehearing, reconsideration or certiorari has expired, been waived or rendered moot.

*Id.* at DT0060966.

Bankruptcy Rule 8002(a) provides that a notice of appeal from a judgment, order or decree of the Bankruptcy Court may be filed within ten days of the entry of such judgment, order, or decree. Fed.R.Bankr.P. 8002(a).

The Revised Joint Plan, attached to the First Amended Disclosure Statement that was filed with the Bankruptcy Court on October 24, 1991, contains definitions of "Effective Date," "Confirmation Date" and "Final Order" that are substantially the same as those definitions in the September 24th Joint Plan. *See* Joint Ex. 12 at D378295–97. In the Revised Joint Plan, "Final Order" was defined as:

an order or judgment of the Bankruptcy Court (or, as appropriate, the United States District Court for the Southern District of New York or any court having the right to determine any appeal thereof), including any revision, modification, or amendment: (a) as to which the time to appeal or seek reargument, rehearing, reconsideration or certiorari has expired without any such action having been taken, *or with such action having been* waived or rendered moot; (b) as to which no timely-filed appeal, reargument, rehearing, reconsideration or certiorari is pending, or if it

is pending, as to which no stay is in effect; or (c) that has been affirmed on any timely-filed appeal or reargument, rehearing reconsideration or certiorari and as to which the time to take any further appeal, reargument, rehearing, reconsideration or certiorari has expired, been waived or rendered moot.

Joint Ex. 12 at D378297 (emphasis added to show change from version of September 24).

The Joint Plan filed on September 24, 1991 and the Revised Joint Plan filed on October 24, 1991 each provided that the Delta Subscription Agreement, the Term Loan Agreement and the Revolving Credit Agreement would become effective on the Effective Date of such plan. Pl.Ex. 3145 at DT0060981; Joint Ex. 12 at D378308.

The understanding of the parties with respect to the date on which funding of Pan Am II would occur did not change as the result of the October 22 Letter Agreement. No provision of that document provides for a closing date of December 4, 1991 as contended by the Creditors Committee and Pan Am. *See* Joint Ex. 9.

(2) *The October 22 Letter Agreement and the October 24 Disclosure Statement*

In a telephone conversation one or two days before the parties entered into the October 22 Letter Agreement, Pan Am's outside counsel Robert Davis discussed with Delta's outside counsel, Joseph Rinaldi, the timing of Delta's proposed investment in Pan Am II. Tr. at 3566–67 (Rinaldi). Mr. Davis recalls having at least one telephone conversation with Mr. Rinaldi during that time period in which he and Mr. Rinaldi exchanged views on the appropriateness of various provisions of the draft letter agreement. Tr. at 323–24 (Davis).

During the telephone conversation, Mr. Davis stated that he was concerned with the gap between the end of the DIP financing to be provided in connection with the October 22 Letter Agreement which was December 3, 1991 and the date upon which Delta would fund Pan Am II. Tr. at 3567 (Rinaldi). Mr. Rinaldi responded that the September filing had contemplated that Delta would not invest in Pan Am II until the plan of reorganization

had become effective, which could be after a period of up to ten days after the confirmation order was entered. *Id.* Mr. Davis replied that he did not want to reopen issues that had been resolved and that he would let Mr. Rinaldi know if there was a problem with the possible gap period.[30] Mr. Davis then dropped the issue. Tr. at 3568 (Rinaldi).

The October 24 Disclosure Statement, which was drafted by Pan Am's counsel under Mr. Davis's direction and supervision, signed by Pan Am and the Creditors Committee, filed with the Bankruptcy Court, and circulated to all creditors after a Bankruptcy Court hearing as to its adequacy, clearly recognizes that Delta's investment in Pan Am II would not occur until after a confirmation order became a final order that was no longer subject to appeal, which would be up to ten days after entry of such order and after all conditions were satisfied. The Disclosure Statement provides that:

> ... EVEN THOUGH SINCE OCTOBER 11, 1991 DELTA HAS MADE AND, SUBJECT TO CERTAIN CONDITIONS, PROPOSES TO MAKE CERTAIN ADDITIONAL LOANS AVAILABLE TO THE DEBTORS PURSUANT TO THE DELTA JUNIOR DIP, NO ASSURANCE CAN BE GIVEN THAT ADDITIONAL FUNDING OF THE DEBTORS WILL NOT BE NECESSARY FOR THE DEBTORS TO CONTINUE OPERATIONS UNTIL THE EFFECTIVE DATE OF THE PLAN, ON WHICH DATE, SUBJECT TO CERTAIN CONDITIONS, DELTA WILL FUND THE WORKING CAPITAL FACILITY, THE TERM LOAN, THE STOCK SUBSCRIPTION AND THE STOP LOSS AMOUNT

> (IF ANY), NET OF THE AMOUNTS REQUIRED TO REPAY THE DELTA JUNIOR DIP. (*SEE* SECTION IV(B)(10 BELOW). THERE CAN BE NO ASSURANCE THAT THE DEBTORS WILL BE ABLE TO OBTAIN ANY SUCH ADDITIONAL FUNDING THAT MAY BE NEEDED....

Joint Ex. 12 at D378170.

The Disclosure Statement states that the Working Capital Facility Agreement would become effective on the Effective Date of the Joint Plan. Joint Ex. 12 at D378203; *see also id.* at D378170, D378176. The Disclosure Statement also provides that Delta's purchase of the Senior Notes and the common stock would occur on the Effective Date of the Joint Plan. Joint Ex. 12 at D378170, D378176 (senior notes), D378205 (stock).

In a section entitled "Overview of the Plan" on page 5, the Disclosure Statement provides in boldface type that:

> THIS DISCLOSURE STATEMENT AND THE PLAN ASSUME THAT THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT ON DECEMBER 3, 1991, THAT THE SECOND PHASE OF THE DELTA TRANSACTION (DESCRIBED IN SECTION IV(B)) WILL BE CONSUMMATED ON OR ABOUT NOVEMBER 1, 1991 (THE "DELTA CLOSING") AND THAT THE EFFECTIVE DATE WILL OCCUR ON OR BEFORE DECEMBER 15, 1991.

Joint Ex. 12 at D378170.

The testimony of Pan Am's counsel Robert Davis that this language was included to obviate the need for recirculation of the Dis-

---

**30.** In view of the clear language in the Revised Joint Plan of Reorganization, the date of December 5, 1991 which appears in the termination provision (section 6.08) of the draft of the Stock Subscription Agreement that was attached to the October 22 Letter Agreement does not reflect the intent of the parties that an earlier closing was contemplated and appears to be a tentative date or an error. *See* Joint Ex. 9 at DP017026.

The Disclosure Statement drafted by Pan Am's counsel provided that the Effective Date of the Joint Plan could be as late as December 31, 1991. *See* Joint Ex. 12 at D378233 ("If the Plan is confirmed on December 3, 1991, however, it is expected that the Effective Date will occur later

in December 1991 but on or prior to December 31, 1991"); *id.* at D378246 (same); D378247 (same); D378248 (same). As drafted with the December 5, 1991 date inserted, the termination provision of the draft Stock Subscription Agreement is inconsistent with other provisions of the same draft. For example, section 5.01 of the draft Stock Subscription Agreement provides that the agreement "shall become effective on the date that the Plan of Reorganization becomes effective," Joint Ex. 9 at DP017023, which the Disclosure Statement acknowledges would be a date later in December, after the confirmation, *see, e.g.,* Joint Ex. 12 at D378170, D378174, D378233.

closure Statement in the event that the confirmation hearing was delayed, *see* Tr. at 293 (R. Davis), ignores the language itself, which provides that, *assuming* confirmation occurs on December 3, 1991, the Effective Date would occur on or before December 15, 1991.

In a subsequent section describing the merger of old Pan Am into Pan Am II, the Disclosure Statement provides that:

> The Plan contemplates that, on the Effective Date, *which is expected to occur no earlier than approximately 10 days after the date the Bankruptcy Court confirms the Plan,* or such other date as the Debtors, the Creditors Committee and Delta agree, PAC and PAA will merge with and into Pan Am. . . .

Joint Ex. 12 at D378174 (emphasis added).

The same provision in the September 24th Disclosure Statement does not contain the phrase "which is expected to occur no earlier than approximately 10 days after the date the Bankruptcy Court confirms the Plan . . . ," *see* Pl.Ex. 3145 at DT0060829. The only inference that can be drawn is that such language was purposefully added by Pan Am's counsel between September 24, 1991 and October 24, 1991.

The "Business Plan" section of the Disclosure Statement states in several different places that "If the Plan is confirmed on December 3, 1991, however, it is expected that the Effective Date will occur later in December 1991 but on or prior to December 31, 1991." Joint Ex. 12 at D378233, D378246, D378247, D378248.

(3) *Other Evidence that Pan Am Expected an Interval prior to the Effective Date*

In addition to the clear language of the Disclosure Statement and Joint Plan, testimony and other documents show that Pan Am's senior officials and legal advisors were aware throughout the relevant period of the ten day interval between confirmation of a plan and the Effective Date.

In a newswire to all Pan Am employees on November 11, 1991, Pan Am's Chief Executive Officer Russell Ray wrote that the confirmation hearing was expected to occur on December 3, 1991, and that "IF THE JUDGE SIGNS THE ORDER ON THAT DATE[,] THE PLAN WILL BECOME EFFECTIVE AFTER A TEN DAY PERIOD WHICH IS SET ASIDE FOR THE APPEALS." Def.Ex. EA. Employee newswires from Mr. Ray were ordinarily shown to Pan Am's counsel before being released. Tr. at 2004 (Ray). The November 11 newswire correctly reflected Mr. Ray's understanding of the Effective Date at the time. Tr. at 2006 (Ray).

Mr. Ray also testified that to his knowledge, no one had waived the appeal period that he understood would occur after confirmation. Tr. at 2013 (Ray).

Pan Am's Chief Financial Officer Rolf Andresen similarly understood that the full ten-day appeal period might have to run before an investment by Delta in Pan Am II could occur. Tr. at 1699 (Andresen). Prior to the filing of the Disclosure Statement on October 24th, Mr. Andresen had a conversation with Pan Am's general counsel, Roger Cooke, about the Effective Date. During that conversation, Mr. Cooke told Mr. Andresen that the Joint Plan contemplated a ten-day appeal period, which the parties could agree to forego, but that a waiver of such appeal period was not assured. Tr. at 1696–97 (Andresen).

A memorandum sent by Mr. Cooke to the prospective members of the reorganized Pan Am's board of directors on November 20, 1991 also establishes Mr. Cooke's awareness of the ten-day period. *See* Def.Ex. DY. In that memorandum, Mr. Cooke wrote that:

> Assuming the Plan is confirmed on the 3rd, it may become effective as early as December 4, 1991 if Delta Air Lines, Inc. ("Delta"), Pan Am and the Creditors' Committee agree to the waiver of certain conditions precedent. Otherwise it will become effective on December 13, 1991.

*Id.* at D313130. Mr. Cooke discussed a draft of that memorandum with Robert S. Harkey, Delta's general counsel, on November 19, 1991. Tr. at 2978–82 (Harkey).

In commenting on an earlier draft of Mr. Cooke's memorandum, Mr. Harkey recognized the ten-day period but did not make reference to the waiver of conditions precedent. Instead, Mr. Harkey proposed language which stated that:

Assuming the Plan is confirmed on the 3rd, it may become effective as early as 12/4 if Delta, Pan Am and the [Creditors Committee] agree. Otherwise it will become effective on December 13.

Def.Ex. RD; Tr. at 2978–82 (Harkey).

At a meeting on November 30, 1991 between Delta and Pan Am officers and professional advisors, Robert Davis, Pan Am's outside counsel, acknowledged that Delta had never committed to funding before the plan became effective, Tr. at 3575 (Rinaldi); Tr. at 2998–99 (Harkey), and referred to a period of ten days before the anticipated Effective Date.

Similarly, at a hearing before the Bankruptcy Court on December 3, 1991, Mr. Davis's partner, George Weisz, told the court:

> We all had lived these weeks in the hope that Your Honor would sign a plan and it would be effective on December 13th, we knew of nobody who would appeal who would get a stay.

Def.Ex. BZ at 56.

Pan Am's claim of reliance on an earlier funding date is overwhelmed by the weight of the evidence. Pan Am offered testimony by Michael Gagnon and Andrew Miller of Price Waterhouse and Pan Am's Assistant Treasurer Joan Fabio that they relied on conversations with Mr. Roeck and Mr. Sanregret of Delta on October 18, 1991 and October 20, 1991 in which each stated that funding by Delta would occur on December 3 or December 4, 1991. Rule 43 Tr. at 513–14 (A. Miller). Mr. Roeck does not recall such a conversation. Tr. at 3716–17 (Roeck). Mr. Miller did not check subsequent documentation to see whether it reflected his discussion with Mr. Roeck. Rule 43 Tr. at 523.[31] After the meeting with Mr. Sanregret, Mr. Andresen raised the issue with Pan Am's general counsel Roger Cooke, Tr. at 1780–82 (Andresen), who said that there was a period for appeal up to ten days long between confirmation and the Effective Date that the parties might agree to forego before the Effective Date. Tr. at 1696–97 (Andresen). Thus the CFO of Pan Am could not have relied on Mr. Sanregret's statement that funding would occur on December 4th. Mr. Andresen was also aware that Mr. Sanregret could not bind Delta to significant business points without first consulting with senior Delta officers in Atlanta. Tr. at 1683 (Andresen); Tr. at 505–06 (Gagnon).

Neither Mr. Miller nor Mr. Gagnon, who were both present at the October 20th meeting with Mr. Sanregret, relied upon any statements by Mr. Sanregret to arrive at an understanding that Delta would fund Pan Am II on December 4th. *See* Rule 43 Tr. at 513–15 (A. Miller); Rule 43 Tr. at 532, 699 (Gagnon).

Mr. Gagnon testified that his understanding that Delta would fund the proposed working capital facility on December 4th was based on a conversation he had with Mr. Handelsman in the hallway of the Bankruptcy Court on October 21st or October 22nd. All Mr. Gagnon recalled from the conversation was the impression that Mr. Handelsman had indicated that funding would be available after the date of confirmation, with no specific date or time period mentioned. Mr. Gagnon could not remember anyone else participating in the conversation, Rule 43 Tr. at 532 (Gagnon), and Mr. Handelsman does not recall participating in any such conversation. Tr. at 4112–13 (Handelsman).

Plaintiffs' testimony concerning those pre-agreement conversations is inconsistent with the plain language of the Joint Plan and the Disclosure Statement, which were signed by

---

**31.** Ms. Joan Fabio testified that on October 20th during a meeting that was attended by Mr. Sanregret of Delta, Mr. Andresen and Ms. Fabio of Pan Am and Michael Gagnon and Andrew Miller of Price Waterhouse, Mr. Sanregret told Ms. Fabio that the funding for Pan Am II would occur around December 3rd or December 4th. Tr. at 676–77 (Fabio). Mr. Sanregret acknowledged the substance of the conversation but stated that he had said he "assumed" funding would occur at that time. Tr. at 3332–33 (Sanregret). Ms. Fabio's claim of reliance is undercut by the weekly cash forecast used by the parties during the weekend of October 19–20, 1991 in which she projected that, assuming Pan Am used the $140 million in DIP financing, it would have a cash balance on December 13, 1991 of $4.1 million. Def.Ex. IU at PN50188; Rule 43 Tr. at 657–59 (Fabio). If Ms. Fabio believed that Delta was to fund Pan Am II on December 3 or 4, 1991, then there would be no reason to forecast to December 13, 1991.

Pan Am and the Creditors Committee, filed with the Bankruptcy Court, and circulated to all creditors after those statements were allegedly made by Delta representatives. The only conclusion to draw is that although some individuals working on the Plan of Reorganization may have believed, hoped or have now rationalized that the agreement provided that funding would occur on the date of confirmation, neither Pan Am senior management nor the Creditors Committee had such an understanding and did not rely on such oral statements as commitments by Delta.

(4) *Possibility of an Early Closing Date*

Although Delta never agreed to a closing on December 4, 1991, Delta understood that a closing as early as December 4, 1991 was a possibility if no objections were filed or if waivers of appeal were obtained. *See* Tr. at 4080–84 (Handelsman); Tr. at 3099–100; 3138–39 (Harkey). Indeed, in commenting to Roger Cooke, Pan Am's General Counsel, on a draft memorandum on November 19, 1991, Delta's General Counsel Robert Harkey wrote that "Assuming the Plan is confirmed on the 3rd, it may become effective as early as 12/4 if Delta, Pan Am and the Creditors Committee agree. Otherwise it will become effective December 13." Def.Ex. RD; Tr. at 2979–81 (Harkey).

The extrinsic evidence relied upon by Pan Am is consistent with Delta's position that a closing as early as December 4 was possible but required an evaluation of the events and circumstances at that time. *See, e.g.,* Pl.Ex. 956 at ZS5163 ("Consummation of these transactions, which have been approved by a federal bankruptcy court, can occur on or after December 4, 1991"); Pl.Ex. 512 at PG004315. *Compare* Def.Ex. AIY at SP01791 (same language with date of December 15, 1991).

The early draft of a confirmation order prepared by Delta's counsel does not show an intent to have an Effective Date immediately following entry of a confirmation order. Pl. Ex. 525 at DP020911. The last paragraph of that draft confirmation order states:

As allowed by Bankruptcy Rule 8005, notwithstanding Bankruptcy Rule 7062, this order shall become effective and enforceable and effective immediately upon entry.

Pl.Ex. 525 at DP020940; *see also* Fed. R.Civ.P. 62. While that provision might have operated to foreclose the entry of any stays of a confirmation order by the Bankruptcy Court, including the automatic ten-day stay that otherwise would arise under Bankruptcy Rule 7062, the order (if entered in that form) would not have abrogated any creditor's right to appeal or to seek a stay from the District Court. Tr. at 4118–21 (Handelsman). Thus, the draft confirmation order, even if it had been agreed to by all parties and signed by the Bankruptcy Court in exactly that form would not have precluded any appeal or reduced the risk relating to any such appeal. Accordingly, the draft language cited by Plaintiffs is not relevant to the issue of the Effective Date of the Joint Plan.

Two documents prepared by Delta's public relations department on the afternoon and evening of December 3, 1991, after the Bankruptcy Court hearing on that date had begun, are consistent with Mr. Handelsman's testimony. A Delta press release, released at 8 p.m. on December 3, 1991, *see* Def.Ex. DNB, states that "Delta Air Lines today said it would not loan Pan Am additional money prior to the Effective Date of Pan Am's proposed Plan of Reorganization on December 14." Pl.Ex. 917. The press release did not exclude the possibility that the Effective Date could be earlier than December 14 in the proper circumstances, although at the time that the document was released, that was unlikely because Pan Am had not proceeded with confirmation at the December 3 hearing. A Delta public relations department "Q & A" that was prepared on the afternoon of December 3, 1991 similarly states that "Delta informed Pan Am that it could not agree to Pan Am's request to provide additional funding to Pan Am prior to the Effective Date of Pan Am's proposed Plan of Reorganization," and later states that "The proposed plan would become effective on December 14." Pl.Ex. 4009. Like the press release issued later that evening, the "Q & A" accurately reflects the circumstances that existed as of the afternoon of December 3, 1991, at which time developments were such that there was no indication

that the Effective Date would be any sooner than the full ten days after confirmation. The release does not indicate that Delta was unwilling to agree to an Effective Date earlier than December 14 in the proper circumstances.

There is no evidence that anyone from Pan Am saw either the December 3 press release or the "Q & A" before Pan Am decided not to proceed with a confirmation hearing on December 3, 1991 and decided not to proceed due to its contents.

### B. *Delta was not Obligated to Provide Interim Financing for Pan Am prior to the Effective Date*

■ The claim by the Creditors Committee and Pan Am that Delta had an obligation to provide interim financing to Pan Am to fund to the Effective Date is not supported by the evidence.

#### (1) *The Drawdown Schedule and Pan Am's Cash Balance*

The drawdown schedule for the Second Tranche of Junior DIP financing was developed by representatives of Pan Am, the Creditors Committee and Delta during a meeting on October 20, 1991 at the Pan Am building. Tr. at 3193 (Sanregret). The drawdown schedule was based on cash forecasts prepared by Joan Fabio, Pan Am's Assistant Treasurer, including the attachments to Exhibit 532. Rule 43 Tr. at 712 (Gagnon); Pl.Ex. 532; *see* Rule 43 Tr. at 628–29 (Fabio); Def.Ex. IU.

The drawdown schedule for the Second Tranche was designed so that Pan Am would continue to have a cash balance of $10 million before each scheduled borrowing. Rule 43 Tr. at 709 (Gagnon).

The Second Tranche drawdown schedule under the amended Loan Agreement provided for a cash balance of $10 million on No-

vember 29, 1991 plus borrowing of $10 million on November 29, 1991. *See* Joint Ex. 10 at D369816; Def.Ex. IU at PW0050195; Pl. Ex. 532 at PW156567.

On Friday, November 29, 1991, Pan Am drew down $10 million as its last payment under the DIP financing. Joint Ex. 9 at DP17051; Joint Ex. 10 at D369816; Pl.Ex. 708. On that date its cash balance was $10 million, thus providing a total of $20 million.[32] On November 27, 1991 Pan Am asked Delta for an additional $20 million. Pl.Ex. 708. In the evening of December 1, 1991, after meeting with Pan Am on Saturday, November 30, 1991 to review Pan Am's financial situation, Delta's CFO Mr. Allen determined not to lend Pan Am the $20 million in DIP financing requested.[33]

At that time Mr. Allen had been advised at a joint meeting of Pan Am and Delta personnel that: (1) Pan Am was projecting losses for November and December 1991 of $19.5 million and $9 million respectively; (2) Pan Am's revenue forecasts for the first half of 1992 were $33 million below the Business Plan while Delta's forecasts were $52 million below the Business Plan for the first half of 1992; (3) Pan Am projected increased losses for Pan Am II in 1991–92 totalling approximately $41.6 million over the October projection; (4) No union agreements had been reached as of December 1, 1991; (5) Mr. Andresen stated that Pan Am II required a liquidity line of $75 million whereas Delta's CFO Mr. Roeck was of the opinion that $100 million was required; (6) The administrative solvency of the creditor's estate was at least $10–11 million insolvent (Mr. Gagnon's estimate); (7) The Creditors Committee was seeking to use up to $100 million of assets assigned to Pan Am II to meet its administrative solvency requirements; (8) Pan Am's counsel would not agree to provide requested opinions of counsel that the securities to be issued to Delta would be valid and binding,

---

32. Pan Am had been unable to demonstrate that its disbursements exceeded its receipts in order to receive the DIP funding as planned on two earlier occasions in November.

33. On December 3, 1991, Pan Am had cash on hand of $9.5 million in domestic accounts. Def. Ex. NZ. Pan Am also had over $15 million in

cash in foreign bank accounts, some of which were frozen by those countries. Tr. at 2787–88 (Fabio). If Pan Am had continued to operate beyond December 4, 1991, some of those funds in its foreign bank accounts would also have been available to sustain its operations. Tr. at 2789 (Fabio).

and Pan Am's counsel also had not provided a certificate of assets which would secure the credit Delta was providing; (9) Pan Am wanted to extend the terms of the Senior Notes and working capital agreement from those in the October agreement; (10) The PBGC, a major creditor, would oppose confirmation unless Delta and/or Pan Am II provided more cash for the creditors; and (11) Mr. Marcus had threatened to tie up any DIP funds of Delta if the confirmation did not go through.

Delta had no legal obligation under the DIP agreement to loan Pan Am more money. Furthermore, since the prospects for confirmation looked bleak and Mr. Marcus had threatened to tie up Delta's DIP funds if the reorganization did not go through, it would have been poor business judgment to advance the $20 million in funds which were subject to being tied up by Mr. Marcus. Plaintiffs have taken the position however that Delta's refusal to provide the $20 million in interim funding constituted a repudiation by Delta of its obligation to invest in Pan Am, basing their position on Pan Am's not having sufficient funds otherwise to operate until December 13, 1991, and that accordingly Pan Am was excused from proceeding with the confirmation hearing and order.

Plaintiffs' argument assumes that the Business Plan was viable. Mr. Andresen and Mr. Ray had admitted on Saturday, November 30, that the Business Plan was not viable and that additional funding of about $75 million was required. Under the circumstances facing Delta this funding would have had to come from Delta. Secondly, even assuming that the Business Plan was viable, Plaintiffs' argument also presumes that other funding could not have been obtained from any source; there was no restriction on other funding. In fact, Delta agreed to be primed. TWA, the Pritzkers, Lazard Freres and the PBGC all refused to provide funds.[34] If, as Plaintiffs claim, the Plan was viable and there was administrative solvency, then it strains credulity that an advance would not

have become available on the primed basis which Delta allowed.

Furthermore, Pan Am's lack of funds is questionable. December 13, 1991 was a Friday. Mr. Weisz stated that on Monday, December 2, 1991 the decision had been made on to postpone the decision to go ahead with confirmation until Saturday, December 7. On December 3, 1991 Pan Am had about $9 million. Def.Ex. NZ. The shutdown expenses Pan Am sought to protect were not just the cost of bringing planes and crews back to the United States and insuring that Pan Am did not run out of funds on December 3, 1991, but also to have funds available for storage costs, for marshalling the assets, protecting the assets ("making certain that you would have something to sell,") Rule 43 Tr. at 653 (Fabio), and the only reasonable conclusion is that Pan Am failed to go ahead with the confirmation not because it would be unable to operate until December 12, 1991, but because it knew it could not prove viability of the Business Plan and its administrative solvency on December 3, 1991, and wanted to use its remaining funds for the purposes Ms. Fabio stated. Rule 43 Tr. at 653 (Fabio).[35] Thus Delta's refusal of additional funds did not cause the Business Plan to be aborted.

C. *Delta's Actions were not those of an Insider*

■ There is no evidence that Delta was in "control" of Mr. Ray or Pan Am at any time or that Delta or its three executives at Pan Am headquarters made any decisions that should have been made by Pan Am's management or board of directors. Indeed, there is no evidence that Delta had any type of relationship with Pan Am other than the ordinary relationship of an acquiring organization engaged in major corporate transactions with Pan Am.

Shortly after the August 12 Bankruptcy Court hearing, Mr. Allen of Delta suggested to Mr. Plaskett of Pan Am that Delta send three employees to New York to act as coor-

---

34. There was no evidence that any banks were approached or would not agree to be placed in a primed condition.

35. Notes taken at the meeting on the morning of December 2, 1991 by Mr. Menke indicated that the Creditors Committee wanted sufficient funds in the estate to sue Delta. Pl.Ex. 4239; *see also* Tr. at 4722–23 (Menke).

dinators between Pan Am and Delta in connection with the proposed transactions. Tr. at 88 (Plaskett); Tr. at 1040–41, 1076 (McHugh). At Pan Am's suggestion, an office on the 46th floor of the Pan Am building was made available for use by three Delta employees—Harold Achtziger, Vice–President Operations, James Sanregret, Director Financial Planning and Control and Thomas Kerns, Vice President International Marketing. Tr. at 1041–42, 1076 (McHugh); Tr. at 89 (Plaskett).

Those three Delta employees worked on issues relating to Delta's acquisition of Pan Am's Shuttle and Atlantic assets, and provided input into Pan Am's planning for Pan Am II. Tr. at 4045–46 (Pappas); Tr. at 3662 (Roeck). Those Delta employees were invited and did attend meetings of Pan Am's "transition team," Tr. at 4045–46 (Pappas). The "transition team" was composed of various members of Pan Am's management. It was similarly responsible for coordinating the transfer of assets to Delta pursuant to the Asset Purchase Agreement and for planning for the operations of Pan Am II. Tr. at 4041–46 (Pappas); Tr. at 1935 (Ray); Tr. at 937–38 (Punwani); Def.Ex. AEL.

The "transition team" did not have any role in the daily operations of Pan Am, which were directed by Pan Am's Chief Operating Officer Peter McHugh until October 31, 1991, Tr. at 1063–64 (McHugh), and by Pan Am's new Chief Executive Officer Russell Ray thereafter. Tr. at 1935–39 (Ray). The three Delta executive assigned as liaisons did receive and review the operational, financial and marketing reports of Pan Am received by the transition team on a regular basis and made reports to senior management of Delta on a daily basis. Delta took no role in running the operations of Pan Am. Tr. at 1077–79 (McHugh).

During the Pan Am bankruptcy case, the Creditors Committee was critical of Pan Am's incumbent management, and in particular the three executives in Pan Am's "Office of the Chairman": Thomas Plaskett, the

Chief Executive Officer; Peter McHugh, the Chief Operating Officer; and Richard Francis, the Chief Financial Officer. Tr. at 4816–17 (Marcus); Tr. at 1401–02 (H. Miller); Def. Ex. HM; Def.Ex. CS. Initially Delta had expressed its confidence in Pan Am's management and its desire to keep management in place. Def.Ex. CS. On August 19, 1991, in a meeting with Mr. Allen of Delta in New York, Mr. Plaskett informed Mr. Allen that he was not interested in running Pan Am II. Tr. at 75–76 (Plaskett).

At a meeting during the next week, Creditors Committee counsel Leon Marcus told Mr. Allen of Delta that Pan Am's senior management should be replaced as soon as possible. Tr. at 4274–75 (Allen). Based on the requests of Plaskett and the Creditors Committee, Mr. Allen began searching for a possible replacement for Mr. Plaskett and a possible CEO for Pan Am II shortly thereafter. Tr. at 4275–78 (Allen).

At an industry gathering during the first week in September, Delta's President Hawkins approached Russell Ray, a vice president of McDonnell Douglass, former senior executive at Eastern Airlines with marketing experience in Latin America and the former President of Frontier Airlines, about his possible interest in becoming Chief Executive Officer of Pan Am II. Mr. Ray said he was interested in such a possibility. Tr. at 4277–82 (Allen); Tr. at 1927–28 (Ray).

Discussions between Mr. Ray, Mr. Ray's counsel and Delta continued during the next week. Tr. at 1929 (Ray); Tr. at 84 (Plaskett). Mr. Ray informed his employer, McDonnell Douglass, of his interest in the position at Pan Am. Tr. at 1930 (Ray).[36] On September 17 or September 18, less than a month after Mr. Plaskett had first raised the need for a new Chief Executive Officer with Delta, Mr. Plaskett learned that Mr. Ray was Delta's nominee for his replacement. Tr. at 85–86 (Plaskett).

Mr. Ray was subsequently approved by the Creditors Committee and by Pan Am's board of directors as interim Chief Executive

**36.** On September 11, 1991, while Delta was having discussions with Mr. Ray, representatives of the Creditors Committee offered the job of interim Chief Executive Officer to Peter McHugh, Pan

Am's Chief Operating Officer, whom the Committee had criticized in the past. Tr. at 1064–66 (McHugh); Tr. at 273 (Lockhart).

Officer of Pan Am and to be the new Chief Executive Officer of Pan Am II. He began work on October 1, 1991. Tr. at 1932 (Ray).

Thus at the behest of both the Creditors Committee and Pan Am's incumbent management, Delta in a reasonably quick fashion sought out and proposed a mutually acceptable nominee with airline experience in Latin America to serve as Chief Executive Officer of Pan Am II.

After he began work at Pan Am, and until Pan Am ceased operations, Mr. Ray had some contact with Delta executives in Atlanta. Those contacts generally involved progress reports by Mr. Ray on items that needed to be accomplished for the reorganization. Tr. at 1939 (Ray).

Delta's actions were normal actions of a corporation about to invest over $300 million in a corporate transaction and did not constitute actions consistent with an insider relationship.

### D. *Delta Acted in Good Faith*

■ Delta's actions and positions in the days leading up to the scheduled confirmation hearing on December 3, 1991 do not show bad faith, but rather Delta made a continuing, substantial effort toward a successful reorganization of Pan Am. During that period, which culminated in a series of meetings on November 30 and December 1, 1991, Delta learned of serious problems with the Business Plan for Pan Am II.[37] That the problems with the Business Plan were both serious and surprising is confirmed by Creditors Committee counsel Leon Marcus who testified that he was "shocked" on December 1, 1991 when he first learned of the size of the deterioration to the Business Plan in a discussion with Mr. Andresen. Tr. at 4826, 4830, 4833 (Marcus).

In view of the circumstances confronting it, Delta made two decisions: first, it declined to agree to provide additional interim DIP financing to Pan Am that it had no contractual obligation to provide; and second, it decided

to wait to evaluate the circumstances in order to determine whether the prerequisites for funding under the Joint Plan, including confirmation, could be met. As Pan Am's Chief Executive Officer Russell Ray testified: "It was their money. It was their shareholders to whom they had to answer. In that regard, I'd have to say in the context as a businessman I believed they operated in good faith...." Tr. at 2045–46 (Ray).

#### (1) *Delta Provided Substantial Marketing Support to Pan Am*

Shortly after Bankruptcy Court approval of the Asset Purchase Agreement on August 12, 1991, and throughout the period until Pan Am ceased operations, Delta provided substantial advertising and sales promotion support to Pan Am. This support featured advertising of Pan Am's current routes as well as the future route system of Pan Am II. Tr. at 3364–89 (Walz); Def.Exs. SQ, ST, SU, DDI, DDH, DDE, DDF, DDG, DDJ, RB, DDD.

Between August 12 and December 4, 1991, Delta developed and paid for three advertising campaigns featuring Pan Am and its proposed relationship with Delta, at a cost to Delta of over $6.4 million. Tr. at 3364–3389 (Walz); Def.Ex. SQ.

The first campaign, the "Pan Am International Promotion," was intended to stimulate traffic on Pan Am's Atlantic routes during September and October thereby providing increased revenue to the estate prior to Delta's takeover. Def.Ex. ST; Def.Ex. DDH; Def.Ex. DDI (ad copy). The promotion offered a free Delta companion ticket to passengers travelling on Pan Am's flights to Europe. Def.Ex. DDH. The "Pan Am International Promotion" appeared in 16 different newspapers and on 33 different radio stations in and around New York City, Boston, the District of Columbia and Philadelphia between August 27, 1991 and October 1, 1991. Tr. at 3376 (Walz); Def.Ex. SQ. Delta spent approximately $1.8 million on media costs alone (not including production costs)

---

**37.** Also during that period, Delta learned of other possible problems that could prevent or delay confirmation of the Joint Plan and that could cause the conditions to any Delta funding obligation to remain unsatisfied. Delta was the only

party making a financial investment in Pan Am II with its contribution of over $300 million. It was reasonable for Delta to measure its actions carefully in relation to the information it received from Pan Am and others.

for the "Pan Am International Promotion." Tr. at 3377–78 (Walz); Def.Ex. SQ.

The second campaign, entitled "Delta's World," featured the Pan Am and Delta logos as well as route maps that included the routes flown by Delta and to be flown by Pan Am II. Def.Ex. DDE; Def.Ex. DDF; Def. Ex. DDG. The "Delta's World" campaign ran in over 50 newspapers and magazines, including *The Wall Street Journal, USA Today,* Newsweek, The Economist, The New Yorker, Time and various trade publications, from October 16 through early December 1991. Tr. at 3380, 3382 (Walz); Def.Ex. SQ. The "Delta's World" campaign cost Delta approximately $4.6 million in media costs alone (not including production costs). Tr. at 3383 (Walz); Def.Ex. SQ.

The third campaign was aimed at members of Pan Am's frequent flyer program, World-Pass, which was to merge with Delta's frequent flyer program on November 1, 1991. On October 28, 1991, Delta ran an advertisement informing WorldPass members that their accumulated mileage would be honored on Delta. The advertisements ran in the *Wall Street Journal* and *U.S.A. Today* at a cost to Delta of approximately $140,000. Tr. at 3387, 3389 (Walz); Def.Ex. SQ.

Delta merged Pan Am's WorldPass into the Delta Frequent Flyer program. Tr. at 129 (Plaskett). As Mr. Plaskett testified, the merger of frequent flyer programs helped generate ticket purchases that Pan Am otherwise would not have received. Tr. at 131 (Plaskett).

The evidence shows that Delta arranged for marketing and advertising support for Pan Am promptly after August 12, 1991 and continued to provide such support until Pan Am ceased operations. The Plaintiffs have offered no evidence showing that the advertising and marketing support provided by Delta was inadequate or unreasonable.

### (2) *Delta Worked in Good Faith to Implement Code Sharing with Pan Am*

In its August 11 proposal, Delta proposed a single-designated code sharing relationship with Pan Am II similar to the type of code sharing that Delta had with its "Delta Connection" carriers. Joint Ex. 11 at D297322; *see* Def.Ex. DHF; Tr. at 3452 (Sohl) (single-designated code sharing described). Delta's code sharing proposal allowed Pan Am to adopt and display the "DL" code on its flights. *Id.* at D297305.[38]

Pan Am was opposed to the single-designated code sharing relationship that Delta had proposed, instead preferring a dual-designated code sharing relationship similar to the relationship that Pan Am had with United Airlines. Tr. at 3406–7, 3412, 3424 (Sohl); *see* Def.Ex. DHF; Tr. at 4038 (Pappas Dep.); Tr. at 3412, 3424 (Sohl).

At a meeting between Pan Am and Delta employees on August 19, 1991, Delta's System Manager of Marketing Technologies, Mark Sohl, explained that Delta had the technical capability to implement single-designated code sharing almost immediately but that Delta's computer system would not be able to accommodate dual-designated code sharing without changes which would take considerably longer to make. Tr. at 3404–07 (Sohl). Mr. Sohl stated that until Delta's computer system was reprogrammed the dual-designated code sharing would be a "nightmare" from Delta's perspective because, unlike single-designated code sharing, it would require a large amount of manual handling of passenger records. Tr. at 3406 (Sohl).

During a telephone conversation on September 17, 1991, Pan Am's Vice President for Airline Planning, John Lewis, agreed with Mr. Sohl that the manual handling that would be required in a dual-designated code sharing relationship on the scale proposed for Pan Am II could be prohibitive. Tr. at 3419 (Sohl).

Delta and Pan Am discussed code sharing at a meeting on October 9, 1991 between Mr. Sohl of Delta and Messrs. Plaskett, Ray and Lewis of Pan Am, among others. Tr. at

---

**38.** Code sharing allows flights connecting between two airlines to receive the same priority in computer reservations systems as connections between flights of a single carrier, resulting in more sales of those flights and more revenues than otherwise would be obtained. Tr. at 3455 (Sohl); Pl.Ex. 4111.

3425–26 (Sohl). Mr. Lewis again agreed that manual handling would be a problem in a dual-designated code sharing arrangement, but the representatives could not agree on a code sharing method at the meeting. Tr. at 3426 (Sohl).

On or about October 17, 1991, Mr. Leonard of Pan Am agreed to a three-phased approach to code sharing that had been proposed by Mr. Sohl. Tr. at 3428 (Sohl); *see* Def.Ex. TF. Under that approach, Pan Am and Delta would phase-in from single-designated code sharing to dual-designated code sharing as programming changes were made over time. Def.Ex. TF.

The parties initially contemplated that the first phase of the code sharing plan would begin on December 15, 1991. In early November, however, the parties agreed to postpone the commencement of code sharing until February 1, 1992 in order to avoid a conflict with flight operations and to have the least negative impact on operations. Tr. at 3428–29 (Sohl).

Delta continued to work on the implementation of the first phase of the code sharing plan until December 6, 1991. Tr. at 3435 (Sohl).

The record demonstrates that any delay in implementing code sharing with Pan Am II is attributable to Pan Am's insistence on dual-designated code sharing which Pan Am had learned Delta could not implement quickly.

### (3) *Delta Hired Extra Pan Am Employees and Deferred Hiring Key Employees at Pan Am's Request*

On August 11, 1992 Delta agreed to increase the number of Pan Am employees it had committed to hire in connection with the Asset Purchase Agreement by over 1,000 Pan Am employees to 6600. This helped to reduce Pan Am's and the estate's employee-related expenses and helped Pan Am efforts to reduce the personnel for Pan Am II. Pl. Ex. 917; Pl.Ex. 4009.

At Russell Ray's request, Delta agreed to defer the employment date of certain key Pan Am employees whom Delta had agreed to hire in order to permit those employees to continue their functions at Pan Am during the transition to Pan Am II. Tr. at 2025–26 (Ray); Def.Ex. DS at D306903–04. In a letter to Delta on November 8, 1991, Mr. Ray wrote that he believed the

> "lending of employee" assistance which has been transpiring between our two companies has been going extremely well. Despite some adverse media reports harmful to both of us, at least our employees seem to be working very well together.

Def.Ex. PX at D305899.

### (4) *Delta Assisted in Pan Am's Lease Negotiations with Airbus*

In November 1991, Mr. Ray asked Mr. Allen if Delta would intervene in negotiations between Airbus Industrie ("Airbus") and Pan Am to reduce the aircraft lease rates to amounts which were feasible for Pan Am II to assume, and Mr. Allen agreed. Tr. at 4285–87 (Allen); Def.Ex. XE; Def.Ex. DS.

At Mr. Ray's request, Mr. Allen visited Airbus headquarters in Toulouse, France and met with Jean Pierson, that firm's Chief Executive Officer. Def.Ex. XE. Mr. Allen asked Mr. Pierson to reduce the lease rates and relax other conditions that Airbus was insisting be agreed to by Pan Am. Tr. at 4285–86 (Allen). Mr. Allen described Delta's interest in the success of Pan Am II, and told Mr. Pierson that anything Airbus could do to help that success would be appreciated by Delta, a large new customer of Airbus as the result of the acquisition of a number of Airbus aircraft from Pan Am in connection with the Asset Purchase Agreement. Tr. at 4287–88 (Allen).

Although Pan Am ultimately agreed to lease rates with Airbus that were higher than anticipated in the Business Plan, Tr. at 1673–74 (Andresen), Mr. Ray acknowledged that Delta's intervention with Airbus was helpful to Pan Am in reaching agreement for some reductions from Airbus. Tr. at 2022–24 (Ray).

### E. *Delta State of Mind: Reasonable not to Fund*

█ Pan Am's last evaluation of the Business Plan was the "Financial Review" prepared by Mr. Andresen prior to the Novem-

ber 30, 1991 meeting with Delta representatives.

By November 25, 1991 Mr. Andresen had determined that Pan Am II would be unable to repay the Senior Notes in 1994–96, demonstrating that Pan Am II was not viable even under Pan Am's own definition of viability. Tr. at 1449–50 (Punwani) (defining viability as the ability to fund operations and pay off debts); Tr. at 798 (Andresen); Pl.Ex. 805 at D320492.

In the November 30 "Financial Review," Mr. Andresen assumed that Pan Am II would suffer net revenue shortfalls of over $27 million through June 1992. Pl.Ex. 809 at DT474. Those revenue projections were very optimistic and were much more favorable to Pan Am than Mr. Lewis's "straight line" outlook of November 18, 1991, in which Mr. Lewis had forecast revenue shortfalls of over $26 million for the first quarter, Pl.Ex. 803 at DT457, in addition to the $9 million revenue shortfall that Mr. Lewis had forecast for December 1991, Pl.Ex. 802 at DT459.

When asked whether reasonable airline people could have disagreed on November 30, 1991 as to whether Pan Am II was a viable entity, Mr. Andresen testified that "It's in the realm of what people ... could disagree about" and that reasonable people could differ with the assumptions that he used in assembling his "Financial Review." Tr. at 1784–85 (Andresen).

(1) *Belief that Rolf Andresen Could Not Testify in Support of the Joint Plan*

At the meeting on December 1, 1991, Mr. Roeck and Mr. Allen also understood that Mr. Andresen had acknowledged that there had been substantial adverse developments to the Business Plan and told Delta that he would not be able to testify in support of the Joint Plan. Tr. at 4303 (Allen); Tr. at 3699–3700 (Roeck).

On the evening of December 1, 1991, following the meeting with Messrs. Ray and Andresen, Mr. Allen reported to Delta's counsel Lawrence Handelsman, Robert Har-

key and others that Mr. Andresen had stated that he would not be able to testify that the Joint Plan was viable and that Mr. Andresen said he had already told that to George Weisz. Tr. at 3998 (Handelsman). Delta representatives reported Mr. Andresen's statement to representatives of the PBGC the following day. Tr. at 4691–92 (Menke).

Delta's counsel also reported Mr. Andresen's statement to the Bankruptcy Court during the hearing on December 3, 1991. Def.Ex. BZ at 38. When pressed by the Bankruptcy Court, Pan Am's counsel Mr. Weisz did not deny that Mr. Andresen had said the Business Plan was not viable. *Id.* at 39–40.[39]

(2) *Belief that Russell Ray Could not Testify in Support of the Joint Plan*

At a meeting on Sunday evening December 1, 1991, Messrs. Allen and Roeck understood that Mr. Ray would not be able to testify that the Business Plan for Pan Am II was viable. Tr. at 3699 (Roeck); Tr. at 4303 (Allen). Mr. Ray admittedly had concerns during the weekend of November 30 and December 1, 1991 that Pan Am II would come into existence but would only last a few months. Tr. at 2110 (Ray).

Mr. Ray testified at trial that he told Delta he could not testify in support of the Joint Plan unless Pan Am "had a source of cash from Delta or someone else." Tr. at 1990–91 (Ray).

During his deposition, which Mr. Ray confirmed as accurate at trial, Mr. Ray testified that he "could not testify in court that it was a viable plan because I knew the liquidity problem. If you take liquidity out or cash reserve required to operate out with the support of a bank or a series of bankers, I'd say yes. Everything else, I would testify, was viable. That one element is in the way." Tr. at 2107 (Ray).

(3) *Belief that Pan Am's Revenue Projections were Overly Optimistic*

Delta's Vice President Coggin had determined that Pan Am projections were overly

---

**39.** The Creditors Committee's investment banker, Henry Miller, testified that a reasonable person with his financial background could have concluded that the Pan Am Business Plan was not

viable as of December 3, 1991, confirming that it was reasonable for Delta to conclude that the Business Plan would not be confirmed. Rule 43 Tr. at 258–60 (H. Miller).

optimistic (see page 458, *supra*). Daniel Kasper, Delta's expert witness, confirmed that Pan Am's projections as of November 30, 1991 for Pan Am II's liquidity as of November 30, 1991 were unrealistic given the deterioration in Pan Am's business condition in late 1991. Tr. 4387–88 (Kasper).

Mr. Kasper testified that Pan Am II's projected revenues as set forth by Pan Am as of November 30, 1991 were too high. Tr. 4388 (Kasper). Mr. Kasper created his estimate of Pan Am II's revenues for the period December 1991 through June 1992 based on information available to the parties as of November 30, 1991. Based on his revenue estimate, Mr. Kasper concluded that as of November 30, 1991, Pan Am was overstating Pan Am II's projected revenues for that seven-month period by $60.5 million. Tr. 4389–90 (Kasper); Def.Ex. DGI at Chart K–16.

Mr. Kasper testified that in his opinion, his estimate of Pan Am II's revenues for the period December 1991 to June 1992 was more realistic than the revenue projections for that period contained in the Business Plan in the Disclosure Statement or in the "Financial Review" of November 30, 1991. Tr. 4413–14 (Kasper); Def.Ex. DGI at Chart K–18.

Applying Mr. Kasper's revenue estimate to Pan Am II's projected liquidity as set forth in the November 30 "Financial Review," Pan Am II would have exhausted its liquidity by June 1992. Tr. 4415–17 (Kasper); Def.Ex. DGI at Charts K–19, K–20.

Under the same analysis, if the benefits of Pan Am II's use of the Pan Am estate receivables were removed from Mr. Andresen's "cash improvements," Pan Am II would have virtually exhausted its liquidity in December 1991 and would have completely exhausted its liquidity in January 1992. Tr. 4421–25 (Kasper); Def.Ex. DGI at Charts K–22, K–23.

Mr. Kasper concluded that the business prospects of Pan Am II viewed as of the end of November 1991 were dismal. Mr. Kasper based his conclusion on the rapid deteriora-

tion in Pan Am's revenues and advance bookings, Pan Am's inability to forecast its own revenues, the acknowledged increases in expenses, and the fact that it was very likely that Pan Am II would exhaust its liquidity during the first half of 1992. Tr. 4435–36, 4442–43 (Kasper). This analysis by Mr. Kasper is more credible than the Business Analysis offered by Plaintiffs' expert witness, Jon Ash, and is adopted by the Court.

### (4) The Creditors' Solvency Analysis was not Credible

On December 3, 1991, Pan Am did not have sufficient assets to satisfy administrative claims in whole or as compromised. As a result of such administrative insolvency, the Joint Plan could not be confirmed.

Pan Am and the Creditors Committee relied on Michael Gagnon, an accountant retained by the Creditors Committee, to testify about administrative solvency. Tr. 464 (Gagnon). Mr. Gagnon's testimony was to be based on an analysis prepared at his direction, the last version of which was prepared sometime on December 3, 1991. *See* Pl.Ex. 937; Tr. at 458–59 (Gagnon). All but two of the figures set forth in Mr. Gagnon's final solvency analysis were "estimates." Tr. at 560 (Gagnon).

Various estimates by Mr. Gagnon had been predicting that Pan Am would be administratively insolvent.[40] Tr. at 3191–92 (Sanregret) (estimate of $10–11 million insolvency as of October 19–20); Tr. at 3254–56 (Sanregret) (estimate of $13 million insolvency as of November 26); Def.Ex. NF (same).

Mr. Gagnon's final analysis, Pl.Ex. 937, as of the afternoon of December 3, 1991 showed an insolvency of $1 million based on improvements in a number of categories. Despite Pan Am's poor November operational results, during the morning of December 3, Mr. Gagnon improved his November 26, 1991 estimate for accounts receivable from $140 million to $145 million. *Compare* Def.Ex. OU *with* Pl.Ex. 937. Mr. Gagnon could not explain the reason for the improvement in his estimate, and testified that he did not receive any new information between the prepara-

---

40. Mr. Gagnon testified that, in his view, a shortfall of assets compared to liabilities of as little as

$1 million could have resulted in administrative insolvency. Tr. at 515 (Gagnon).

tion of those two analyses. Tr. at 522 (Gagnon). On November 25, Mr. Gagnon's estimate for accounts receivable had been $135 million. Def.Ex. NF. In view of the November reductions in revenues his increased estimate for receivables is not credible.

During the morning of December 3, Mr. Gagnon also reduced his estimate for liabilities for "other accounts payable" by $17 million, from $205 million to $188 million. Compare Def.Ex. OU with Pl.Ex. 937. Mr. Gagnon could not explain the reason for that change, and testified that he did not receive any new information during that period. Tr. at 555–59 (Gagnon). On November 25, Mr. Gagnon's estimate for "other accounts payable" had been $215 million. Def.Ex. NF. Mr. Gagnon could not explain why his estimate for Creditor Trust and transition costs to be borne by the Estate decreased from $50 million on November 25 to $45 million on December 3. Tr. at 555–56 (Gagnon); compare Def.Ex. NF with Pl.Ex. 937. These unexplained changes in Mr. Gagnon's analysis on December 3 total $22 million.

Significantly also Mr. Gagnon's liquidity analysis used more favorable estimates than Pan Am. On November 23 Pan Am's estimates for lease return claims were over $3 million higher than the $40 million estimate included by Mr. Gagnon in Exhibit 937 (after deducting $6.4 million in such expenses that he later eliminated as more properly expenses of Pan Am II). See Pl.Ex. 3017. Pan Am's estimates for Creditor Trust and transition costs to be borne by the estate were over $55 million, over $10 million higher than Mr. Gagnon's estimate in Exhibit 937. Pl. Ex. 3017.

As of December 3, 1991, over 2,000 employees would have had to be severed by Pan Am II after the confirmation hearing to comply with the Disclosure Statement. Pl.Ex. 3016; Tr. at 1451–53 (Punwani); Joint Ex. 12 at D378240. These severance claims were to be borne by the Creditors. Mr. Gagnon's estimate for severance claims was $22 mil-

lion. Pl.Ex. 937. Pan Am had filed a motion pursuant to section 1113 of the Bankruptcy Code to limit pre-confirmation severance claims asserted by Pan Am's unions to $22 million. Pl.Ex. 958 at 21. The motion however did not seek to limit the post confirmation severance claims of the 1,800 unionized employees who were to be furloughed after confirmation. See Pl.Ex. 3016. Those severance costs which under the Disclosure Statement were to be obligations of the estate, were not taken into account in Mr. Gagnon's analysis.

Mr. Gagnon used assumptions in his analysis that under the Financial Disclosure statement required Delta's approval. On November 27, 1991, James Sanregret of Delta sent Mr. Gagnon a memorandum outlining Delta's disagreements with certain assumptions in Mr. Gagnon's November 25, 1991 summary analysis. Def.Ex. QA; Tr. at 3250 (Sanregret). In view of the deterioration in Pan Am II's projected liquidity and its need for working capital, there was no reason to assume Delta would approve of those assets being used by the Estate.

Mr. Gagnon also assumed that administrative creditors would be entitled to $42 million in Pan Am's deposits and $15 million in prepayments. Pl.Ex. 937. The administrative creditors were not entitled to the use of those assets unless Pan Am, Delta and the Creditors Committee agreed. See Joint Ex. 12, section VIII(B)(4)(h) at D378204. Delta took the position that those assets should be retained for the benefit of Pan Am II as provided in the Disclosure Statement, which delineated deposits and prepayments as assets to be held by Pan Am II and not available to satisfy administrative claims. Def. Ex. QA at PW205493–94; Tr. at 3234–41 (Sanregret).

Mr. Gagnon's analysis did not make any provision for the $5 million in deposits for Pan Am II. Tr. at 542 (Gagnon). The opening balance on the balance sheets set forth in the Disclosure Statement stated that Pan Am II would have $5 million in deposits. Joint Ex. 12 at D378248. Those funds were essential to Pan Am II's viability. During the last week of November 1991, Mr. Andresen told Mr. Sanregret that Pan Am II would need at

least \$10–15 million in deposits. Tr. at 3278–79 (Sanregret); Def.Ex. QA at PW205493–94.[41]

During the last week in November, Mr. Gagnon estimated the amount of such "other accounts payable" to be \$215 million. Def. Ex. NF. On the morning of December 3, 1991, Mr. Gagnon reduced the estimate of "other accounts payable" to \$205 million, and again to \$188 million. Def.Ex. OU; Pl.Ex. 937.

In sum, the record establishes that on December 3, 1991, the Creditors Committee proposed solvency analysis for the December 3, 1991 was hearing was not credible. Based on the evidence presented, the only conclusion is that the Pan Am estate was far from administratively solvent and that Mr. Gagnon's analysis was designed to obtain approval of his solvency analysis by stripping Pan Am II of its assets. By itself, administrative insolvency would have prevented confirmation of the Joint Plan. *See* 11 U.S.C. § 1129(a)(9)(A). Alternatively, if that solvency analysis were approved, the court could not have approved the Business Plan or any business plan as viable.

III. ***PAN AM DID NOT SATISFY THE CONDITIONS PRECEDENT TO DELTA'S FUNDING OBLIGATION***

■ Beginning in August Delta made clear to Pan Am and the Creditors Committee that the conditions precedent to any Delta funding obligation were important elements of the proposed transaction, and repeatedly reminded Pan Am that the conditions precedent had to be fully satisfied before Delta would provide funding to Pan Am II. Def.Ex. DS; Def.Ex. LZ.

By its terms, the Joint Plan could not become effective unless certain conditions had been satisfied or waived. *See* Joint Ex. 12 at D378318–20. Satisfaction or waiver of each of the conditions to effectiveness of the Joint Plan was a condition to any Delta obligation to provide funds to Pan Am II. Joint Ex. 12 at D378319. In addition, the proposed Working Capital Facility Agreement, Senior Note Purchase Agreement and Stock Subscription Agreement were to include the following conditions that had to be satisfied or waived before any Delta funding obligation under those proposed agreements could arise. *See* Joint Ex. 9 at DP016942–950.

A. *Confirmation of a Plan of Reorganization Satisfactory to Delta*

Confirmation of a plan of reorganization satisfactory to Delta by December 5, 1991 was a condition precedent to any Delta funding obligation. Joint Ex. 12 at D378319.

Pan Am did not attempt to confirm the Joint Plan on December 3, 1991 or thereafter. The testimony as to why Pan Am did not proceed with a confirmation hearing on December 3, 1991 is self-contradictory.

At the Bankruptcy Court hearing on December 3, 1991, Creditors Committee counsel Leon Marcus told the Bankruptcy Court that "[t]aking out the Delta fees and the Delta repayment schedule and the code sharing numbers, Mike [Gagnon] from Price Waterhouse and his crew have done a terrific job of preparing a business plan that we think we can get testimony on." Def.Ex. BZ at 52. Obviously this "business plan" was not the Business Plan in the Disclosure Statement

---

**41.** The analysis of Pan Am's books and records conducted by Pan Am's Assistant Treasurer Joan Fabio for Mr. Gagnon's solvency analysis was not definitive. *See* Tr. at 2700–01 (Fabio). Ms. Fabio reviewed a print-out of asserted administrative claims and, based on her memory of Pan Am's books and records and applying her own judgments, without resort to the knowledge of other executives of Pan Am, determined which of those claims were valid and whether an appropriate accrual had been made for each valid claim in Pan Am's books. Tr. at 2700–01 (Fabio). Ms. Fabio testified that "Where I came upon a name that did not represent what I considered to be a valid claimant for administrative

purposes, I deemed that to be not necessary for consideration in the administrative estimation process." Tr. at 2701 (Fabio). Following her review of the printout of claims, Ms. Fabio reported to the accounting firms that their solvency analyses took into account every "valid" administrative claim asserted against Pan Am. Tr. at 2703 (Fabio).

Ms. Fabio testified that she did not have a detailed description of the claims that comprised that \$390.7 million amount, Tr. at 2743 (Fabio), and that her review did not cover at least \$220 million in administrative claims. *See* Pl.Ex. 3183; Tr. at 2742–43 (Fabio).

which provided for such fees, repayment schedule and code-sharing. Joint Ex. 12 at D378201–31.

Prior to the chambers conference, Creditors Committee counsel Leon Marcus testified that he wanted to go forward and confirm a plan. Tr. at 4875 (Marcus). It is evident that he had in mind some plan which was not the Business Plan set forth in the Disclosure Statement. Thus there is no evidence that any party was prepared to seek confirmation of the Business Plan.

Pan Am was not in a position to obtain confirmation of the Joint Plan on December 3, 1991. No Pan Am plan of reorganization was confirmed on or before December 5, 1991. Undisputed Facts ¶ 19. As of December 3, 1991, the Joint Plan was not satisfactory to Delta, and Pan Am and the Creditors Committee did not apprise Delta of any developments which would increase the viability of the plan. Tr. at 4304 (Allen).

B. *New Collective Bargaining Agreements "In Full Force and Effect"*

It was a condition precedent to any Delta funding obligation that Pan Am reach new collective bargaining agreements with each of its five unions and such agreements were required to be "in full force and effect." The new labor agreements, including the duration thereof, were required to be "in form and substance satisfactory to" Delta. Joint Ex. 12 at D378318.

Delta told Pan Am that it wanted new collective bargaining agreements to be "in full force and effect" in order to insure against a strike or union challenge during the five years of the Business Plan that could jeopardize Delta's investment. Tr. at 1314 (Kimmins); Def.Ex. LZ. Delta advised Pan Am that in order to be "in full force and effect," the new collective bargaining agreements had to be ratified in accordance with the constitution and/or by-laws of each of the respective unions. Def.Ex. LZ. Pan Am and the Creditors Committee acknowledged this requirement in the Disclosure Statement which states at page 70 that "[t]he Plan assumes that existing labor contracts with Pan Am's five labor unions will have been renegotiated and ratified prior to confirma-

tion of the Plan of Reorganization." Joint Ex. 12 at D378235.

Pan Am's Chief Executive Officer Russell Ray and chief labor negotiator William P. Kimmins knew that ratification of the new collective bargaining agreements was required. Def.Ex. CD; Pl.Ex. 958 at 6. During 1991 there were five principal unions which represented Pan Am's employees—the Independent Union of Flight Attendants (the "IUFA"), the Flight Engineers International Association (the "FEIA"), the Transport Workers Union (the "TWU"), the Air Line Pilots Association (the "ALPA"), and the International Brotherhood of Teamsters (the "IBT"). Tr. at 1270 (Kimmins). At the outset of negotiations between Pan Am and its unions, Mr. Kimmins told the leaders of the five unions that any new collective bargaining agreement had to be ratified by December 3, 1991. Tr. 1301, 1324–25 (Kimmins).

(1) *Independent Union of Flight Attendants*

In 1991, Mr. Brian Moreau was President of the IUFA. Tr. at 2413 (Moreau). During or before October 1991, Mr. Moreau told Mr. Kimmins that the IUFA had a lengthy ratification process. Tr. at 2413–14 (Moreau). During negotiations between Pan Am and the IUFA, Mr. Kimmins frequently told the IUFA leaders that they should attempt to reach an agreement with Pan Am as soon as possible in order to have a new, effective collective bargaining agreement in place by December 3, 1991. Tr. at 1312, 1317–18 (Kimmins). In response to questions by Mr. Kimmins about how IUFA leaders intended to have a new, effective agreement in place by December 3, 1991, Mr. Moreau told Mr. Kimmins not to worry how the IUFA would achieve this. Tr. at 1318, 1323 (Kimmins).

In 1991, the IUFA followed a procedure required by the IUFA Constitution and By-laws for approval of new collective bargaining agreements which included approval by the Negotiating Committee and by the Executive Board, and a ratification vote by the IUFA membership. Tr. at 2432–33 (Moreau). Exhibit 3162 is a copy of the constitution and bylaws of the IUFA that was in effect in December 1991 (the "IUFA Constitution"). Tr. at 2433 (Moreau); Pl.Ex. 3162.

Article X, Section 7 of the IUFA Constitution states at page 22 that "[a]ll proposed Collective Bargaining Agreements shall be subject to membership ratification." Pl.Ex. 3162. Article X, Section 8 of the IUFA Constitution states at pages 22–23 that:

The complete text [of a proposed Collective Bargaining Agreement] shall be available at each Base, and a synopsis of the text shall be sent to the membership prior to ratification vote by the membership.

Ratification shall be conducted as follows:

a. Prior to a strike—by secret mail ballot referendum;

b. During a strike—by a secret ballot at all Base membership meetings.

Pl.Ex. 3162.[42]

Article X, Section 10 of the IUFA Constitution states at page 23 that "[a] Proposed Agreement shall not be considered ratified unless a majority of the voting members in good standing votes in the affirmative." Pl. Ex. 3162.

Pan Am reached a tentative agreement with the Independent Union of Flight Attendants at approximately 12:00 noon on December 3, 1991 (the "IUFA Tentative Agreement"). Tr. at 2420 (Moreau); Tr. at 1289–90 (Kimmins); Def.Ex. VE at 15980. No signed copy of the IUFA Tentative Agreement exists. Tr. at 2420–21 (Moreau). The IUFA Executive Board voted to recommend to the IUFA membership that it ratify the IUFA Tentative Agreement. Tr. at 2434, 2448–49 (Moreau). No synopsis of the IUFA Tentative Agreement was ever prepared or made available to IUFA members. Tr. at

2452–53 (Moreau). The IUFA never informed its members that it was going to attempt a three-day membership ratification process commencing on December 3, 1991. Tr. at 2457 (Moreau).[43] There was no membership ratification vote with regard to the IUFA Tentative Agreement. Tr. 2440 (Moreau).

The IUFA never agreed to permit the imposition of the IUFA Tentative Agreement under Section 1113 of the Bankruptcy Code. Tr. at 2469 (Moreau). Delta was never shown, and never gave its approval of, the terms of the IUFA Tentative Agreement. Tr. at 1347, 1351–52 (Kimmins); Tr. at 3009 (Harkey).

In 1991, the IUFA had filed administrative claims for severance of approximately $40 million against Pan Am. Tr. at 2443 (Moreau). The Tentative Agreement which would have settled the IUFA's severance claims against Pan Am never was put into a final writing and was not signed. Tr. at 2444–45 (Moreau).

A new collective bargaining agreement between Pan Am and IUFA was not "in full force and effect" in accordance with the IUFA constitution and by-laws on December 3, 1991, nor did any party seek to have the court invoke section 1113 of the Bankruptcy Code. Pan Am and the Creditors Committee therefore failed to satisfy this condition to any Delta funding obligation.

#### (2) *Flight Engineers Int'l Ass'n*

Exhibit 3034 is a copy of the constitution and bylaws of the Pan Am chapter of the Flight Engineers International Association

---

42. Unless there was an ongoing strike, the IUFA Constitution did not permit ratification votes to be taken at IUFA bases. Tr. at 2452 (Moreau). In 1991, IUFA members on furlough could be permitted to participate in ratification votes on collective bargaining agreements depending on when they were furloughed and whether they had paid their dues while on furlough. Tr. at 2453 (Moreau). A significant number of IUFA members were on furlough as of early December 1991. Tr. at 1321 (Kimmins).

43. In 1985, the IUFA conducted a membership ratification vote which took 30 days to complete. Tr. at 2454 (Moreau). In 1988, the members of the IUFA voted to reject a newly negotiated collective bargaining agreement. Tr. at 2453–54

(Moreau); Tr. at 1322–23 (Kimmins). In the period after the IUFA members rejected the proposed collective bargaining agreement in 1988, the terms and conditions of the previous agreement remained in effect. Tr. at 2454 (Moreau). After the IUFA members rejected the proposed collective bargaining agreement in 1988, there were further negotiations and a second ratification vote on a new proposed agreement. Tr. at 2454 (Moreau). Each of the membership ratification votes conducted by the IUFA in 1988 took approximately 45 days to complete. Tr. at 2454 (Moreau). Since the current IUFA Constitution came into effect in 1985, the IUFA had never conducted a membership ratification vote in less than 30 days. Tr. at 2457 (Moreau).

that was in effect in December 1991 (the "FEIA Constitution"). Pl.Ex. 3125 at 19 (Grainger Dep.); Pl.Ex. 3034.

Article IX, Section 1(A) of the FEIA Constitution states at page 23 that:

> "The Employment Agreement between the Company and PAA Chapter, or other agreements that significantly and primarily affect hours of labor, wages or working conditions, shall not become operative or binding without the approval of two-thirds (⅔) majority weighted vote of the Board of Directors and subsequent approval of the majority of the respective general membership (Flight Engineers or Flight Engineer Instructors) that respond by Secret Ballot."

Pl.Ex. 3034.

During 1991, Mr. Maurice Grainger was Secretary–Treasurer of the Pan Am chapter of the FEIA. During November and December 1991, Mr. Grainger was President of the Pan Am chapter of the FEIA. Pl.Ex. 3125 at 7–9 (Grainger Dep.). On October 31, 1991, Mr. Grainger sent a memorandum to all Pan Am flight engineers and instructors which stated that "[n]egotiations, acceptance and ratification by December 3rd has [sic] been requested, so it will be a very busy November what with flying, holidays and Association work, and negotiations." Pl.Ex. 3035. During early November 1991, Mr. Grainger told Mr. Kimmins that there was a "time problem" with the FEIA's membership ratification procedures. Pl.Ex. 3125 at 38–39 (Grainger Dep.). During negotiations between Pan Am and the FEIA, FEIA leaders proposed to Mr. Kimmins that any new collective bargaining agreement be approved by the FEIA Board by December 3, 1991, and by a membership ratification vote after December 3. Mr. Kimmins said that this proposal was not acceptable and that Pan Am was not agreeable to FEIA conducting its membership ratification vote after December 3. Tr. at 1330–32 (Kimmins). Pan Am "constantly pushed aside" the FEIA in order to negotiate with the other, larger unions first.

Pl.Ex. 3125 at 39, 44 (Grainger Dep.). In late November 1991, just prior to Thanksgiving, Mr. Grainger told Mr. Kimmins that the FEIA was not going to be able to conduct a membership ratification vote by December 3, 1991. Pl.Ex. 3125 at 44–46 (Grainger Dep.).[44]

Witnesses testified that Pan Am reached a tentative agreement with the FEIA at approximately 10:30 a.m. on the morning of December 2, 1991 (the "FEIA Tentative Agreement"). Tr. at 1289 (Kimmins); Pl.Ex. 3125 at 54–55 (Grainger Dep.); Pl.Ex. 904. The FEIA Tentative Agreement was incorporated into a term sheet with attachments. Tr. at 1289 (Kimmins); Pl.Ex. 904. Attached as Attachment F to the FEIA Tentative Agreement was a letter from Mr. Grainger to Mr. Kimmins that was signed by Mr. Grainger and countersigned under the words "I concur with the above" by Mr. Kimmins. Pl.Ex. 904. Attachment F to the FEIA Tentative Agreement stated that:

> This will confirm our agreement that the tentative Collective Bargaining Agreement reached between Pan American World Airways and the Flight Engineers International Association on December 2, 1991 is contingent upon the ALPA, IBT and TWU *ratifying* new collective bargaining agreements with Pan American which conform to and meet the cost saving required by Pan American's proposals to the respective organizations on October 18, 1991.
>
> \* \* \* \* \* \*
>
> In the event those organizations [the ALPA, IBT and TWU] *fail to ratify the necessary agreements by December 3, 1991,* this tentative Collective Bargaining Agreement between FEIA and Pan American, whether or not it has been ratified, shall at FEIA's option be deemed null and void.

Pl.Ex. 904 (emphasis added). Attachment F to the FEIA Tentative Agreement was a part of, and constituted a term of, the FEIA Tentative Agreement. Tr. at 1338 (Kimmins).

---

44. In 1988, the FEIA had conducted a membership ratification vote with regard to a proposed collective bargaining agreement. The membership ratification process included "road shows" by union leaders and a voting period of between thirty and forty-five days. Pl.Ex. 3125 at 16–17 (Grainger Deposition).

On December 3, 1991, Mr. Grainger hand delivered a letter to Mr. Kimmins. Tr. at 1293, 1295 (Kimmins); Pl.Ex. 3125 at 73 (Grainger Dep.); Pl.Ex. 902. Mr. Grainger's December 3, 1991 letter to Mr. Kimmins stated that:

The constraints of time and the unprecedented emergency situation in which the Company finds itself, makes it impossible to submit the agreement for a vote by secret ballot prior to December 3, 1991. However, membership approval of the agreement as negotiated by our negotiating committee under the circumstances is expected.

Upon the representation of management that unless there has been a ratified agreement on wages and working conditions with all the unions on the property, the Company will immediately close its doors, and in the interests of preserving the jobs of all our members, as well as the recall rights of all our furloughees, as Chapter President, I declare to you that the agreement has been duly ratified by this Chapter, subject only to the ratification of agreements with all other unions on the property.

Pl.Ex. 902.

Mr. Grainger was not relying on any provision of the FEIA Constitution when he stated in his December 3, 1991 letter that "the agreement has been duly ratified by this Chapter." Pl.Ex. 3125 at 84–87 (Grainger Dep.). Delta was never shown, and never gave its approval of, the terms of FEIA Tentative Agreement. Tr. at 1334, 1338, 1347, 1351–52 (Kimmins); Tr. at 3009 (Harkey). The FEIA did not conduct a membership ratification vote with respect to the FEIA Tentative Agreement. Tr. at 1334, 1345 (Kimmins); Pl.Ex. 3125 at 56 (Grainger Dep.). The FEIA did intend to conduct a membership ratification vote with respect to the FEIA Tentative Agreement after Decem-

ber 3, 1991, but on December 3, 1991 there were no plans made as to when this vote would take place. Pl.Ex. 3125 at 75–76 (Grainger Dep.).

The FEIA Tentative Agreement was never ratified in accordance with the requirements of the FEIA Constitution. The FEIA Tentative Agreement was not "in full force and effect" on December 3, 1991. Pan Am therefore failed to satisfy this condition to any Delta funding obligation prior to the confirmation hearing.

#### (3) Transport Workers Union

Article XXV, Section 2 of the TWU Constitution states at page 72 that "[a]ny proposed agreement shall be subject to ratification by the members covered by such proposed agreement." [45] Pl.Ex. 964; Tr. at 2349 (Kerrigan).

TWU's International Secretary testified that the constitution requiring ratification was not applicable to Pan Am II because its President George Leitz had ruled that ratification was not required since the union had not yet been determined which TWU members employed by Pan Am would be the employees of Pan Am II and which might be DynAir employees under the prepared DynAir agreement ratification. Tr. at 2347–52 (Kerrigan).

Delta was never shown and never gave its approval of the TWU Tentative Agreement. Tr. at 1347, 1351–52 (Kimmins); Tr. at 3009 (Harkey). [46]

No signed agreement between Pan Am and the TWU was ever entered into, and no new agreement between Pan Am and the TWU was ever presented to the TWU membership for ratification. No new TWU agreement was "in full force and effect" on December 3, 1991. Therefore Pan Am failed to satisfy this condition to any Delta funding obligation.

---

**45.** Article V, Section 1 of the TWU Constitution states at page 7 that:

[The International President] shall interpret the meaning and application of the provisions of this Constitution. Any such interpretation or application may be appealed by any member or by any Local Union adversely affected to

the International Executive Council and thereafter, to the Convention.
Pl.Ex. 964.

**46.** In November 1991, the TWU had filed administrative pay claims of approximately $2.1 billion against Pan Am. Tr. at 2372 (Kerrigan); Pl.Ex. 1028.

Pan Am reached a tentative agreement with the Transport Workers Union (the "TWU Tentative Agreement") at approximately 4:00 a.m. on December 3, 1991. Tr. at 2358 (Kerrigan); Tr. at 1291–92 (Kimmins). The TWU Tentative Agreement was not signed by Pan Am or the TWU. Tr. at 2383 (Kerrigan); Tr. at 2487–88 (Bakalo). The TWU did not conduct a membership ratification vote with regard to the TWU Tentative Agreement.[47] Tr. at 1340, 1345 (Kimmins); Tr. at 2354–55 (Kerrigan).

(4) *Air Line Pilots Association*

Exhibit 3130 is a copy of the constitution and bylaws of the ALPA that was in effect in 1991 (the "ALPA Constitution"). Tr. at 1222–23 (Labbee); Pl.Ex. 3130. Article XVII, Section 1 of the ALPA Constitution states at page 42 that "[a]ny and all agreements, contracts or documents of any and every character whatsoever shall not become effective, binding or operative unless and until they bear the signature of the President." Pl.Ex. 3130.

Mr. Randy Babbitt was President of ALPA during 1991 as referred to in Article XVIII, Section 1 of the ALPA Constitution. Tr. at 1240, 1244 (Labbee). Captain Manueal Labbee was Chairman and Negotiating Committee Chairman of the Pan Am Master Executive Council of the ALPA in 1991. Tr. at 1221 (Labbee).

Messrs. Labbee and Kimmins testified that Pan Am reached a tentative agreement with the ALPA at approximately 2:00 a.m. on the morning of December 2, 1991 (the "ALPA Tentative Agreement"). Tr. at 1225–26 (Labbee); Tr. at 1288–89 (Kimmins). The ALPA Tentative Agreement was incorporated into a term sheet with attachments. Tr. at 1226 (Labbee); Tr. at 1289 (Kimmins); Pl.Ex. 3031. President Babbitt never signed the ALPA Tentative Agreement. Tr. at 1240–41 (Labbee).

Attachment G to the ALPA Tentative Agreement was a letter signed by Captain Labbee and countersigned under the words "I concur with the above" by Mr. Kimmins. Pl.Ex. 3031 at DT0119822.

Attachment G to the ALPA Tentative Agreement stated that:

This will confirm our agreement that the tentative Collective Bargaining Agreement reached between Pan American World Airways and the Air Line Pilots Association on December 1, 1991 is contingent upon the IBT, FEIA and TWU ratifying new collective bargaining agreements with Pan American which conform to and meet the cost saving required by Pan American's proposals to the respective organizations on October 18, 1991.

In the event those organizations [the IBT, FEIA and TWU] *fail to ratify* the necessary agreements by December 3, 1991, this tentative Collective Bargaining Agreement between ALPA and Pan American, whether or not it has been ratified, shall at ALPA's option be deemed null and void.

Pl.Ex. 904 (emphasis added).

Attachment G to the ALPA Tentative Agreement was a part of, and constituted a term of, the ALPA Tentative Agreement. Tr. at 1344 (Kimmins).

As of the time Pan Am ceased operations on December 4, 1991, ALPA had not made a decision whether to exercise its option to render the ALPA Tentative Agreement null and void under Attachment G in view of the other unions' failure to ratify new collective bargaining agreements. Tr. at 1250 (Labbee).

The ALPA Tentative Agreement was terminable at ALPA's sole option. The ALPA Tentative Agreement had been ratified by the ALPA membership in accordance with its Constitution and the failure of its President to sign could have been remedied. Thus this agreement is found to be the functional equivalent of being "in full force and effect" on December 3, 1991. However, in view of the failure of other unions to ratify, the tentative agreement was subject to cancellation by ALPA.

---

**47.** In 1988, the members of the TWU voted to reject a newly negotiated collective bargaining agreement. Tr. at 2387–88 (Kerrigan).

Furthermore, Delta was never shown, and never gave its approval of, the ALPA Tentative Agreement. Tr. at 1251, 1257 (Labbee); Tr. 1344, 1347 (Kimmins); Tr. 3007, 3009 (Harkey). This was important because Article 16, Section 16.2.1 of the Joint Plan sets forth as a condition to effectiveness of the Joint Plan that all liabilities under the Pilots "A" Plan be fully discharged. Joint Ex. 12 at D378318. The Pilots "A" Plan was not terminated by the parties and the liabilities of the Pilots "A" Plan were not fully discharged as of the time Pan Am ceased operations on December 4, 1991. Tr. at 1259 (Labbee); Tr. at 2148–50 (Cohen); Def.Ex. CN. Attachment D to the ALPA Tentative Agreement sets forth an arrangement under which, in consideration for ALPA's agreement to terminate the Pilots "A" Plan, ALPA members would receive certain supplemental payments and/or benefits. Tr. at 1230, 1251–53 (Labbee); Pl.Ex. 3031 at DTO119819; Def.Ex. RE. Defense Exhibit RE sets forth a preliminary schedule pursuant to which supplemental payments would be made under the arrangements described in Attachment D to the ALPA Tentative Agreement. Tr. at 1253–54 (Labbee).

The arrangements set forth in Attachment D to the ALPA Tentative Agreement may constitute a "follow-on plan" which could have been deemed illegal by the PBGC, and could have created an obligation for Pan Am II to restore the unfunded amounts under the Pilots "A" Plan even if it had been terminated. Tr. at 2151–55 (Cohen). The PBGC was never shown, and did not review or approve, the arrangements set forth in Attachment D to the ALPA Tentative Agreement in 1991. Tr. at 2154–55 (Cohen); Tr. at 1256–57 (Labbee). Thus, by failing to clear the Tentative Agreement with Delta and the PBGC, Pan Am failed to satisfy this condition precedent to any Delta funding obligation.

**(5)** *International Brotherhood of Teamsters*

Witnesses testified that on December 2, 1991, the IBT and Pan Am reached a tentative agreement on a new collective bargaining agreement (the "IBT Tentative Agreement"). Tr. at 1189 (Griswold); Pl.Exs. 945 and 946. There was no testimony that the tentative agreement was brought to Delta's attention.

The IBT Tentative Agreement was never executed by any party. Tr. at 1191–92 (Griswold). The IBT Tentative Agreement contained a provision purporting to require the hiring of certain IBT members by Delta (the "Delta Hiring Provision"). Tr. at 1194–95 (Griswold); Pl.Ex. 946. The Delta Hiring Provision was contained in a side-letter to the IBT Tentative Agreement and had signature lines for the IBT, Pan Am and Delta. Pl.Ex. 946. The Delta Hiring Provision was never shown to Delta. Tr. at 1195 (Griswold); Tr. at 1351–52 (Kimmins). The Delta Hiring Provision was never signed by any party. Tr. at 1197 (Griswold). The IBT Tentative Agreement was more favorable to the IBT than the written proposal delivered to the IBT by Pan Am in late October 1991 and to which Delta did not object. Tr. at 1203 (Griswold).

Delta was never shown, and never gave its approval of, the IBT Tentative Agreement. Tr. at 1347, 1351–52 (Kimmins); Tr. at 1209 (Griswold); Tr. at 3009 (Harkey).

**C.** *Resolution of Pan Am Pension Liabilities*

The PBGC had filed claims against Pan Am for underfunding in its pension plans for about $913 million, of which it asserted an administrative or other priority for over $300 million. Tr. at 2066 (Cohen).

It was a condition to the effectiveness of the Joint Plan (and to any Delta funding obligation under the proposed agreements relating to an investment in Pan Am II) that:

Debtors shall have reached agreements or other arrangements with the Pension Benefit Guaranty Corporation ("PBGC"), the Department of Labor ("DOL") and the Internal Revenue Service ("IRS") on terms and conditions satisfactory to each of Debtors, Delta and the Creditors Committee providing that any and all liability, whether actual or contingent, to the PBGC, the DOL or the IRS with respect to any employee benefit plan ... shall be fully dis-

charged by the Confirmation Date pursuant to the Plan.

Joint Ex. 12 at D378318.

The PBGC representatives knew that a PBGC settlement was a condition to effectiveness of the Joint Plan and a condition precedent to any Delta funding obligation under the proposed funding agreements. Tr. at 4736 (Menke).

On the morning of December 2, 1991, the PBGC circulated to counsel papers to be filed in Court stating that it was objecting to confirmation of the Joint Plan and that it would present testimony that the Joint Plan should not be confirmed. Def.Ex. AQO; Tr. at 2000–01 (Cohen).

On December 2 and December 3, 1991, the PBGC's Deputy Executive Director and chief negotiator, Diane Burkley, discussed the possibility of litigation against Delta with Pan Am's counsel George Weisz. Tr. at 4624–28 (Burkley). During those conversations, Ms. Burkley and Mr. Weisz agreed that it would be desirable to be able to show that the conditions to the Joint Plan had been met. *Id.*

On the morning of December 3, 1991, Creditors Committee counsel Marc Richards met with PBGC representatives to discuss the PBGC settlement. At the time of the meeting, the PBGC sought $54–55 million in cash and Pan Am and its Creditors Committee offered $45–46 million in cash as part of the proposed settlement of the PBGC's administrative and priority claims. Tr. at 4734–35 (Menke). At the time of the meeting, the PBGC knew that the Joint Plan might not be confirmed that afternoon. Tr. at 4757 (Menke).

At that time, the parties agreed that the PBGC would receive $50 million in cash for its administrative and priority claims, Tr. at 4737 (Menke); Tr. at 2067–68 (Cohen), and that the PBGC would receive 2.5% of the common stock of Pan Am II as part of the settlement of the PBGC's administrative claims. Pl.Ex. 907 at CG152199.[48]

The term sheet setting forth the terms of a proposed settlement was signed by representatives of the PBGC, Pan Am and the Creditors Committee on December 3, 1991 at about the time originally scheduled for the Bankruptcy Court confirmation hearing. Tr. at 2070 (Cohen); Tr. at 4613 (Burkley). The PBGC signed the term sheet because it "did not want to have the finger pointed at [their] agency as the reason why there was not going to be a reorganized Pan Am." Tr. at 2171 (Cohen). Delta was never shown or advised of any purported PBGC settlement. Tr. at 3006 (Harkey).[49]

### D. *Termination of Pilots "A" Plan*

The PBGC also had to consent to the termination of the Pilots "A" Plan and the discharge of any liabilities of Pan Am II in connection with such plan. It was a condition precedent to any funding obligation under the proposed agreements relating to the Delta investment in Pan Am II that:

> On or before the Confirmation Date, the Borrower shall take all actions necessary to terminate in accordance with all applicable laws, rules and regulations, and shall terminate, on terms and conditions satisfactory to Delta ... each and every Employee Benefit Plan, and any other plan, arrangement or contract (other than a collective bargaining agreement) benefitting current or former employees, whether funded or unfunded, subject to ERISA or not so subject (other than the Employee Benefit Plans, other plans, arrangements or contracts identified on Schedule 2 to this Appendix), and any necessary consents to such terminations, whether governmental, union or other shall have been acquired by Pan Am, and any and all liability, whether actual or contingent,

48. The Joint Plan provided that the stock in Pan Am II would be distributed only to Delta and to Pan Am's unsecured creditors. Joint Ex. 12 at D3778305. As a result, an amendment to the Joint Plan and consent of the unsecured creditors was required to permit that term of the PBGC settlement agreement to which Pan Am's unsecured and secured creditors might object.

49. In 1992, the PBGC tried to enforce a provision of the settlement agreement in a motion before the Bankruptcy Court. At that time, Pan Am took the position that the provision was not enforceable. Tr. at 4755 (Menke).

owed to any person in connection with such plans, arrangements or contracts shall be discharged by the Confirmation Date pursuant to the Plan of Reorganization. Joint Ex. 9 at DP016946. Without such agreements and consents Pan Am II would have continuing obligations for such plan under ERISA.

The Fixed Benefit Retirement Plan for Pilots (the "Pilots 'A' Plan") was one of the defined benefit pension plans that was required to be terminated as of the date of confirmation as a condition precedent to any Delta funding obligation. Joint Ex. 12 at D378186. The Pilots "A" Plan had an unfunded benefit liability of at least $50 million and had annual minimum funding obligations of $5–7 million per year for the Pilots "A" Plan. Tr. at 2126, 2153 (Cohen).

The PBGC acknowledged that the Pilots "A" Plan was not terminated prior to December 4, 1991, Tr. at 2148–50 (Cohen), and that the Pilots "A" Plan was terminated by consent in January 1992. Tr. at 2148 (Cohen); Def.Ex.CN. At the time of the confirmation hearing, the clearing approvals of the PBGC to be bound by the findings of the Bankruptcy Court that would have permitted the termination of the Pilots "A" Plan had not been received. Tr. at 2138–39 (Cohen). Although a memorandum recommending that the PBGC agree to be bound by the findings of the Bankruptcy Court was being drafted for submission to the Executive Director of the PBGC, the memorandum was never finished and was never submitted to the Executive Director,[50] Tr. at 2130–34 (Cohen), and the Executive Director never agreed to issue a notice of determination that the Pilots "A" Plan could be terminated. Tr. at 2139 (Cohen).

However, unbeknownst to the PBGC, Tr. at 2155–56 (Cohen), Pan Am pilots' union, ALPA, and Pan Am had agreed to permit the termination of the Pilots "A" Plan in exchange for an arrangement pursuant to which Pan Am would pay ALPA's members certain benefits to compensate for pension benefits lost as the result of termination of the Pilots "A" Plan. Tr. at 1230, 1252–53 (Labbee); Pl.Ex. 3031 at Attachment D. This potentially constituted a "follow-on" plan. Tr. at 2154 (Cohen). The Supreme Court has held that the PBGC has the power to determine that the existence of a potentially abusive follow-on plan constitutes grounds for restoring the obligations of a pension plan terminable by a Chapter 11 debtor.[51] *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990), Tr. at 2151 (Cohen).

The PBGC's lack of knowledge of the "follow-on" plan agreed to between Pan Am and ALPA which would have had to be disclosed if a confirmation hearing had been held would have required a resubmission to the PBGC Executive Director. If the Pilots "A" Plan had been terminated without such a knowledgeable action by the PBGC, the "follow-on" plan might have resulted in restoration of the Pilots "A" Plan and liability to Pan Am II. If the Pilots "A" Plan were restored or never terminated by the PBGC, Pan Am II would have been responsible for at least $50 million in unfunded benefit liabilities. Accordingly, for Pan Am II to be viable the PBGC would have had to release it from "follow on" liability at the confirmation hearing. There was no proof that such action by the PBGC was ever considered.

### E. *No IRS Settlement*

It was a condition to effectiveness of the Joint Plan, and a condition to any Delta funding obligation under the proposed agreements relating to a Delta investment in Pan Am II, that Pan Am reach agreement with the Internal Revenue Service ("IRS") provid-

---

**50.** The statutory notice period required prior to voluntary terminations under ERISA for the Pilots "A" Plan would, however, have allowed termination on December 5, 1991, which was sixty days after the PBGC issued its notice of intent to terminate that defined benefit plan. Tr. at 2147 (Cohen).

**51.** In the event of restoration, a pension plan is returned to its pre-termination status. As a result, the plan sponsor once again becomes responsible for all unfunded benefit liabilities under the restored plan. Tr. at 2152 (Cohen). If the Pilots "A" Plan had been restored following termination, Pan Am II would have become responsible for at least $50 million in unfunded benefit liability.

ing that all Pan Am liability to the IRS with respect to any employee benefit plan be fully discharged. Joint Ex. 12 at D378318; Joint Ex. 9 at DP016942.

The IRS filed claims against Pan Am relating to Pan Am's employee benefit plans totalling approximately $540 million. Tr. at 1152–53 (Mayell).

On December 2, 1991, the IRS served an objection to confirmation of the Joint Plan. Pl.Ex. 967; Tr. at 1137 (Mayell). Although the attorney representing the IRS sought the requested approval, the IRS never formally withdrew that objection. Tr. at 1161 (Mayell).

Any settlement of the IRS claims in the Pan Am bankruptcy case had to be approved by the Department of Justice before it would be deemed final and binding on the IRS. Tr. at 1153–56 (Mayell). *See* 28 C.F.R. Part O, appendix to subpart Y, directive 176–91 § 1(b) (1993). As of December 3, 1991, several layers of approval within the Department of Justice had not been obtained and could not be obtained before the scheduled confirmation hearing. Tr. at 1153–56 (Mayell).

On December 3, 1991, Manvin Mayell, the Assistant United States Attorney who was handling settlement negotiations on behalf of the IRS, sent a letter to counsel for the Creditors Committee to confirm that he would "not be able to secure necessary approvals of any proposed resolution of the [IRS claims] by the time of plan confirmation. Without such approvals I will not be able to sign any stipulations." Def.Ex. CM; Tr. at 1156–58 (Mayell).

No settlement of the IRS claims was ever entered into and no such settlement ever received the necessary agency approval. As a result, that condition to the Joint Plan and to any Delta funding obligation had not been satisfied as of the confirmation date, and any confirmation order would have had to be satisfied as to the necessary approval of the settlement.

### F. *Material Adverse Changes*

It was a condition to any Delta obligation to invest in Pan Am II that:

Since August 12, 1991 there shall have been no material adverse change in the business, financial position, results of operations or prospects of the Retained Assets, except for any change resulting from conditions or circumstances disclosed to Delta on or prior to such date, and except that any change in results of operations (whether before or after September 24, 1991) resulting from conditions or circumstances in effect on September 24, 1991 shall not constitute such a material adverse change.

Joint Ex. 9 at DP016944.

Pan Am's business performance deteriorated significantly from August 12, 1991 through the end of November 1991. Tr. 4352–53 (Kasper).

At trial, Mr. Andresen testified that prospects for Pan Am II became riskier during the first year or half-year between the filing of the Disclosure Statement on October 24th and the November 30 meeting. Tr. at 1681 (Andresen).

In the period September through November 1991, Pan Am's passenger revenues on its Latin America Division, Domestic North–South routes and Southern Tier routes declined at an accelerating rate versus 1990 levels. Tr. 4356–57 (Kasper); Def.Ex. DGI at Charts K–2, K–3.

In a November 12, 1991 memo, Mr. Lewis reduced by $19.5 million his September 1991 forecast of Pan Am's November 1991 revenues. Mr. Lewis explained that this revenue shortfall indicated that Pan Am was operating "considerably behind plan." Tr. 2266 (Lewis); Pl.Ex. 802. By the end of November, this shortfall had increased by $3.9 million for a total shortfall of over $23 million for that month. Tr. 4368–69 (Kasper); Def. Ex. DGI at Chart K–10.

Pan Am's advance bookings in November for travel on the Latin America Division, Domestic North–South routes and Southern Tier routes during the month of December declined substantially in 1991 from 1990 levels. Tr. 4357–59 (Kasper); Def.Ex. DGI at Charts K–4, K–5.

Pan Am's advance bookings as of the end of November for travel on the Latin America

Division, Domestic North–South and Southern Tier routes during the months of January and February declined from 1990 levels even more substantially than had bookings for December. Tr. 4360–61 (Kasper); Def. Ex. DGI at Chart K–6.

Pan Am's advance bookings for travel during the months of January and February on the Latin America Division routes declined 19.1% and 25.5%, respectively, as of November 23, 1991 compared to the same day in 1990; on the Domestic North–South routes, such advance bookings had declined 39.3% and 43.5%, respectively, as of November 23, 1991 compared to the same day in 1990; and on the Domestic Southern Tier routes, such advance bookings had declined 22.6% and 21.3%, respectively, as of November 23, 1991 compared to the same day in 1990. Def.Ex. DGI at Chart K–6 (derived by Mr. Kasper from Pl.Ex. 814).

The percentage of non-revenue passengers (per flight) in Pan Am's traffic mix increased in the period August through October 1991, indicating that Pan Am's advance bookings for December 1991 and January and February 1992 also overstated the actual revenues that Pan Am II would realize from those bookings. Tr. 4362–63 (Kasper); Def.Ex. DGI at Chart K–7.

The business plan deterioration came as a surprise to Pan Am as well as Delta. As of November 12, 1991, an update prepared by Mr. Punwani's staff at Pan Am showed that Pan Am was projecting no change in the projected revenues or the projected expenses for Pan Am II from the levels set forth in the business plan. Tr. 1501–02 (Punwani); Def. Ex. DEQ.

These statistics reflect a material adverse change to Pan Am's business both after August 12 and after September 24, 1991 and also reflect a material adverse change in the business prospects of Pan Am II after August 12 and after September 24, 1991. Tr. 4441–42, 4451–53 (Kasper).

These statistics corroborate the material adverse change that Andresen and Ray as well as the Delta management recognized on November 30 and December 1, 1991 (see pages 458–459, supra). Indeed, Mr. Marcus

was "shocked" on December 1, 1991 when he learned of the magnitude of the deterioration of the Business Plan (see page 477, supra). Additional funding was required to make Pan Am II viable if operated under the Plan as amended by Mr. Andresen's Financial Review. An investment capital of least $75 million was required to provide the necessary assurance of liquidity during the period projected by the Plan (see page 460, supra). The only practical source of such funding was Delta or the Creditors Committee. The Creditors Committee was demanding more assets of Pan Am II (see pages 457–58, supra), thus the outlook for funding was slight. Therefore, from the perspective of all parties, the projections for Pan Am II had undergone significant material adverse changes.

### G. Other Failed Conditions

#### (1) Termination of Welfare Plans

Through various welfare benefit plans, Pan Am provided health and other insurance benefits to its retired employees, their spouses and dependents. These plans were subject to the same condition precedent to any funding obligation under the proposed agreements relating to a Delta investment in Pan Am II that applied to the employee plans. See Joint Ex. 9 at DP016946 (quoted in Section III(D), supra).

On November 29, 1991, the Retirees Committee filed an objection to confirmation of the Joint Plan. Def.Ex. VD. Among the challenges to the Joint Plan raised by the Retirees Committee was that the Joint Plan and Disclosure Statement was not circulated to 1,500 Pan Am retirees within the time period prescribed by the Bankruptcy Rules. Id. at ¶ 6. The Retirees Committee also objected because a letter from the Retirees Committee recommending that retirees refrain from voting on the Joint Plan was not circulated by Pan Am in a timely manner. Id. at ¶ 7. The Retirees Committee asserted that any vote of the class of retirees in favor of the Joint Plan was void. Id. at ¶ 8; Tr. at 1013 (Jones). The Retirees Committee never withdrew its objection to the Joint Plan.

Pan Am's welfare benefit plans were not terminated until December 14, 1991. Def. Ex. DX at 5; Tr. at 1026–31 (Jones).

A term sheet setting forth the terms of an alleged settlement between Pan Am and the Official Retirees Committee of Pan Am Corporation (the "Retirees Committee") was initialed at the courthouse on December 3, 1991. Tr. at 1003–07 (Jones).

One term set forth in that term sheet was that Pan Am's retirees would receive 2.5% of the common stock of Pan Am II in satisfaction of the retirees' administrative claims. Pl.Ex. 3043 at ¶ 10.

The Joint Plan provided that Delta was to receive 45 million shares of Class "A" stock and the unsecured creditors were to get 55 million shares of common stock. Joint Ex. 12 at D378205.

No representative of the Retirees Committee initialed or signed the term sheet. Tr. at 1020–22 (Jones). The term sheet contains no provision for the termination of Pan Am's retiree welfare plans. Pl.Ex. 3043.

Pan Am did not view the term sheet to be a binding agreement by the Retirees Committee to permit termination of the retiree welfare plans. On December 13, 1991, Pan Am insisted that the Retirees Committee sign a stipulation terminating the retiree welfare plans. Tr. at 1026–31 (Jones); Def.Ex. DX.

### (2) CRAF Settlement

It was a condition to the effectiveness of the Joint Plan and to any funding obligation of Delta under the proposed agreements relating to a Delta investment in Pan Am II that:

(i) The Creditors Committee and Pan Am shall have agreed to the execution by Pan Am of a modified Pan Am CRAF Enhancement Contract and a modified Airlift Services Contract with the USAF in accordance with the CRAF Settlement Agreement in form and substance satisfactory to Delta, Pan Am and the Creditors Committee, (ii) such parties shall have agreed that such modified contracts will be assumed by reorganized Pan Am, (iii) *Pan Am shall have entered into an agreement with Delta providing for reorganized Pan Am to indemnify and hold harmless Delta in the event that reorganized Pan Am breaches in any way such Pan Am Airlift Services Contract or Pan Am CRAF Enhancement Contract* and (iv) the refund obligation under the existing or modified CRAF Enhancement Contract or Airlift Services Contract between Pan Am and USAF with respect to the seven B747 CRAF enhanced aircraft to be operated by reorganized Pan Am shall not have triggered, or if triggered shall have been cured by the Effective Date.

Joint Ex. 12 at D378319; Joint Ex. 9 at DP016943 (emphasis added).

On the afternoon of December 3, 1991, a CRAF settlement agreement meeting these requirements was signed by Robert Harkey, Delta's general counsel. Tr. at 2966 (Harkey); Def.Ex. PN. At that time, the CRAF settlement agreement had been also signed by Paula Dow, an Assistant United States Attorney representing the USAF. Pan Am refused to execute the CRAF settlement agreement and Ms. Dow struck her signature from the document. Tr. at 2967–68 (Harkey), 2538–39 (Rendich); *see* Def.Ex. PN.[52]

## IV. DELTA IS ENTITLED TO REPAYMENT OF AMOUNTS ADVANCED UNDER THE LOAN AGREEMENT

■ On October 21, 1991, Pan Am and Delta entered into a $50,000,000 Loan Agreement (the "Loan Agreement"). Joint Ex. 8.

On or about October 21, 1991, Joan Fabio, Pan Am's Assistant Treasurer, executed a $140,000,000 Promissory Note for amounts advanced pursuant to the Loan Agreement,

---

**52.** It was a condition precedent to the proposed agreements relating to a Delta investment in Pan Am II that Pan Am enter into arrangements that were satisfactory to Pan Am, Delta and the Creditors Committee providing for the availability of aircraft required for the operation of Pan Am II. Joint Ex. 9 at DP016943–44.

Proposed lease extensions relating to 19 leased aircraft were required to be signed by both Delta and the Creditors Committee. Tr. at 1119–20 (Mehm). None of those proposed extensions were signed by either Delta or the Creditors Committee. Tr. at 1119–20 (Mehm); Pl.Ex. 3054, 3055, 3056, 3057, 3058, 3059, 3060, 3061, 3062, 3063, 3064, 3065, 3067, 3071. Pan Am never agreed to the proposed lease extension relating to one B727 aircraft. Pl.Ex. 3071; Tr. at 1121–22 (Mehm).

as it might be amended and approved by the Bankruptcy Court. Def.Ex. TS.

On October 21, 1991, the Bankruptcy Court held a hearing to consider the Loan Agreement. Counsel for Pan Am and for the Creditors Committee appeared and urged the Bankruptcy Court to authorize the agreement and permit Pan Am to borrow under the agreement. Pl.Ex. 500.

Following the hearing, the Bankruptcy Court entered an interim order authorizing the Loan Agreement and up to $48 million in borrowing thereunder. In its order, the Bankruptcy Court found that:

> The DIP Financing has been negotiated in good faith between [Pan Am] and Delta, with all parties represented by counsel, and any loans made to [Pan Am] by Delta pursuant to the Loan Agreement shall be deemed to have been extended in good faith, as that term is used in Section 364(e) of the [Bankruptcy] Code.

Def.Ex. AW at ¶ 5.

The Bankruptcy Court issued a final order authorizing the full $50 million in borrowing on November 6, 1991. Def.Ex. AX. In the final order, the Bankruptcy Court made the same finding of Delta's good faith as had been contained in the interim order.

On October 25, 1991, Pan Am and Delta entered into Amendment No. 1 to Loan Agreement, pursuant to which, *inter alia,* Delta agreed to increase the amount of DIP financing under the Loan Agreement to up to $140,000,000, subject to certain conditions. Joint Ex. 10.

At a hearing on October 25, 1991, the Bankruptcy Court granted interim approval of Amendment No. 1 to the Loan Agreement and authorized Pan Am to borrow most of the funds available under the amended Loan Agreement. Counsel for Pan Am and for the Creditors Committee appeared and supported the amendment to the Loan Agreement and the borrowings contemplated thereunder. Pl.Ex. 508. Following the hearing, the Bankruptcy Court entered an order finding that the "DIP Financing has been negotiated in good faith by [Pan Am] and Delta" and that "any loans made to [Pan Am] shall be deemed to have been extended [by Delta] in good faith ..." Def.Ex. BB at ¶ 5. Creditors Committee counsel Ray Mantle countersigned the order, thereby attesting that the Creditors Committee had "[N]O OBJECTION TO THE ENTRY OF [THAT ORDER]." *Id.* at 14.

On November 12, 1991, the Bankruptcy Court entered a final order authorizing Pan Am to borrow up to the full amount available under the Loan Agreement, as amended. Def.Ex. BC. In the final order, the Bankruptcy Court made the same findings of Delta's good faith as had been contained in the previous orders. Creditors Committee counsel Marc Richards counter-signed the order, thereby attesting that the Creditors Committee had "[N]o objection to the entry of [that order]." *Id.*

In several borrowings on dates specified in the Loan Agreement as amended between October 22 and November 29, 1991, Pan Am borrowed $115 million under the Loan Agreement.[53] Undisputed Facts. ¶ 14. Pan Am has not repaid any of those borrowings or any interest accrued thereon. Undisputed Facts. ¶ 15.

Section 2.3 of the Loan Agreement provides that "If the Maturity Date occurs before the confirmation of a Plan of Reorganization, then [Pan Am] shall pay to Delta on the Maturity Date an amount equal to all outstanding Obligations." Joint Ex. 8 at CG0097145.

The "Maturity Date" is defined as "December 5, 1991 unless a Plan of Reorganization is confirmed on or before December 5, 1991...." *Id.* at CG CG0097184.

Because no Pan Am plan of reorganization was confirmed, under section 2.3 of the Loan Agreement, Pan Am was required to pay all outstanding Obligations to Delta on December 5, 1991. Thus Pan Am has been in default under the Loan Agreement since December 5, 1991.

Under section 1.5 of the Loan Agreement, interest has accrued on amounts outstanding under the Loan Agreement at a rate of 4½%

---

**53.** *See* Section I(F), *supra,* for terms of the loan and amounts drawn by Pan Am.

plus the Prime Rate since December 5, 1991. Joint Ex. 8 at CG0097142.

## V. *DELTA'S COUNTERCLAIMS AGAINST THE CREDITORS COMMITTEE*

On August 11, 1991, Creditors Committee counsel Leon Marcus signed the August 11 Letter on behalf of the Creditors Committee. In signing the August 11 Letter, the Creditors Committee pledged to support the transactions contemplated in the August 11 Letter, including the Asset Purchase Agreement. *See* Joint Ex. 5 at 6–7.

On October 3, 1991 Mr. Marcus threatened Delta that he would force Pan Am into liquidation and sue Delta unless it provided additional financing. Def.Ex. AU. On October 8, 1991 Mr. Marcus made different threats to Delta to obtain financing. Tr. at 2957–59 (Harkey); Def.Ex. IC. On November 4, 1991 his letter again threatened to sue Delta. Def.Ex. BG at 9.

Problems of market-place perception and travel agent confidence arising from the publication of Mr. Marcus's Letter of November 4, 1991 caused or contributed to the deterioration in Pan Am's actual results and advance bookings in November 1991, and the resulting loss of anticipated revenues at Pan Am. Tr. at 2328–29 (Lewis), 4150–51 (Coggin); Def.Ex. BL; Pl.Ex. 807 at DT232243.

During a meeting between Delta and Pan Am representatives on November 30, both Russell Ray and John Lewis stated that the leak of Marcus Letter of November 4 had a negative impact on Pan Am's revenues and Pan Am II's prospects. Tr. at 3983 (Handelsman), 2986 (Harkey), 3272 (Sanregret), 1969 (Ray); Ex. XXY.

Mr. Lewis had expressed the same view in a telephone call with Delta's Robert Coggin on November 20, 1991. Tr. at 4150–53 (Coggin); *see* Def.Ex. BL.

Mr. Lewis testified at trial that travel agent confidence was impacted adversely by the publication of the November 4 Marcus Letter. Tr. at 2329 (Lewis); *see* Def.Ex. 807 (same observation on November 27, 1991). Mr. Lewis testified that:

adverse publicity, given the fact that Pan Am had such ongoing problems ..., just doesn't help stimulate sales. It just creates some further problems that existed. And those problems are such that if you were running a travel agency and looking at booking on a bankrupt carrier who was going to operate, there is no problem. But if you were unsure as to where that carrier was flying or what the situation was, you may take your passenger and put him on another airline.... [T]he adverse publicity of the Marcus letter and Midway Airlines just kind of reinforced the fact that there were these continuing problems. You don't need this type of publicity.

Tr. at 2329 (Lewis).

Tamir Rankow, President and CEO of Atlas Travel Management Co., testified that he and his travel agency located in Miami, Pan Am II's proposed hub, booked away from Pan Am in favor of Pan Am's competitors after he read the articles published on November 6, 1991 in the *Miami Herald* and on November 7, 1991 in the *Wall Street Journal* that reported the information contained in the November 4 Marcus Letter. Tr. at 3637–39 (Rankow). Atlas Travel Management Co. is one of South Florida's five largest corporate travel agencies with yearly gross sales of approximately $16 million. Tr. at 3615–16 (Rankow).

Mr. Ray stated that in addition to its effects on Pan Am's revenues, the publication of the allegations in the Marcus Letter of November 4 had delayed the labor negotiation process by about three weeks, which would be from November 6 to November 27, 1991. Tr. at 3572 (Rinaldi); Def.Ex. XXY at 2. This time was required for ratification of the new collective bargaining agreements required for Pan Am II under the Disclosure Statement.

The Creditors Committee ostensibly represented Pan Am's unsecured creditors, who were to be the majority equity holders in Pan Am II. In its efforts to obtain administrative solvency and satisfy the claims of administrative creditors, however, the Creditors Committee disregarded the interests of unsecured creditors by demanding administrative solvency assets that were supposed to be left

for Pan Am II. *See* Joint Ex. 12 at D378204; Def.Ex. QA.

In their December 1, 1991, solvency analysis the Creditors Committee accountants assumed that the estate would keep all of Pan Am's realizable deposits and prepayments, not even leaving Pan Am II with the $5 million in deposits that had been assumed in the opening balance sheet in the Business Plan. Tr. at 542 (Gagnon); Tr. at 3212–13 (Sanregret); Def.Ex. QA. This allocation would have required Pan Am II to replenish such deposits out of its line of credit or the sale of assets held for additional working capital.

Similarly, during late November when Pan Am's net revenue forecast for the first quarter of 1992 showed a deterioration of $32 million, the Creditors Committee took the position that Pan Am II was to bear $13.1 million for information services which had previously been transition costs that under the Disclosure Statement were otherwise the responsibility of the estate, and took a similar position with respect to $6.4 million in expenses relating to return conditions for certain GECC aircraft leases, and with respect to the $4 million cost of delay in any agreement to be reached with DynAir. Tr. at 3210–13 (Sanregret); Pl.Ex. 805 at D320489.

In addition to seeking to remove funds from Pan Am II and to get Delta to provide additional funds, Mr. Gagnon did not respond to requests by Rolf Andresen that the Creditors Committee agree to defer collection of receivables from Pan Am II in order to provide Pan Am II with additional liquidity. Tr. at 3228–31 (Sanregret). Without the agreement of the Creditors Committee to such requests, even under the Andresen Plan Pan Am II would have run out of cash and working capital during the first quarter of 1992. Tr. at 1677 (Andresen).

The Creditors Committee's counterproductive behavior continued up to and after the Bankruptcy Court hearing on December 3, 1991.

In a telephone conversation with Delta counsel Lawrence Handelsman on the morning of December 2, 1991, Mr. Marcus stated that Pan Am intended to withdraw the Joint Plan. Mr. Marcus stated that the Creditors Committee would not agree to withdraw the plan because he believed he could show that the "pre-conditions" to the Joint Plan had been satisfied and he intended to proceed with confirmation in order to set up a massive lawsuit against Delta. Tr. at 4004, 4136–37 (Handelsman). At the time of that telephone call, Mr. Marcus knew or should have known that the Joint Plan could not be confirmed because of the recent, unexpected deterioration in Pan Am's business plan. *See* Pl.Ex. 4239 at 1–2; *cf.* page 477, *supra.*

During that telephone call with Mr. Handelsman, Mr. Marcus told Mr. Handelsman that the Creditors Committee would try to prevent the repayment to Delta of amounts advanced to Pan Am pursuant to the amended Loan Agreement. Tr. at 4004 (Handelsman).

At a meeting with representatives of the PBGC on December 2, 1991, Mr. Marcus described the strategy that the Creditors Committee intended to pursue at the scheduled confirmation hearing the next day: To proceed with confirmation of the Joint Plan although the Business Plan was not viable in order to lay the groundwork for a lawsuit against Delta. Tr. at 4715–23 (Menke); *see* Pl.Ex. 4239. At that meeting, Mr. Marcus stated that Pan Am's investment banker, Jonathan O'Herron of Lazard Freres & Co., was unwilling to testify that the Joint Plan was feasible. Pl.Ex. 4239 at 1; Tr. at 4718–19 (Menke). Nevertheless, Mr. Marcus said that the Creditors Committee would attempt to show that the conditions to the effectiveness of the Joint Plan had been satisfied, Pl.Ex. 4239 at 1; Tr. at 4721 (Menke), and then would have Pan Am's counsel George Weisz represent to the Bankruptcy Court that Pan Am had been unable to find a witness to testify to viability because of the interest rates and fees to be charged by Delta to Pan Am II, Pl.Ex. 4239 at 2. Those interest rates and fees had been agreed to by the Creditors Committee and Pan Am as shown in the Disclosure Statement. Joint Ex. 12 at D378176. The litigation strategy described by Mr. Marcus at the December 2, 1991 meeting with the PBGC was inconsis-

tent with the requirement of the Bankruptcy Code that a plan of reorganization be proposed in good faith. 11 U.S.C. § 1129(a)(3). The Creditors Committee and Pan Am were proponents of the Plan from September 24, 1991 until confirmation.

At the Bankruptcy Court hearing that afternoon, the Creditors Committee stated publicly its earlier threats to interfere with Delta's contractual rights under the amended Loan Agreement. During that hearing, Mr. Marcus stated that "[Delta] know[s] that the creditors are going to do everything that they can if this busts up to prevent them from getting their $100 million [DIP loan repaid]." Ex. BZ at 46.

Following Pan Am's shutdown, the Creditors Committee continued in its efforts to prevent repayment to Delta of the amounts advanced under the amended Loan Agreement. On December 10, 1991, Creditors Committee counsel Richard Levy sent a letter to Pan Am's counsel demanding Pan Am's cooperation in the Creditors Committee's legal efforts against Delta, and threatening to name Messrs. Ray and Andresen as co-defendants in the Creditors Committee's lawsuit unless those Pan Am executives assisted in its litigation.[54] Def.Ex. PF.

## VI. *BANKRUPTCY CAUSES OF ACTION: COUNTS I, II AND III*

### A. *General Background*

█ It is well settled that bankruptcy courts possess a broad range of equitable powers, including the authority to disallow or subordinate the claims of any creditor who attempts to take unfair advantage of the debtor or other creditors. *See Pepper v. Litton,* 308 U.S. 295, 307–08, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939); *see also* 11 U.S.C. §§ 510(c), 502(b)(1).

"[I]n the exercise of [this] equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate." *Pepper,* 308 U.S. at 307–08, 60 S.Ct.

at 246. The court's equitable powers may be "invoked to the end that ... substance will not give way to form [and] technical considerations ... not prevent substantial justice from being done." *Id.* at 305, 60 S.Ct. at 244; *see also Liona Corp. v. PCH Assocs. (In re PCH Assocs.),* 949 F.2d 585, 597 (2d Cir. 1991) ("It is well established that a bankruptcy court, as a court of equity, may look through form to substance when determining the true nature of a transaction as it relates to the rights of parties against a bankrupt's estate.").

Based on the findings of fact and for the reasons stated below, the Court concludes that equitable subordination and/or disallowance of Delta's claim for $115 million (plus interest) under the October DIP is not warranted. For the same reasons, Delta's counterclaim under the October DIP for payment of those funds with interest is granted.

In the first count of the complaint the Plaintiffs object to all claims of Delta (including the Delta claim based on its DIP financing of $115 million), in the second count Plaintiffs move for the avoidance of Delta's liens and in the third count Plaintiffs move for the equitable subordination of all of Delta's claims. As noted by Plaintiffs, all of these claims are interconnected and can be discussed together.

### B. *Elements Of Equitable Subordination*

"The fundamental aim of equitable subordination is to 'undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness in terms of the bankruptcy results.'" *Monzack v. ADB Investors (In re EMB Assocs., Inc.),* 92 B.R. 9, 15 (Bankr.D.R.I.1988) (quoting *Bostian v. Schapiro (In re Kansas City Journal–Post Co.),* 144 F.2d 791, 800 (8th Cir.1944)). "[T]he Courts will be guided by cardinal principles of equity jurisprudence to the end that injustice or unfairness is not done in the administration of the bankrupt estate." *Machinery Rental, Inc. v. Herpel (In re Multi-*

---

**54.** Pan Am's Chief Executive Officer Russell Ray did not authorize Pan Am to bring this action against Delta. Tr. at 2113 (Ray).

*ponics, Inc.)*, 622 F.2d 709, 721 (5th Cir.1980) (citation omitted).

The bankruptcy court's power to subordinate a claim based upon the inequitable conduct of the claimant is codified in § 510(c) of the Bankruptcy Code, which provides:

> ... after notice and a hearing, the court may—
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c); *see also Multiponics, Inc.*, 622 F.2d at 721; *Monzack*, 92 B.R. at 15.

### (1) *Insider Status*

Where the allegedly inequitable conduct was committed by an "insider" of the debtor, that conduct will be "rigorously scrutinized" by the courts. *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir.1991); *See also Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.)*, 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983). In making this assessment, "[t]he presence or absence of the 'earmarks of an arm's length bargain' may be significant," along with other "indicia of fair dealing and candor." *Multiponics, Inc.*, 622 F.2d at 714 (quoting *Pepper*, 308 U.S. at 306–7).

Once the debtor produces material evidence of inequitable conduct by an insider, the burden of proof shifts to the insider to demonstrate the good faith and inherent "fairness" of his conduct toward the debtor and the other creditors. *Estes v. N & D Properties, Inc. (In re N & D Properties, Inc.)*, 799 F.2d 726, 731 (11th Cir.1986); *See Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 701 (5th Cir.1977); *Teltronics Servs., Inc.*, 29 B.R. at 169. An insider must establish that his conduct was "fair in the bankruptcy sense." *Multiponics, Inc.*, 622 F.2d at 715.

Although the Bankruptcy Code defines the term "insider," 11 U.S.C. § 101(31),[55] courts have uniformly held that the Bankruptcy Code's definition is merely illustrative and that the term "insider" must be flexibly applied on a case-by-case basis. *See, e.g., Wilson v. Huffman (In re Missionary Baptist Found. of Am.)*, 712 F.2d 206, 210 (5th Cir. 1983); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 298 (Bankr.W.D.Pa.1990), *amended on other grounds*, No. 88–0448 (Bankr.W.D.Pa. Aug. 2, 1990); *EMB Assocs., Inc.*, 92 B.R. at 15; *In re Applegate Property, Ltd.*, 133 B.R. 827, 832 (Bankr.W.D.Tex.1991).

In applying the term "insider," courts generally rely on the legislative history of the "insider" definition, 11 U.S.C. § 101(31), which makes clear that the term covers "one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." S.Rep. No. 989, 95th Cong., 1st Sess. 25 (1978), *reprinted in*

---

**55.** Section 101(31) provides in pertinent part:

(31) "insider" includes—

(A) if the debtor is an individual—
 (i) relative of the debtor or of a general partner of the debtor;
 (ii) partnership in which the debtor is a general partner;
 (iii) general partner of the debtor; or
 (iv) corporation of which the debtor is a director, officer, or person in control;

(B) if the debtor is a corporation—
 (i) director of the debtor;
 (ii) officer of the debtor;
 (iii) person in control of the debtor;
 (iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or relative of a general partner, director, officer, or person in control of the debtor;

(C) if the debtor is a partnership—
 (i) general partner in the debtor;
 (ii) relative of a general partner in, general partner of, or person in control of the debtor;
 (iii) partnership in which the debtor is a general partner;
 (iv) general partner of the debtor; or
 (v) person in control of the debtor;

(D) if the debtor is a municipality, elected official of the debtor or relative of an elected official of the debtor;

(E) affiliate, or insider of an affiliate as if such affiliate were the debtor; and

(F) managing agent of the debtor.

1978 U.S.C.C.A.N. 5787, 5810, 6269 (legislative history to 11 U.S.C. § 101(31)); *see, e.g., Allegheny Int'l, Inc.,* 118 B.R. at 298; *EMB Assocs. Inc.,* 92 B.R. at 15; *Equibank v. Dan–Ver Enters., Inc. (In re Dan–Ver Enters., Inc.),* 86 B.R. 443, 449 (Bankr.W.D.Pa. 1988); *Jackson Purchase Prod. Credit Assoc. v. Taylor (In re Taylor),* 29 B.R. 5, 7 (Bankr. W.D.Ky.1983); *see also DeRosa v. Buildex Inc. (In re F & S Central Mfg. Corp.),* 53 B.R. 842, 848 (Bankr.E.D.N.Y.1985) (insiders include those with "special influence over the debtor").

In determining whether a creditor is an "insider" of the debtor under this flexible approach, courts have considered a wide variety of factors, including whether the creditor: (i) received information from the debtor that was not available to other creditors, shareholders and the general public, *see Allegheny Int'l, Inc.,* 118 B.R. at 298; *EMB Assocs., Inc.,* 92 B.R. at 16; (ii) attempted to influence decisions made by the debtor, *see Allegheny Int'l, Inc.,* 118 B.R. at 298; (iii) selected new management for the debtor, *see Allegheny Int'l, Inc.,* 118 B.R. at 298; *cf. N & D Prop., Inc.,* 799 F.2d at 732; (iv) had special access to the debtor's premises and personnel, *see Allegheny Int'l, Inc.,* 118 B.R. at 298; (v) was the debtor's sole source of financial support, *see Bergquist v. First Nat'l Bank (In re American Lumber Co.),* 5 B.R. 470, 478 (D.Minn.1980); *Freuhauf Corp. v. T.E. Mercer Trucking Co. (In re T.E. Mercer Trucking Co.),* 16 B.R. 176, 189–90 (Bankr. N.D.Tex.1981); and (vi) generally acted as a joint venturer or prospective partner with the debtor rather than an arms-length creditor, *see Fabricators, Inc.,* 926 F.2d at 1465–66; *Teltronics Services, Inc.,* 29 B.R. at 170; *Allegheny Int'l, Inc.,* 118 B.R. at 298–99; *cf. In re Simpson,* 222 F.Supp. 904, 908–10 (M.D.N.C.1963).

Illustrative of the "insider" definition under the Code is *In re Allegheny.* In that case, an investor sought to take over a Chapter 11 debtor by voluntarily purchasing claims in the bankruptcy proceeding in order to achieve a "blocking" position against the debtor's proposed plan of reorganization and then filing an alternative plan at the eleventh hour. *Allegheny Int'l, Inc.,* 118 B.R. at 285–

87. With the debtor's full cooperation, the investor was given access to "voluminous" amounts of inside information and was given extensive access to debtor's premises and personnel. *Id.* at 298. The investor used this special relationship to attempt to influence the debtor's business decisions, demanding that its own nominees be named principals of the debtors and that top employees of the debtor be made to resign. *Id.* The investor also caused press releases to be issued indicating that it was in control of the debtor. *Id.* The court held that, even though the investor "did not have actual control or legal decision making power," *id.* at 298, its abuse of its special relationship with the debtor made it an "insider ... for purpose[s] of this reorganization," *id.* at 299.

■ Before a creditor will be found to be an "insider" to a debtor for purposes of considering whether that creditor's claim should be equitably subordinated, the creditor must be shown to have been able "to command the debtor's obedience to [the creditor's] policy directives" to such an extent "that there has been ... a merger of identity. Unless the creditor has become, in effect, the *alter ego* of the debtor, he will not be held to an ethical duty in excess of the morals of the marketplace." *Teltronics Servs., Inc.,* 29 B.R. at 171.

Based on all the facts and circumstances in this case, the Court finds that Delta was not an "insider" of Pan Am for purposes of equitable subordination (*see* Section II(D), *supra*). Although Delta was the only debtor in possession lender and had special access to Pan Am's premises and personnel, and received details of Pan Am's flight operations not sought by other creditors, the relationship between Pan Am and Delta was one of a corporation whose executives engaged in due diligence regarding a major transaction with another corporation whose business was being closely monitored by a Creditors Committee and administrative creditors with adverse interests.

■ To obtain equitable subordination against a creditor who is not an "insider" to the debtor, it must be shown that the creditor "committed fraud, overreaching or spoliation to the detriment of others." *In re W.T.*

*Grant Co.,* 4 B.R. 53, 75 (Bankr.S.D.N.Y. 1980) *aff'd,* 699 F.2d 599 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

There has been no showing of fraud, overreaching or spoliation by Delta (*see* Section II(C), *supra*).

Throughout its dealings with Pan Am and the Creditors Committee, Delta was not able to command Pan Am's obedience to Delta's policy directives and acted at all times in accordance with its legal and equitable obligations.

■ In orders dated October 22, 1991, October 25, 1991, November 6, 1991 and November 12, 1991, (the "DIP Orders"), the Bankruptcy Court found that both the Loan Agreement and Amendment No. 1 to Loan Agreement have:

> been negotiated in good faith between [Pan Am] and Delta, with all parties represented by counsel, and any loans made to [Pan Am] by Delta pursuant to the Loan Agreement shall be deemed to have been extended in good faith....

Def.Ex. AW at ¶ 5; Def.Ex. AX at ¶ 5; Def. Ex. BB at ¶ 5; Def.Ex. BC at ¶ 5. At hearings before the Bankruptcy Court on October 21, 1991 and October 25, 1991, Pan Am and the Creditors Committee each appeared and urged the Bankruptcy Court to enter such orders. Pl.Ex. 500; Pl.Ex. 508. Counsel for the Creditors Committee countersigned three of those orders, stating that there were no objections to the entry of such orders. Def.Ex. AX; Def.Ex. BB; Def.Ex. BC.

Pan Am and the Creditors Committee are barred under the doctrines of issue preclusion (collateral estoppel) and law of the case from challenging Delta's good faith in the negotiation of the Loan Agreement and Amendment No. 1 to the Loan Agreement and in advancing DIP financing to Pan Am in accordance with the terms of the agreements. *Tobias v. First Nat'l City Bank & Trust Co.,* 709 F.Supp. 1266, 1269 (S.D.N.Y. 1989) (issue preclusion under New York law); *Deutsch v. Integrated Barter Int'l, Inc.,* 700 F.Supp. 194, 196–97 (S.D.N.Y.1988) (collateral estoppel under New York law); *United States v. Yonkers Bd. of Educ.,* 856 F.2d 7, 11 (2d Cir.1988) (law of the case).

### C. *Avoidance of Delta's Liens*

■ Delta advanced funds to Pan Am under the Loan Agreement and Amendment No. 1 to the Loan Agreement in reliance upon the security interest in Pan Am's assets granted by the Bankruptcy Court.

Throughout its dealings with Pan Am and the Creditors Committee, Delta acted in accordance with its legal and equitable obligations (*see* Section II(C), *supra*).

The Plaintiffs are not entitled to avoidance of the Delta liens, and the Plaintiffs' objections to Delta's claims for repayment of amounts outstanding under the amended Loan Agreement are without merit.

### VII. *PLAINTIFFS' CLAIM FOR IMPOSITION OF A CONSTRUCTIVE TRUST ON THE ASSETS PURCHASED UNDER THE ASSET PURCHASE AGREEMENT (COUNT IV)*

■ Plaintiffs' Count IV, for imposition of a Constructive Trust, seeks further equitable relief based on the facts alleged in connection with Counts I through III.

■ Constructive trusts are imposed "when property has been acquired under such circumstances that the holder of legal title may not in good conscience retain the beneficial interest therein." *Security Pacific Mortgage and Real Estate Servs., Inc. v. Republic of the Philippines,* 962 F.2d 204, 210 (2d Cir.1992) (citation omitted). "Under New York law, a party claiming entitlement to a constructive trust must ordinarily establish four elements: (1) a confidential or fiduciary relationship, (2) a promise, express, or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment." *Koreag, Controle et Revision S.A. v. Refco F/X Associates, Inc. (In re Koreag, Controle et Revision S.A.),* 961 F.2d 341, 352 (2d Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992). *See also Chemical Bank v. United States Lines (S.A.), Inc. (In re McLean Indus., Inc.),* 132 B.R. 271, 286 (Bankr.S.D.N.Y.1991)

(citing *Sharp v. Komalski*, 40 N.Y.2d 119, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976)). Although these four factors provide important "guideposts," they should not "rigidly limit[ ]" the application of this equitable doctrine. *In re Koreag*, 961 F.2d at 352. "A constructive trust is the formula through which the conscience of equity finds expression. . . ." *Id.* at 353 (citations omitted). Thus, even absent one or more of the above "guideposts," the Court may impose a constructive trust to reach an equitable result. *See, e.g., Security Pacific*, 962 F.2d at 210; *In re Koreag*, 961 F.2d at 353–54.

Delta did not have a confidential or fiduciary relationship with Pan Am or the Creditors Committee. With respect to the assets conveyed pursuant to the Asset Purchase Agreement (the "Purchased Assets"), Delta was an arm's length purchaser. Pan Am and the Creditors Committee agreed to convey the Purchased Assets on the terms and conditions set forth in the Asset Purchase Agreement, as amended. Joint Ex. 2; Joint Ex. 7. In the amended Asset Purchase Agreement, Pan Am and the Creditors Committee agreed to consideration from Delta of $416 million cash for the Purchased Assets, plus the assumption of certain Pan Am liabilities. Joint Ex. 2; Joint Ex. 7.[56] Delta performed all of its obligations under the amended Asset Purchase Agreement. In closings on September 1, 1991 and November 1, 1991, Delta paid Pan Am the full $416 million in cash provided for under the Asset Purchase Agreement. Def.Ex. AY; Def.Ex. AZ.

Pan Am did not transfer the Purchased Assets in reliance on any promise or other assurance not contained in the amended Asset Purchase Agreement. Joint Ex. 2; Joint Ex. 7. If Pan Am did transfer the purchase assets in reliance on any other promise from Delta, that promise was to proceed in good faith with the proposed financing of Pan Am II as set forth in the Joint Plan of Reorganization and its operating plan. Delta did proceed in good faith with the proposed financing (*see* Section II(C), *supra* ).

Delta was not unjustly enriched through the acquisition of the Purchased Assets pursuant to the amended Asset Purchase Agreement, and the Plaintiffs' claim for imposition of a constructive trust with respect to those assets is denied.

## VIII. PLAINTIFFS' CLAIM FOR BREACH OF CONTRACT (COUNT V)

A. *The August 11 And October 22 Agreements were "Binding Preliminary Commitments" that Contractually Obligated Delta to Negotiate in Good Faith Toward an Investment in Pan Am II*

(1) *General Principles of "Binding Preliminary Commitments"*

■ One type of a "binding preliminary commitment" is an agreement in which the parties have committed themselves to the major terms of a transaction, but other terms remain to be negotiated and definitive documentation remains to be prepared. *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987) (Leval, J.); *see Weinreich v. Sandhaus*, 850 F.Supp. 1169, 1176 (S.D.N.Y.1994); *P.A. Bergner & Co. v. Martinez*, 823 F.Supp. 151, 155–56 (S.D.N.Y.1993); *Chrysler Capital Corp. v. Southeast Hotel Properties Ltd. Partnership*, 697 F.Supp. 794, 799–800 (S.D.N.Y.1988), *aff'd without op.*, 888 F.2d 1376 (2d Cir.1989).

■ The parties to a "binding preliminary commitment" are contractually obligated to negotiate in good faith toward a final agreement that incorporates the major terms to which they had previously agreed. Neither party may repudiate those major terms, or engage in conduct designed to scuttle the transaction. *See Teachers Ins.*, 670 F.Supp. at 498; *P.A. Bergner*, 823 F.Supp. at 156.

■ A preliminary commitment is binding on the parties if they have manifested an intention to be bound, as evidenced by their

---

**56.** On August 7, 1991, Pan Am's investment banking advisor Jonathan O'Herron of Lazard Freres & Co. gave his opinion to the Pan Am board of directors that the Asset Purchase Agreement was "fair" to Pan Am. Tr. at 113–14 (Plaskett). At the time of the Lazard Freres fairness opinion, the consideration that Pan Am had agreed to accept for the Purchased Assets was $310 million plus the assumption of certain Pan Am liabilities. Joint Ex. 2 at DP010514.

"words and deeds" at the time of the agreement. *See R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984); *Teachers Ins.*, 670 F.Supp. at 499; *Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 788 (Tex.Ct.App.1987) (interpreting New York law), *cert. dismissed*, 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988).

In determining whether a preliminary agreement is enforceable, courts generally consider: (i) the language of the agreement; (ii) the context of the negotiations; (iii) the existence of open terms; (iv) partial performance; and (v) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989); *see also Weinreich*, 850 F.Supp. at 1177; *P.A. Bergner*, 823 F.Supp. at 156; *Texaco*, 729 S.W.2d at 788–89.

■ A party who claims that a preliminary commitment is not binding bears the burden of proving that the other parties to the agreement "should have known that the disclaiming party did not intend to be bound before the [definitive documentation] was signed." *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

■ The parol evidence rule, which applies to fully-integrated contracts, *see Mastrangelo v. Kidder, Peabody & Co., Inc.*, 722 F.Supp. 1126, 1131 (S.D.N.Y.1989), does not apply to the question of the enforceability of "binding preliminary commitments," *see P.A. Bergner*, 823 F.Supp. at 156–58; *Chrysler Capital*, 697 F.Supp. at 800; *Teachers Ins.*, 670 F.Supp. at 498–502; *Four Seasons Hotels Ltd. v. Vinnik*, 127 A.D.2d 310, 316–18, 515 N.Y.S.2d 1, 5–6 (1st Dep't 1987); E. Allan Farnsworth, *Precontractual Liability and Preliminary Commitments: Fair Dealing and Failed Negotiations*, 87 Colum.L.Rev. 217, 261–62 n. 186 (1987) ("It is particularly difficult to see how the parol evidence rule, which is premised on an en-

forceable integrated agreement, could bar evidence to show that an agreement is enforceable."). Accordingly, the Court has considered the testimony of witnesses as to the content of the October 22 Agreement as well as the August 11 Agreement.

(2) *The August 11 and October 22 Agreements were Binding Preliminary Commitments*

The evidence at trial demonstrates that the August 11 Letter Agreement, and the October 22 Letter Agreement which effectively superseded it, were "binding preliminary commitments" which contractually obligated Delta to negotiate toward an investment in Pan Am II in accordance with the major terms agreed upon among Delta, Pan Am and the Creditors Committee on those dates.

(a) *The Language of the Agreements*

In examining the language of the August 11 and October 22 Letter Agreements, a key inquiry is whether Delta expressly reserved its right *not* to be bound. *See Arcadian*, 884 F.2d at 72–73; *Weinreich*, 850 F.Supp. at 1177.

Both documents—letters which Delta drafted—use the phrase "Agreed and accepted" to signify agreement by Pan Am and the Committee. Such language evidences an intention to be bound. *See Tribune*, 670 F.Supp. at 499; *Ward v. Pricellular Corp.*, No. 90 Civ. 5214 (MGC), 1991 WL 64043, at *7 (S.D.N.Y. Apr. 16, 1991); *Four Seasons Hotels*, 127 A.D.2d at 322, 515 N.Y.S.2d at 9.

Contrary to Delta's argument, the fact that the August 11 Letter Agreement states that Delta's investment in Pan Am II is subject to, among other things, definitive documentation is not dispositive on the issue of whether the August 11 Agreement is binding. As noted, preliminary commitments may be binding on the parties notwithstanding the need for such documentation.

The October 22 Agreement provides that, subject to certain conditions, Delta shall make an equity investment of $50 million[57]

---

57. "Delta will, subject to an order of the Bankruptcy Court approving such financing in form and substance satisfactory to Delta and subject to the conditions set forth ... below, advance to

Pan Am up to $50 million in debtor in possession ("DIP") financing on the terms and conditions described in the draft DIP agreement to be approved by the Bankruptcy Court on October 22,

and "shall purchase $155 million principal amount of Senior Notes" (Joint Ex. 9 at DP16893), and will provide the $100 million Working Capital Facility (*see* Joint Ex. 9 at DP16896).

The numerous exhibits to the October 22 Agreement—including draft term sheets which contain many of the terms of the Senior Notes and Working Capital Facility, a form of Stock Subscription Agreement, and new by-laws for Pan Am II—further demonstrate that, as of October 22, the parties had committed themselves to pursuing Pan Am's reorganization in good faith. Delta's counsel Lawrence Handelsman stated as much in his November 7 and 12 letters to Mr. Marcus for the Committee.[58] This practice is consistent with the testimony of Delta's senior management.

(b) *The Context of the Negotiations*

The context of the negotiations of the August 11 and October 22 Agreements also establish that the parties intended those agreements to be binding.

The August 11 Agreement resulted from negotiations coordinated by the Creditors Committee, which had made clear to Delta and Pan Am in late July that it would not support the proposed asset sale unless Delta also committed to participate in financing a plan of reorganization. Delta's August 11 proposal to the Committee was intended to secure the Committee's support. Indeed, the Committee specifically rejected the sort of non-binding proposal that Delta's counsel now characterizes the August 11 Agreement to be. Defendant's argument that by that agreement Delta did not intend to make a binding commitment to proceed with Pan Am II is rejected.

Delta's conduct following the execution of the August 11 Agreement underscores the conclusion that a binding preliminary agreement existed. Delta immediately issued a press release stating that it had reached an "agreement" with the Committee and that "Delta will make investments in the reorganized Pan Am." *See Texaco*, 729 S.W.2d at 789–90 (court recognizes intent to be bound as evidenced in press release announcing multi-billion dollar transaction which uses words indicative of commitment, such as "will," rather than subjective or hypothetical terms). Delta also referred to the August 11 Agreement as an "agreement" in its Board of Directors' minutes and SEC filings. Such contemporaneous characterizations may be "helpful indicators of the parties' intentions." *Tribune*, 670 F.Supp. at 497.

Delta accompanied Pan Am and the Creditors Committee to bankruptcy court on August 12 to present the August 11 Agreement to Judge Blackshear. "[B]ecause the parties' agreement in this case was reached in the context of a judicial sale, it is deemed binding as a matter of law." *Winston Inn & Restaurant Corp. v. DeMichiel (In re Winston Inn & Restaurant Corp.)*, 120 B.R. 631, 636 (E.D.N.Y.1990).

The context of the negotiations of the October 22 Agreement likewise shows that it was a binding preliminary commitment. The October 22 Agreement was executed just two days before the filing of the Disclosure Statement and Joint Plan of Reorganization. Many detailed terms of Delta's proposed investment in Pan Am II needed to be finalized so that they could be addressed in the Disclosure Statement. Although the Common Stock Purchase Agreement, Senior Note Purchase Agreement and Working Capital Facility Agreement required further additions and modifications and remained to be finalized through negotiation, Delta's counsel acknowledged in a letter on November 7, 1991 that the economic terms of Delta's investment were fully set forth in the October 22 Agreement, and that the preparation of

---

1991 attached hereto...." Joint Ex. 9 at DP016892.

**58.** Mr. Handelsman, Delta's outside counsel, reported that as of November 7, "Delta remains committed to confirmation of the plan of reorganization of Pan Am and to ensuring that Pan Am emerges from Chapter 11 as a strong and viable company." Def.Ex. CY at D385471. Several days later, on November 12, Mr. Handelsman represented that "Delta is committed to proceed to confirmation of a plan in accordance with the terms agreed upon in October without any material changes to those terms." Pl.Ex. 2050.

loan documents should not be difficult.[59]

### (c) Partial Performance

The consummation of the sale of the Shuttle Assets on September 1 and the Atlantic Assets on November 1 further evidences that the parties intended Delta's commitment to Pan Am II to be a binding one. As noted previously, the parties discussed Delta's investment in Pan Am II during the negotiations surrounding the Asset Sale by agreeing to invest in Pan Am II. Delta's subsequent purchase of those assets is thus deemed partial performance of its binding preliminary commitments with Pan Am and the Committee.

### (d) The Existence of Open Terms

Although some open terms existed as of October 22—including the content of certain financial covenants—such terms did not render the October 22 Agreement non-binding. Indeed, Delta's counsel acknowledged in early November that the material economic terms of Delta's investment had already been agreed upon.[60]

### (e) Customary Form of Such Transactions

Although the August 11 Agreement, including the attached term sheet, comprises only eleven pages, the October 22 Agreement, including exhibits, is more than 150 pages in length. It is a substantial document setting forth material terms of the agreement among Delta, Pan Am and the Committee as well as the increased DIP financing agreed to by Delta. The agreement is tailored to a major transaction of the kind contemplated by the parties in the circumstances they then faced. Due to the exigencies facing the parties, the October 22, 1991 Agreement although conditional was binding on the parties.

### B. Delta Did Not Repudiate Any Contractual Obligation

██ "The repudiation of a party's duties under a contract must be 'positive and unequivocal' in order to establish an anticipatory breach." *Reprosystem, B.V. v. SCM*

*Corp.*, 630 F.Supp. 1099, 1101 (S.D.N.Y.1986) (citing *Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145, 408 N.Y.S.2d 36, 379 N.E.2d 1166 [1978]); *see Garcia v. Chase Manhattan Bank, N.A.*, 735 F.2d 645, 648 (2d Cir. 1984); *Gittlitz v. Lewis*, 28 Misc.2d 712, 713, 212 N.Y.S.2d 219 (Sup.Ct. New York Cty.), *app. denied*, 13 A.D.2d 829, 218 N.Y.S.2d 942 (1961).

"An offer to perform in accordance with the promisor's interpretation of the contract although erroneous, if made in good faith, is not such a clear and unequivocal refusal to perform as amounts to a renunciation giving rise to an anticipatory breach." *Kimel v. Missouri State Life Ins.*, 71 F.2d 921, 923 (10th Cir.1934); *see also Bausch & Lomb Inc. v. Sonomed Technology, Inc.*, 780 F.Supp. 943, 963 (E.D.N.Y.) (alleged repudiation had valid basis in law and fact as reaffirmation of rights), *aff'd in relevant part*, 977 F.2d 720 (2d Cir.1992); *see New York Life Ins. Co. v. Viglas*, 297 U.S. 672, 676, 56 S.Ct. 615, 616, 80 L.Ed. 971 (1936).

The Joint Plan provided that the Working Capital Facility Agreement, the Senior Note Purchase Agreement and the Stock Subscription Agreement would become effective on the Effective Date of the Joint Plan. Joint Ex. 12 at D378308–09.

If the Joint Plan had been confirmed and a confirmation order entered on December 3, 1991, the "Effective Date" of the Joint Plan likely would have been on December 14, 1991, the first business day following the expiration of the ten-day appeal period provided for under Bankruptcy Rule 8002(a) thereby causing the confirmation order to become a "Final Order." Joint Ex. 12 at D378296–97.

Based on the circumstances that existed upon completion of the confirmation hearing, the parties might have agreed to an Effective Date earlier than December 14, 1991. Such an agreement would depend on developments at the confirmation hearing. Unions and major creditors could oppose the reorganiza-

---

**59.** In his letter of November 7, Mr. Handelsman stated that "the economic terms of the [financing] are set forth in detail in our agreement of October 22," and that "[f]inalization of those documents should not be difficult...." Def.Ex. CY at D385475.

**60.** *See* note 67 (*Paul v. Monts*), *infra.*

tion making Pan Am II not viable. Accordingly Delta, who was making an investment of over $300 million, was not in a position to agree to an early effective date in advance of a confirmation hearing.

No agreement ever existed among the parties that a Delta investment in Pan Am II would occur on December 4, 1991. No term of the August 11 Letter, the October 22 Letter Agreement, the Joint Plan or the Disclosure Statement required or indicated that a closing occur on December 4, 1991. Joint Ex. 5; Joint Ex. 9; Joint Ex. 12. Indeed, for Plaintiffs to contend that Delta had committed to invest $300 million on December 4, 1991 not only flies in the face of the language of the Joint Plan of Reorganization, but would require the Court to find that Delta and its very experienced attorneys were grossly stupid.

The mootness clause in the definition of "Final Order" does not result in an Effective Date of December 4, 1991. Joint Ex. 9 at DP016936-37. Funding under the proposed agreements would not have rendered all possible appeals of a confirmation order moot. *See Frito–Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.),* 10 F.3d 944, 953–54 (2d Cir.1993); *Spirtos v. Moreno (In re Spirtos),* 992 F.2d 1004, 1006–07 (9th Cir.1993); *In re Andreuccetti,* 975 F.2d 413, 418–19 (7th Cir.1992).

The Disclosure Statement is the most accurate reflection of the parties' contemporaneous understanding of the proposed transactions. The Disclosure Statement recognizes that a Delta investment in Pan Am II would occur on the Effective Date of the Joint Plan, which was expected to occur "no earlier than approximately ten days after the date the Bankruptcy Court confirms the Plan," Joint Ex. 12 at D378174, and as late as December 15, 1991, *id.* at D378170.

Any statements in December by Delta that Delta would not provide funding to Pan Am prior to the Effective Date of the Joint Plan and any request on November 30 or in December by Pan Am and the Creditors Committee for funding earlier than the Effective Date were consistent with the parties' understanding of when funding would occur under the terms that had previously been negotiated in October.[61]

 C. *Pan Am did not Satisfy, and was not Ready, Willing and Able to Satisfy the Conditions Precedent to any Delta Funding Obligation*

■ Any Delta investment in Pan Am II was subject to certain conditions precedent that were to be included in the Working Capital Facility Agreement, the Senior Note Purchase Agreement and the Stock Subscription Agreement. The conditions precedent were described in an attachment to the October 22 Letter Agreement and to the Joint Plan. Joint Ex. 9 at DP016942-50; Joint Ex. 12 at D378427; *see also* Joint Ex. 12 at D378318-19 (setting forth similar conditions to the effectiveness of the Joint Plan).

"A condition precedent [to a contract] is one which must be performed before ... the other party is obligated to perform. If the condition remains unsatisfied, the obligations of the parties are at an end." *Lester v. Resolution Trust Corp.,* 994 F.2d 1247, 1254 (7th Cir.1993) (citation omitted); *see also Merritt Hill Vineyards Inc. v. Windy Heights Vineyard, Inc.,* 61 N.Y.2d 106, 113, 472 N.Y.S.2d 592, 596, 460 N.E.2d 1077 (1984); *805 Third Ave. Co. v. M.W. Realty Assocs.,* 58 N.Y.2d 447, 452–53, 461 N.Y.S.2d 778, 781, 448 N.E.2d 445, 448 (1983); Restatement (Second) of Contracts § 224 (1981).

"[I]f the occurrence of a condition is required by the agreement of the parties, rather than as a matter of law, a rule of strict compliance traditionally applies." *Wakefield v. Northern Telecom, Inc.,* 769 F.2d 109, 113 (2d Cir.1985) (citing Farnsworth, *Contracts,* § 8.3 at 544 [1982] ), *modified after remand on other grounds,* 813 F.2d 535 (2d Cir.1987).

---

61. Even if Delta's statements did not represent both parties' understanding, they at least represented Delta's good faith understanding of its obligations, and do not constitute a repudiation. *See Bausch & Lomb, Inc. v. Sonomed Technology, Inc.,* 780 F.Supp. 943, 963 (E.D.N.Y.), *aff'd in relevant part,* 977 F.2d 720 (2d Cir.1992); *see also New York Life Ins. Co. v. Viglas,* 297 U.S. 672, 676, 56 S.Ct. 615, 616, 80 L.Ed. 971 (1936) (Cardozo, J.).

No Delta obligation to provide the funding to Pan Am II on the Effective Date ever arose because Pan Am did not satisfy the conditions precedent to any such obligation. It is noteworthy that with respect to most of these conditions, no evidence was presented that Pan Am ever notified Delta that they had been satisfied.

The first condition that Pan Am was obligated to meet was that the Plan of Reorganization be confirmed. The plan of reorganization was never confirmed. Indeed at Pan Am's request no hearing was held.

Another condition precedent that was not satisfied was that new collective bargaining agreements be "in full force and effect." At the time of the confirmation hearing at least three of Pan Am's five unions—FEIA, IUFA and TWU—had not ratified new collective bargaining agreements in accordance with the provisions of their respective constitutions and/or by-laws and had not taken any steps to institute ratification.

Failure to abide by the union ratification provisions exposed any purported collective bargaining agreement to challenge and nullification by the union memberships. *See Livingston v. International Ass'n of Bridge, Structural and Ornamental Iron Workers,* 647 F.Supp. 723, 726 (W.D.N.C.1986); *Parker v. Local 413, Int'l Bhd. of Teamsters,* 501 F.Supp. 440, 451 (S.D.Ohio 1980), *aff'd,* 657 F.2d 269 (6th Cir.1981).[62]

Pan Am II's viability and the viability of Delta's investment in it were dependent on collective bargaining agreements being in place for a four year period.[63] Plaintiffs contend that Pan Am was excused from securing the required union agreements because of Delta's "unjustified repudiation" prior to confirmation. *See King World Productions, Inc. v. Financial News Network, Inc.,* 660 F.Supp. 1381, 1386–87 (S.D.N.Y.) (Weinfeld, J.) (proof required of tenant that it was ready, willing and able to perform sublease did not include futile submission to landlord for approval), *aff'd,* 834 F.2d 267 (2d Cir. 1987). However, as discussed above in Section VIII(B), Delta's statements did not constitute a repudiation, and thus Pan Am was not excused from obtaining the union agreements.

D. *Pan Am's Failure to Satisfy the Conditions Precedent to any Delta Funding Obligation was not Caused by Delta*

◼ Even if Pan Am were excused from performing the conditions precedent to any Delta obligation to provide funding to Pan Am II, Pan Am was not ready, willing and able to satisfy those conditions. Delta therefore cannot be held liable for breach of such an obligation. *See Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 523 (2d Cir.1990); *Record Club of America, Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1275 (2d Cir.1989); *Penthouse Int'l, Ltd. v. Dominion Fed. Savings & Loan Assoc.,* 855 F.2d 963, 979 (2d Cir.1988), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 154 (1989); *Helmsley–Spear, Inc. v.*

---

**62.** Plaintiffs contend that approval by the leadership of two unions (the FEIA and TWU) constituted binding agreements because "a union may be responsible for the actions of its agents if third parties dealing with the agents reasonably believe the acts to be authorized." *Kozera v. Westchester–Fairfield Chapter of Nat'l Electrical Contractors Ass'n, Inc.,* 909 F.2d 48, 54 (2d Cir.1990) (citing *NLRB v. Local 815,* 290 F.2d 99, 103 [2d Cir.1961] ), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 956, 112 L.Ed.2d 1044 (1991). However, Pan Am did not advise Delta of any such union approvals, and the evidence did not establish that Pan Am's management reasonably believed these approvals were authorized. Thus they did not constitute binding agreements.

**63.** To proceed to invest over $300 million without union agreements in place for that period would have been poor business judgment. Pan Am could have moved the Bankruptcy Court to invoke its powers under Bankruptcy Code Section 1113(e) to issue an "interim" modification of the proposed agreements, but it did not, and in any event such a modification would not have insured labor peace during the period required for Delta to make a safe investment of over $300 million. *See In re Ionosphere Clubs, Inc.,* 139 B.R. 772, 780–81 (S.D.N.Y.1992) (relief under § 1113(e) must be temporary in nature); *In re United Press Int'l, Inc.,* 134 B.R. 507, 514 (Bankr. S.D.N.Y.1991) (same); *Truck Drivers Local 807, Int'l Bhd. of Teamsters v. Carey Transp. Inc.,* 816 F.2d 82, 89–90 (2d Cir.1987); *In re Garofalo's Finer Foods, Inc.,* 117 B.R. 363, 374 (Bankr. N.D.Ill.1990) ("interim" relief imposed under § 1113 for approximately one month).

*Westdeutsche Landesbank Girozentrale,* 721 F.Supp. 43, 45 (S.D.N.Y.1989).

### (1) *Feasibility*

▉▉▉ Under Section 1129 of the Bankruptcy Code, a plan of reorganization cannot be confirmed if it is not feasible, *i.e.,* if confirmation of the plan is "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor...." 11 U.S.C. § 1129(a)(11) (1994). To establish feasibility, the debtor must present "proof through reasonable projections that there will be sufficient cash flow to fund the plan and maintain operations according to the plan. Such projections cannot be speculative, conjectural or unrealistic." James F. Queenan, Jr. *et al.,* 5 *Chapter 11 Theory & Practice* § 30.04 (1st ed. 1994) (citing *In re Nelson,* 84 B.R. 90, 93 (Bankr.W.D.Tex. 1988)); *see also In re SM 104 Ltd.,* 160 B.R. 202, 234–37 (Bankr.S.D.Fla.1993).

As a result of its deteriorated financial condition and the reduced operational projection for Pan Am II on December 3, 1991, a material adverse change had affected Pan Am's operations and projections, and Pan Am was unable to provide the required evidence at confirmation that there would be sufficient cash flow to fund and maintain operations under the Business Plan to establish the feasibility of the Business Plan as required under the Joint Plan (*see* Section III, *supra* ).

### (2) *Administrative Solvency*

Section 1129 also requires the sponsor of a plan of reorganization to prove that:

> Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—
>
> (A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim ...

11 U.S.C. § 1129(a)(9)(A). This requirement has been referred to as "administrative solvency."

On December 3, 1991, Pan Am and the Creditors Committee were unable to establish the "administrative solvency" of the Pan Am estate. Indeed, the record establishes that the estate was "administratively insolvent" at that time (*see* Section II(F)(2), *supra* ).

### IX. *PLAINTIFFS' CLAIM FOR BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING (COUNT VI)*

### A. *Overview of Duty of Good Faith and Fair Dealing*

▉▉▉ Under New York law, there exists in every contract a covenant of good faith and fair dealing. *See Carvel Corp. v. Diversified Management Group, Inc.,* 930 F.2d 228, 230 (2d Cir.1991); *Filner v. Shapiro,* 633 F.2d 139, 143 (2d Cir.1980); *Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933).

▉▉ The covenant of good faith and fair dealing precludes parties to a contract from engaging in conduct that will destroy or injure the right of the other party to receive the benefits of the contract. *See Filner,* 633 F.2d at 143 (citing *Kirke La Shelle Co.,* 263 N.Y. at 87, 188 N.E. 163); *see also Reprosystem, B.V. v. SCM Corp.,* 522 F.Supp. 1257, 1279 (S.D.N.Y.1981) (duty of good faith "required [defendant] to act otherwise than to single-mindedly bail out of what it came to see as a bad deal"), *rev'd on other grounds,* 727 F.2d 257 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

▉▉ Although the duty of good faith and fair dealing may not be used to vary an express term of the parties' agreement, *see Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 304–05, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 90–91 (1983), where the agreement provides the parties with discretion that discretion must be exercised consistent with the purpose of the agreement, *see Bank of China v. Chan,* 937 F.2d 780, 789 (2d Cir.1991) (party's actions may implicate covenant of good faith when it acts so directly to impair value of contract for another party that actions may be assumed to be inconsistent with parties' intent); *Carvel,* 930 F.2d at

231–32 (although distributorship agreement gave Carvel "considerable discretion" with regard to advertising, store location and other matters, discretion did not relieve Carvel of duty to act in good faith); *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 923 n. 8 (2d Cir.1977) (although contract gave music publisher discretion to expend promotional funds, that discretion was not absolute, but was required to be exercised in good faith); *see also* Restatement (Second) of Contracts § 205 cmt. a (1981) (good faith performance "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party").

Delta did not breach its duty of good faith and fair dealing under either the August 11 Letter or the October 22 Letter Agreement. Both the August 11 Letter and the October 22 Letter Agreement were negotiated in good faith and carried out in good faith by Delta (*see* Section II(C), *supra*).

Delta did not prevent the completion of negotiations of the Working Capital Facility Agreement, the Senior Note Purchase Agreement or the Stock Subscription Agreement. Numerous open issues caused in part by the lower projections of income and increased expenses' material adverse effect on the Business Plan remained with respect to those draft agreements on December 3, 1991. Pan Am was responsible for the parties' inability to resolve at least three of those open issues—the ratios to be used under the proposed financial covenants, the refusal of Pan Am's counsel to provide a requested opinion letter on a material issue, and the lack of required schedules of assets needed for Delta to obtain and perfect a valid and enforceable security interest in connection with those agreements. Thus Pan Am's conduct prevented the preparation of the definitive documentation for use at the confirmation hearing (*see* Section III, *supra*).

"The parties' contractual rights and liabilities may not be varied, nor their terms eviscerated, by a claim that one party has exercised a contractual right but has failed to do so in good faith." *National Westminster Bank U.S.A. v. Ross*, 130 B.R. 656, 679 (S.D.N.Y.1991) (citations omitted) (dismissing claim for breach of duty of good faith under loan agreement where lender had contractual right to refuse to lend funds), *aff'd* 962 F.2d 1 (2d Cir.1991); *see Sharma v. Skaarup Ship Mgmt. Corp.*, 699 F.Supp. 440, 449 (S.D.N.Y. 1988) (bank's exercise of its contractual right to refuse to approve charter parties was not a breach of duty of good faith), *aff'd*, 916 F.2d 820 (2d Cir.1990), *cert. denied*, 499 U.S. 907, 111 S.Ct. 1109, 113 L.Ed.2d 218 (1991). Thus Delta's failure to agree to commit to go forward with financing Pan Am II prior to the Effective Date was not an act of bad faith.

Delta also did not breach the implied duty of good faith and fair dealing by declining to provide Pan Am with additional financing under the amended Loan Agreement. Under the terms of the amended Loan Agreement, Delta was not obligated to provide such additional DIP financing. Joint Ex. 10 at D369810.

Delta did not breach the implied duty of good faith by declining to commit to provide funding for Pan Am II prior to the satisfaction of the conditions precedent prior to the Effective Date of the Joint Plan. Delta's position was fully consistent with the provisions of the Joint Plan. Delta's position was also consistent with the parties' understanding of the proposed transactions as reflected in the Disclosure Statement.

Delta's other actions during the period from August 12 through December 4, 1991 reflect continuing efforts by Delta to work toward the consummation of the proposed Delta investment in Pan Am II (*see* Section II(C), *supra*).

## X. *PLAINTIFFS' CLAIM FOR PROMISSORY ESTOPPEL (COUNT VII)*

### A. *Elements of Claim for Promissory Estoppel*

■ To state a claim for promissory estoppel under New York law, a plaintiff must establish "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance." *Totalplan Corp. of Am. v. Colborne,*

14 F.3d 824, 833 (2d Cir.1994) (citation omitted); *see also City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 48–49 (2d Cir.1988). Plaintiffs have not made this showing.

In New York, the doctrine of promissory estoppel applies both in situations where there purports to be a signed writing between the parties governing their conduct and in situations where no writing exists. *See e.g., Arcadian Phosphates,* 884 F.2d at 73–74; *Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co.,* 804 F.2d 787, 793–95 (2d Cir.1986); *Cyberchron Corp. v. Calldata Sys. Dev., Inc.,* 831 F.Supp. 94, 113–15 (E.D.N.Y.1993); *P.A. Bergner & Co. v. Martinez,* 823 F.Supp. 151, 160–61 (S.D.N.Y. 1993); *Marilyn Miglin, Inc. v. Gottex Indus., Inc.,* 790 F.Supp. 1245, 1251–53 (S.D.N.Y.1992); *Triology Variety Stores, Ltd. v. City Prods. Corp.,* 523 F.Supp. 691, 696–98 (S.D.N.Y.1981).

Parol evidence is not admissible to vary or interpret plain and unambiguous terms of a written agreement. *Randolitz v. Neptune Paper Prods.,* 22 N.Y.2d 383, 386–87, 292 N.Y.S.2d 878, 881, 239 N.E.2d 628, 630–31 (1968). "Where the plain writing is inconsistent with the alleged prior oral agreement there is no basis for a claim of an estoppel...." *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 447 (2d Cir. 1985) (quoting *Ginsberg v. Fairfield–Noble Corp.,* 81 A.D.2d 318, 322, 440 N.Y.S.2d 222, 225 [1st Dep't 1981]).

Under New York law, there can be no "clear and unambiguous promise" where the promise is explicitly made conditional or contingent on some future event. *See In re Gulf Oil/Cities Service Tender Offer Lit.,* 725 F.Supp. 712, 735 (S.D.N.Y.1989) ("Although plaintiffs would like to pretend the [disclaimers] made in the Offer to Purchase do not exist, promissory estoppel, as an equitable measure, does not allow parties to pick and choose which statements they prefer to hear.").

Any Delta promise to invest in Pan Am II was subject to confirmation of a Pan Am plan of reorganization that was satisfactory to Delta and to various other conditions precedent. Joint Ex. 5 at 6; Joint Ex. 9 at DP016943; Joint Ex. 12 at D378319 and DP378428–29. There was no "clear and unambiguous promise" by any Delta representative that Delta would provide funding to Pan Am II without satisfaction of the conditions precedent.

Any reliance by Pan Am or the Creditors Committee on Delta's alleged oral statements that funding would occur on December 4, 1991 was unreasonable. The Joint Plan and Disclosure Statement, which was filed with the Bankruptcy Court after the alleged conversations relied upon by the Plaintiffs, directly contradict the statements allegedly made by one or two representatives of Delta that Delta would provide funding on December 4, 1991. *See* Joint Ex. 12 at D378170, D378174, D378203, D378308.

In addition, throughout the relevant period the Plaintiffs were aware of the likelihood of a ten-day period before the Effective Date of the Joint Plan. At all times, the Plaintiffs were also aware that Pan Am's reorganization efforts might not succeed, and that Pan Am might not even survive until a confirmation hearing. The October 22 Letter Agreement recognized the possibility that the Pan Am Plan of Reorganization might not be confirmed. Joint Ex. 9 at DP016893. Similarly, the Disclosure Statement issued by Plaintiffs warned in bold type (1) that Pan Am might not survive until the Effective Date of the Joint Plan and (2) that the Joint Plan might not be confirmed. Joint Ex. 12 at D3783170–71.

The Plaintiffs did not act to their detriment in reliance on any promises by Delta. In selecting Delta's proposal on August 11 instead of other proposals, Pan Am and the Creditors Committee did no more than select the party with whom it would proceed in good faith toward a final agreement. The proposals of other bidders were subject to risks and uncertainties similar to those in the Delta proposal.

Therefore, the Court denies Plaintiffs' claim based on promissory estoppel.

## XI. *PLAINTIFFS' CLAIM FOR BREACH OF FIDUCIARY DUTY (COUNT VIII)*

### A. *Elements of Claim for Breach of Fiduciary Duty*

In order to prove a claim for breach of fiduciary duty, Plaintiffs must dem-

onstrate (1) the existence of a fiduciary relationship between the parties, and (2) a breach of the fiduciary duty. *See Cramer v. Devon Group, Inc.*, 774 F.Supp. 176, 184 (S.D.N.Y.1991).

■ It is well-settled that a debtor/creditor relationship alone does not create a fiduciary relationship. *See, e.g., Official Publications Inc. v. Kable News Co.*, 775 F.Supp. 631, 638 (S.D.N.Y.1991). There must be an additional showing of "a relationship of confidence, trust, or superior knowledge or control." *Broadway Nat'l Bank v. Barton–Russell Corp.*, 154 Misc.2d 181, 197, 585 N.Y.S.2d 933, 945 (Sup.Ct.N.Y.County 1992) (citations omitted).

■ Once a fiduciary duty is established, it is breached by the fiduciary party's conduct which, while potentially acceptable in an arms-length transaction in the marketplace, prejudices the party to whom the duty is owed.

The [fiduciary] relationship requires that "[n]either party may exert influence or pressure upon the other or take selfish advantage of the trust in such a way as to benefit himself or prejudice the other." A breach of fiduciary duty has occurred when influence has been acquired and abused and when confidence has been reposed and retained.

*Richardson Greenshields Sec., Inc. v. Mui–Hin Lau*, 693 F.Supp. 1445, 1456 (S.D.N.Y. 1988) (citations omitted).

■ Distinct from a breach of contract claim, a claim for breach of fiduciary duty need not meet the standard requirements of causation and damages. *See Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir.1994). "An action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach—not simply to compensate for damages in the event of a breach." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 995–96 (2d Cir.1983) (citing *Diamond v. Oreamuno*, 24 N.Y.2d 494, 498, 301 N.Y.S.2d 78, 81, 248 N.E.2d 910, 912 [1969] ).

**B.** *The Existence of a Fiduciary Duty*

■ There is no rigid formula for determining the existence of a fiduciary relationship.

Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one [person] trusts in, and relies upon, another.

*Penato v. George*, 52 A.D.2d 939, 942, 383 N.Y.S.2d 900, 904–05 (2d Dep't 1976) (citations omitted). Therefore, a fiduciary duty may exist in less formal situations than the traditional fiduciary relationship. *See TP Group, Inc. v. Wilson*, No. 89 Civ. 2227, 1990 WL 52131, at *3 (S.D.N.Y. April 17, 1990) (citing *Penato v. George* ).

■ The existence of a contractual relationship between two parties does not preclude the finding of a fiduciary relationship as well. A fiduciary duty between two parties may exist independent of their contractual relationship. *See Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50, 57, 529 N.Y.S.2d 279, 283 (1st Dep't 1988). But when "parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *National Westminster Bank U.S.A. v. Ross*, 130 B.R. 656, 679 (S.D.N.Y.1991) (no fiduciary relationship between bank and borrower) (citations omitted), *aff'd*, 962 F.2d 1 (2d Cir.1991); *see Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 122 (2d Cir. 1984) (close debtor-creditor relationship did not give rise to fiduciary duty). An ordinary contract is generally insufficient to give rise to a special relationship. *Congress Financial Corp. v. John Morrell & Co.*, 790 F.Supp. 459, 474 (S.D.N.Y.1992).

No "extraordinary circumstances" exist in this action to justify the imposition of a fidu-

ciary duty as opposed to a duty to proceed in good faith upon Delta.[64]

Throughout its negotiations with Pan Am, Delta was an arm's length third-party with respect to Pan Am. Although Delta was in close contact with Pan Am during that period in connection with the ongoing and proposed transaction between the two companies, Delta did not exert control over Pan Am or otherwise usurp the role of Pan Am's own management in directing its operations.

■ Further, a fiduciary relationship generally cannot be implied between parties to a commercial transaction when each party is represented by counsel and other professional advisors who have been retained to protect their best interests. *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 739 (2d Cir.1984).

Pan Am and the Creditors Committee were each represented by sophisticated outside counsel and professional financial and investment advisors throughout their negotiations with Delta. In addition, throughout the period, Pan Am was represented by its own General Counsel and legal staff.

The Court denies Plaintiffs' claim based on a breach of fiduciary duty by Delta.

## XII. *LOSS OF UNSECURED CREDITORS' INTEREST IN PAN AM (COUNT IX: UNJUST ENRICHMENT)*

Count IX is asserted by the Creditors Committee on behalf of Pan Am's unsecured creditors seeking to recover as compensatory damages the value of the 55% equity interest in Pan Am II that the unsecured creditors would have received had Pan Am II come into existence. This Count also seeks punitive damages, but does not allege any facts or seek any relief other than that also alleged by Plaintiffs pursuant to Counts V through VIII. Accordingly, the findings of fact and conclusions of law relating to Count V

through VIII control for Count IX, and the claim is dismissed as unproven.

## XIII. *DELTA'S COUNTERCLAIM AGAINST PAN AM*

■ In connection with the amended Loan Agreement, the Bankruptcy Court granted Delta "a valid, enforceable and perfected security interest in and lien upon all of the Collateral of" Pan Am, subject to certain permitted prior liens. Def.Ex. AW at ¶ 9; Def.Ex. AX at ¶ 9; Def.Ex. BB at ¶ 9; Def. Ex. BC at ¶ 9. The Bankruptcy Court also ordered that any claims by Delta arising under the amended Loan Agreement which were not secured would be granted administrative priority under Section 507(a)(1) of the Bankruptcy Code. Def.Ex. AW at ¶ 8; Def. Ex. AX at ¶ 8; Def.Ex. BB at ¶ 8; Def.Ex. BC at ¶ 8.

By failing to repay to Delta outstanding principal and interest under the amended Loan Agreement on December 5, 1991, Pan Am breached that agreement.

The Pan Am assets in which Delta has a valid and perfected security interest have been sold by Pan Am, and Delta's liens have attached to the proceeds of such assets, which are still held by Pan Am.

Pan Am has sufficient funds to repay all prior secured claims as well as those of Delta.

Delta is entitled to immediate repayment of all outstanding principal amounts that have been advanced pursuant to the amended Loan Agreement, together with accrued interest at the standard rate of 2½% over Prime Rate for periods prior to December 5, 1991 and at the Default Rate of 4½% over Prime Rate for the period from December 5, 1991 up to and including the date of remittance.

---

**64.** Plaintiffs allege that Delta's knowledge of Pan Am's poor cash position created a fiduciary duty on Delta's part not to take actions to further deplete Pan Am's cash. Knowledge of a party's financial position is inadequate as a matter of law to create a fiduciary relationship. Rather, some form of control over or entrustment of a

party's finances is necessary. *See Chipman v. Steinberg,* 106 A.D.2d 343, 345, 483 N.Y.S.2d 256, 258 (1st Dep't 1984) (to create a fiduciary relationship, one party must entrust its money, property or services with another), *aff'd,* 65 N.Y.2d 842, 493 N.Y.S.2d 129, 482 N.E.2d 925 (1985).

## XIV. *DELTA'S COUNTERCLAIMS AGAINST THE CREDITORS COMMITTEE*

 Delta asserts the following counterclaims against the Creditors Committee: (1) breach of the implied covenant of good faith and fair dealing; (2) tortious interference with Delta's DIP financing agreement with the Debtors; (3) indemnification; and (4) contribution.

Delta has not sustained any of these counterclaims against the Creditors Committee as a matter of law and fact. As set forth below, Delta has failed to prove that it was damaged by the substantial misconduct that Delta alleges. The Creditors Committee, therefore, is entitled to the entry of judgment against Delta on each of Delta's counterclaims.

The Court observes at the outset that, as a general matter, Delta cannot sustain any of its counterclaims against the Creditors Committee unless it demonstrates *causation in fact* by proving, by a preponderance of the evidence, that (1) the Committee committed a wrong, (2) Delta suffered an injury, and (3) the injury was the "certain result of the wrong." *Story Parchment Co. v. Paterson Parchment Paper Co. et al.,* 282 U.S. 555, 562–64, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931); *see also Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946).

The Creditors Committee's behavior toward Delta in making threats to obstruct Delta's interests unless Delta provided increased financing, attempts to renegotiate final executed agreements, threats to Pan Am's President, and threats to tie up Delta in litigation were obstructive of the relationship required if the reorganization was to go forward and Pan Am II was to succeed. These actions by the Chairman of the Creditors Committee undoubtedly created distrust on the part of Delta. However, Delta has not shown that it suffered damage which was caused by those acts. While there was unrebutted evidence that the release of the letter to the *Miami Herald* by a member of the Creditors Committee did adversely affect the operational results and income of Pan Am as well as set back union negotiations by three weeks, thus injuring the prospects for confirmation and Pan Am II's prospects, there is no evidence to demonstrate what damage if any Delta sustained from those acts.

On the evidence presented at trial, Delta failed to satisfy the legal requirements to establish any of its counterclaims.

### A. *The Creditors Committee, Its Duties and Qualified Immunity*

#### (1) *The Creditors Committee's Duties and Powers*

 An official creditors committee is an entity that exists only as a matter of federal bankruptcy law, and only in the context of a case commenced under Chapter 11 of the Bankruptcy Code. *See* 11 U.S.C. §§ 1102, 1103.

An official committee appointed by the United States Trustee under Section 1102(a)(1) of the Bankruptcy Code,[65] such as the Creditors Committee in this case, is authorized by the Bankruptcy Code to perform various activities. Section 1103(c) of the Bankruptcy Code enumerates the powers of a Committee:

A committee appointed under section 1102 of this title may—

(1) consult with the trustee or debtor in possession concerning the administration of the case;

(2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

(3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect

---

**65.** 11 U.S.C. § 1102(a)(1) provides:

As soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.

and file with the court acceptances or rejections of a plan;

 (4) request the appointment of a trustee or examiner under section 1104 of this title [11 U.S.C. § 1104]; and

 (5) perform such other services as are in the interest of those represented.

11 U.S.C. § 1103(c). *See In re Penn–Dixie Indus., Inc.,* 9 B.R. 941, 944 (Bankr.S.D.N.Y. 1981) (committee's powers under Section 1103(c) constitute a "wide and important array of authority and responsibility" in a Chapter 11 case).

In addition, Section 1109 of the Bankruptcy Code provides that, as a party in interest in a Chapter 11 case, a creditors committee "may raise and may appear and be heard on any issue in a case under [Chapter 11]." 11 U.S.C. § 1109(b).

■ An official committee of creditors plays a pivotal role in the bankruptcy process. *See, e.g., In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 717, 722 (Bankr. S.D.N.Y.), *aff'd,* 140 B.R. 347 (S.D.N.Y.1992); *Retail Mktg. Co. v. Northwest Nat'l Bank (In re Mako, Inc.),* 120 B.R. 203, 212 (Bankr. E.D.Okla.1990). The function of an official creditors committee is to aid, assist, and monitor the debtor to ensure that the unsecured creditors' views are heard and their interests promoted and protected. *See Official, Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.),* 984 F.2d 1305, 1315–16 (1st Cir.1993), *quoting In re Daig Corp.,* 17 B.R. 41, 43 (Bankr.D.Minn.1981).

The Creditors Committee owed a fiduciary duty only to the class of creditors it represents, not to the Debtor, Delta, or any other party in the bankruptcy case. *See Bohack Corp. v. Gulf & Western Indus., Inc. (In re Bohack Corp.),* 607 F.2d 258, 262 n. 4 (2d Cir.1979); *In re SeaEscape Cruises, Ltd.,* 131 B.R. 241, 243 (Bankr.S.D.Fla.1991); *In re Microboard Processing, Inc.,* 95 B.R. 283, 285 (Bankr.D.Conn.1989) ("A creditors' com-

mittee and its members owe no duty to the debtor or to the estate.... A committee and the holders of claims who serve on it only have a fiduciary duty to the parties or class represented").

 (2) *Qualified Immunity of the Creditors Committee*

■ Because of its central statutory role in the Chapter 11 process, and to assure the effective representation of its constituency, an official committee such as the Creditors Committee enjoys a qualified immunity that corresponds to, and is intended to further, the Committee's statutory duties and powers. The qualified immunity extends to conduct within the scope of the committee's statutory or court-ordered authority. *Philip v. L.F. Rothschild Holdings (In re L.F. Rothschild Holdings),* 163 B.R. 45, 49 (S.D.N.Y.1994); *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 717, 722 (Bankr.S.D.N.Y.), *aff'd,* 140 B.R. 347 (S.D.N.Y.1992); *Central Transp., Inc. v. Roberto (In re Tucker Freight Lines, Inc.),* 62 B.R. 213, 216, 218 (Bankr.W.D.Mich. 1986). The qualified immunity of an official creditors committee has been recognized to be analogous to that of a bankruptcy trustee to the extent that the committee acts within its statutory authority. *See, e.g., Dana Commercial Credit Corp. v. Nisselson (In re Center Teleprods., Inc.),* 112 B.R. 567, 578 (Bankr.S.D.N.Y.1990); *Central Transp., Inc. v. Roberto (In re Tucker Freight Lines, Inc.),* 62 B.R. 213, 218 (Bankr.W.D.Mich.1986).

The Creditors Committee in the Pan Am case enjoyed a qualified immunity, as a matter of law. In order to overcome the Creditors Committee's qualified immunity and hold the Committee liable for alleged wrongdoing, Delta was required to prove that the Committee engaged in "willful misconduct" or "*ultra vires* activity." *Luedke v. Delta Air Lines, Inc.,* 159 B.R. 385, 392–93 (S.D.N.Y.1993). *See Philip v. L.F. Rothschild Holdings (In re L.F. Rothschild Holdings),* 163 B.R. 45, 49 (S.D.N.Y.1994).[66] Del-

---

**66.** "Willful misconduct" requires a showing of "either 'the intentional performance of an act with knowledge that the performance of that act will probably result in injury' or 'the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences.'" *Republic Nat'l Bank of N.Y. v. East-*

*ern Airlines, Inc.,* 815 F.2d 232, 238–39 (2d Cir. 1987) (citation omitted). "*Ultra vires* actions" require a showing that the conduct was engaged in "without any authority whatever." *Minotti v. Lensink,* 798 F.2d 607, 609 (2d Cir.1986), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987).

ta has failed to prove that the Creditors Committee engaged in willful misconduct or *ultra vires* action or that any alleged wrongdoing by the Committee caused harm to Delta. Although the actions of the Creditors Committee were harmful to the proposed reorganization of Pan Am by December 3, 1991, there is no showing that Delta was harmed thereby.

## XV. *DELTA'S COUNTERCLAIMS FAIL AS A MATTER OF LAW*

### A. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Delta's first counterclaim seeks damages against the Creditors Committee for an alleged breach of the implied covenant of good faith and fair dealing.

The Creditors Committee owed Delta and Pan Am a duty of good faith and fair dealing under the August 11 Letter and October 22 Letter Agreement. *Goodstein Constr. Corp. v. City of New York,* 80 N.Y.2d 366, 373, 590 N.Y.S.2d 425, 430, 604 N.E.2d 1356, 1361–62 (1992).

Delta presented no evidence that the Creditors Committee engaged in actions that prevented Delta from carrying out Delta's obligations—principally DIP funding and the funding of Pan Am II—under the October 22 Agreement or the Joint Plan, the two documents Delta offers as the purported basis for the Committee's alleged duty of good faith. Delta's funding decisions were its own. There is no evidence that the Committee caused Delta to repudiate its funding obligations.

Accordingly, judgment will be entered in favor of the Creditors Committee on Delta's counterclaim for breach of the implied covenant of good faith and fair dealing.[67]

### B. *Tortious Interference with the Loan Agreement*

■ To establish tortious interference with an existing contract under New York

law, a party must allege and prove: (1) the existence of a valid contract, (2) that the third party knew of the contract, (3) that the third party intentionally procured the breach of that contract, and (4) the causation of damages. *See National Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 685–86 (S.D.N.Y.1991), *aff'd,* 962 F.2d 1 (2d Cir. 1992); *see also North Am. Realty Advisory Servs., L.P. v. Flint,* 89 Civ. 5351, 1992 WL 84897 *4 (S.D.N.Y. April 10, 1992); *Hammerhead Enters., Inc. v. Brezenoff,* 551 F.Supp. 1360, 1369 (S.D.N.Y.1982), *aff'd,* 707 F.2d 33 (2d Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983); *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980).

Delta charges that, by virtue of Committee counsel's threats to sue in October and November and his statements on December 2 and 3, 1991 concerning the Committee's intention to prevent the repayment of the DIP Loan, the Creditors Committee interfered with Delta's DIP financing agreement with the Debtors. On the proof adduced at trial, this counterclaim fails as matters of law and fact.

Delta loaned Pan Am $115 million pursuant to the Loan Agreement.

The Creditors Committee was aware of the Loan Agreement and that Delta had loaned Pan Am funds pursuant to that agreement. *See* Pl.Ex. 500; Pl.Ex. 501. The Creditors Committee did not procure the breach of the Loan Agreement. Delta failed to establish that the Creditors Committee induced Pan Am to take any action regarding the DIP financing agreement, let alone to breach the agreement by failing to repay.

The evidence reveals that the Creditors Committee's actions here were motivated by the economic interests of the Pan Am creditors it represented. Accordingly, although threats to abort the agreement and other

---

67. Prior to confirmation and the performance of the conditions to the October 22, 1990 Agreement, the Joint Plan was not binding and did not give rise to a duty of good faith running from the Committee to Delta. *See generally Paul v. Monts,* 906 F.2d 1468, 1471 (10th Cir.1990); *Garsal*

*Realty, Inc. v. Troy Sav. Bank (In re Garsal Realty, Inc.),* 39 B.R. 991, 994 (N.D.N.Y.1984), *aff'd,* 755 F.2d 913 (2d Cir.1985). Delta did not offer any evidence that the Committee proposed the Plan in bad faith.

Creditors Committee actions were not conducive, to say the least, to achieving the Joint Plan of Reorganization they are not actionable. *National Westminster Bank v. Ross*, 130 B.R. 656, 678 (S.D.N.Y.1991), *aff'd sub nom. Yaeger v. National Westminster Bank*, 962 F.2d 1 (2d Cir.1992).

To the extent Delta alleges that counsel to the Creditors Committee threatened to bring a lawsuit to prevent repayment of the DIP Loan, that constitutes merely a threat to exercise a legal right. Such a threat, although improper, does not support a claim for interference with contract. *See Manufacturers Hanover Trust Co. v. Jayhawk Assoc.*, 766 F.Supp. 124, 128 (S.D.N.Y.1991) (threat to insist on one's legal rights does not constitute economic duress).

Judgment will be entered in favor of the Creditors Committee on Delta's counterclaim for interference with contractual relations.

### C. *Indemnification*

Delta seeks indemnification from the Creditors Committee on the ground that the Committee's alleged wrongful acts are the sole cause of any liability of Delta. The evidence does not support this claim.

■ Indemnification arises where there is an express indemnification agreement or where it is implied in contract or in law. *Peoples' Democratic Republic of Yemen v. Goodpasture, Inc.*, 782 F.2d 346, 351 (2d Cir.1986); *In re Poling Transp. Corp.*, 784 F.Supp. 1045, 1048–49 (S.D.N.Y.1992), *modified* (S.D.N.Y. March 11, 1993). Delta has not alleged nor proved an express indemnification agreement.

■ Indemnification which is implied in contract requires that the proposed indemnitor have assumed by contract the duty—and hence the liability for its breach—of the proposed indemnitee to the plaintiff. *Mas v. Two Bridges Assocs.*, 75 N.Y.2d 680, 690, 555 N.Y.S.2d 669, 672, 554 N.E.2d 1257, 1260 (1990). There is no evidence that either of the purported sources of alleged Committee contractual obligations to Delta, the October 22 Agreement or the Joint Plan, creates a

right of indemnification by Delta against the Creditors Committee.

■ The remaining possible basis for implied indemnification alleged by Delta—that the Creditors Committee is the principal wrongdoer and is thus responsible for any liability Delta may have to Plaintiffs—is equally unsupported in law. The law generally implies indemnification only where the indemnitor is *solely* responsible for the wrongdoing for which the indemnitee has been held liable. *Mas*, 75 N.Y.2d at 690, 555 N.Y.S.2d at 674, 554 N.E.2d at 1262; *see also Trustees of Columbia Univ. v. Mitchell/Giurgola Assocs.*, 109 A.D.2d 449, 453, 492 N.Y.S.2d 371, 375 (1st Dep't 1985).

The Court has concluded that Delta is not liable, thus Delta failed to establish any liability which had to be caused *solely* by the Creditors Committee's actions.[68] Having failed to show that the Committee bears sole responsibility for any liability of Delta, judgment must be entered for the Creditors Committee on Delta's counterclaim for indemnification.

### D. *Contribution*

■ Contribution permits the Court to apportion liability among two or more wrongdoers. *See Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 583 N.Y.S.2d 957, 964, 593 N.E.2d 1365, 1371–72 (1992).

■ The right to contribution is not available if the liability for which contribution is sought is for "economic loss" arising from a contract or duties undertaken by contract. *Board of Educ. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 523 N.Y.S.2d 475, 477–78, 517 N.E.2d 1360, 1362–63 (1987). Contribution is only available where the underlying claim sounds in tort. *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 859 F.2d 242, 249–50 (2d Cir.1988) (contract claims do not support contribution even if they are couched in the language of tort); *see also Macmillan, Inc. v. Federal Ins. Co.*, 764 F.Supp. 38, 41 (S.D.N.Y.1991) (contract claims do not support contribution).

**68.** Delta's expenses for this litigation are not solely caused by the Creditors Committee since the action has been pursued by Pan Am in addition to the Creditors Committee.

Delta thus cannot recover contribution with respect to those of Plaintiffs' claims which are contractually-based. These include Plaintiffs' claims for breach of contract, breach of the duty of good faith and fair dealing, and promissory estoppel, Delta's counterclaims for contribution with respect to these claims are dismissed.

Plaintiffs' claim for breach of fiduciary duty, while couched in terms of tort, arises "directly from obligations undertaken by" Delta under Delta's agreements with Pan Am. Accordingly, Delta's liability to Plaintiffs for breach of fiduciary duty is akin to its liability for economic loss resulting from its breach of contract. Therefore, contribution is not available. *Macmillan, Inc. v. Federal Ins. Co.*, 764 F.Supp. 38, 41 (S.D.N.Y.1991); *see also Board of Educ. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 26–28 & n. 2, 517 N.E.2d 1360, 523 N.Y.S.2d 475, 477–78 & n. 2 (1987).

In any event, the Court concludes that there is no evidence that Delta breached a fiduciary duty to Pan Am or that the Creditors Committee contributed to such breach.

Delta's lack of evidence of Committee-caused damage to Delta is fatal to its contribution claim. *See Tri–Ex Enters., Inc. v. Morgan Guar. Trust Co. of N.Y.*, 586 F.Supp. 930, 933 (S.D.N.Y.1984) ("The essential requirement of a claim for contribution under New York law is that both the third-party plaintiff and the third-party defendant share responsibility for an injury in violation of duties they respectively owed to the injured person."). Accordingly, judgment will be entered in favor of the Creditors Committee on Delta's counterclaim for contribution.

Delta seeks repayment of the DIP financing that Delta provided to Pan Am under the Loan Agreement dated October 21, 1991, as amended, and four Bankruptcy Court orders (the "DIP Orders"). On May 20, 1993, the Bankruptcy Court denied Delta's motion to enforce the DIP Orders and instead consolidated Delta's claim for repayment with this action. Upon an appeal by Delta, this Court on December 27, 1993 issued an Opinion and Order remanding the matter back to the Bankruptcy Court for an explanation of the reasons underlying the Bankruptcy Court's

Order. *See Delta Air Lines, Inc. v. Pan Am Corp., et al.*, 162 B.R. 667 (S.D.N.Y.1993). As of today the Bankruptcy Court has not responded to this Court's remand.

## XVI. *CONCLUSION*

Accordingly, it is ordered that the funds loaned by Delta to Pan Am pursuant to the Loan Agreement be repaid with interest by Pan Am's estate to Delta within 10 days of the date of this order.

Enter judgment for Defendant on Plaintiffs' claims and judgment for the Creditors Committee Defendant on Defendant's counterclaim.

IT IS SO ORDERED.